1

2

3

4

5

6

7

8                                      UNITED STATES DISTRICT COURT

9                                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARK BAX and LUCIA PERSHE BAX,                No.  1:17-cv-01348-DAD-SAB

12                          Plaintiffs,

13                  v.                              ORDER GRANTING DEFENDANT TENET
                                                    HEALTHCARE CORPORATION'S MOTION
14   DOCTORS MEDICAL CENTER OF                      FOR SUMMARY JUDGMENT AND
     MODESTO, INC. and TENET                        GRANTING IN PART DEFENDANT
15   HEALTHCARE CORPORATION,                        DOCTORS MEDICAL CENTER OF
                                                    MODESTO, INC.'S MOTION FOR PARTIAL
16                          Defendants.             SUMMARY JUDGMENT

17                                                  (Doc. No. 21)

18

19          This matter came before the court on January 8, 2018 on defendant Tenet Healthcare

20   Corporation's ("Tenet Healthcare") motion for summary judgment, or in the alternative, partial

21   summary judgment, and defendant Doctors Medical Center of Modesto, Inc.'s ("DMC") motion

22   for partial summary judgment.  (Doc. No. 21.)  At the hearing, attorney Andrew Rozynski

23   appeared on behalf of plaintiffs.  Attorney Jeffrey Polsky appeared on behalf of defendants.

24   Following oral argument, the matter was taken under submission.  Having considered the parties'

25   briefs and oral arguments, and for the reasons stated below, the court will grant Tenet

26   Healthcare's motion for summary judgment and grant in part and deny in part DMC's motion for

27   partial summary judgment.

28   /////

                                                     1

## BACKGROUND

Plaintiffs are deaf and communicate primarily in American Sign Language ("ASL"). They contend that defendants discriminated against them by not facilitating effective communication during their separate hospital visits, in violation of Title III of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), the Unruh Civil Rights Act, and the California Disabled Persons Act ("CDPA").

The following facts are undisputed unless otherwise noted.[1] DMC is a full-service healthcare facility located in Modesto, California and treats patients from different areas within the Stanislaus County community. (Doc. No. 29-2 at ¶ 1.) DMC is an indirect subsidiary of Tenet Healthcare. (*Id.* at ¶ 40.) All of the events alleged by plaintiffs occurred at DMC. (*Id.* at ¶ 37.)

In order to accommodate the special needs of hearing-impaired patients and visitors to the hospital, DMC maintains policies and procedures to ensure effective communication between hospital staff and persons who are deaf or hard of hearing. (*Id.* at ¶ 3.) DMC's Auxiliary Aids and Services Policy states: "Facility personnel will provide qualified sign-language interpreters and/or other auxiliary aids to sensory-impaired persons where necessary to afford such persons an equal opportunity to benefit from the services provided." (*Id.* at ¶ 4.) Specifically, a qualified sign language interpreter and/or other appropriate auxiliary aids will be provided in the following, non-exhaustive circumstances:

> (a) determination of a patient's medical history or description of ailment or injury;
>
> (b) provision of patient rights, informed consent or permission for treatment;
>
> . . .
>
> (d) diagnosis or prognosis of an ailment or injury;

---

[1] These facts have been derived from plaintiffs' response to defendants' separate statement of undisputed facts (Doc. No. 29-2) and defendants' response to plaintiffs' separate statement of undisputed facts (Doc. No. 31-1).

(e) explanation of procedures, tests, treatment, treatment options or surgery;

(f) explanation of medications prescribed including dosage as well as how and when the medication is to be taken and any possible side effects;

(g) explanation regarding follow-up treatment, therapy, test results or recovery;

(h) discharge instructions; . . . .

(Doc. No. 31-1 at ¶ 4.) The Auxiliary Aids and Services Policy further provides guidelines for the initial intake of patients, the provision of interpreting services, addressing the needs of non-patient deaf persons, the use of additional facility services, and the maintenance of a log pertaining to requests for auxiliary aids or services. (Doc. No. 29-2 at ¶ 5.)

In order to provide live in-person ASL interpreters when needed, DMC contracts with local outside agencies, including NorCal Services for the Deaf and Hard of Hearing ("NorCal Services"). (*Id.* at ¶ 6.) DMC also employs other auxiliary aids to communicate with people who are hearing-impaired, including communication boards, Video Remote Interpreting ("VRI"),[2] and written correspondence. (*Id.* at ¶ 7.)

## A. Mark Bax's Visits to DMC

On October 14, 2015, DMC admitted Mr. Bax as a patient after he visited the hospital due to pain and swelling stemming from an infection in his left foot. (*Id.* at ¶ 9.) DMC completed an examination of Mr. Bax's left foot and provided him with antibiotics. (Doc. No. 31-1 at ¶ 11.)

On October 16, 2015, Dr. Michael Wolterbeek performed exploratory surgery on Mr. Bax's foot. (Doc. No. 29-2 at ¶ 10.) In connection with Mr. Bax's surgery on October 16, 2015, DMC ordered an in-person interpreter from NorCal Services who translated for Mr. Bax pre-surgery. (*Id.* at ¶ 12.) Both the preoperative and postoperative diagnoses were "left foot diabetic and infection with localized gangrene." (*Id.* at ¶ 11.) On October 17 and 18, 2015, the days

---

[2] A VRI system is "an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images." 28 C.F.R. § 36.104. Using VRI, a live ASL interpreter is located remotely and communicates with the doctor and patient through a portable screen located in the hospital.

following the surgery, Mr. Bax communicated to DMC staff via written notes about his foot pain and whether he had received pain medication.  (Doc. No. 31-1 at ¶¶ 14, 15.)  On October 19, 2015, DMC ordered an in-person interpreter who assisted with discussions regarding Mr. Bax's foot infection and high blood sugar.  (Doc. No. 29-2 at ¶ 13.)

DMC scheduled Mr. Bax for a second surgery on October 21, 2015, to clean and close up the wound in his left foot.  (*Id.* at ¶ 15.)  DMC ordered interpreters from NorCal Services for October 20 and 21, 2015, to facilitate communication the day before Mr. Bax's surgery and the day of that surgery.  (*Id.* at ¶ 17.)  On October 20, 2015, the interpreter arrived without issue.  (*Id.* at ¶ 18.)  On October 21, 2015, however, despite DMC's request for an interpreter to be present on the day of Mr. Bax's second surgery, no interpreter arrived.  (*Id.* at ¶ 19.)  When the interpreter did not arrive ahead of the planned surgery, DMC staff called NorCal Services, who said that no interpreters were available.  (*Id.* at ¶ 20.)

DMC staff therefore attempted to communicate with Mr. Bax through other means, including VRI.  (*Id.* at ¶ 22.)  However, technical difficulties were experienced with the VRI system, and Mr. Bax informed staff that it was unacceptable for him.  (*Id.* at ¶ 23.)  Mr. Bax declined to proceed with surgery without a live interpreter present.  (*Id.* at ¶ 25.)

The following day, on October 22, 2015, DMC supplied an ASL interpreter for discussions regarding additional patient education.  (*Id.* at ¶ 27.)  Mr. Bax's second surgery was rescheduled and took place on October 23, 2015 with a live interpreter present.  (*Id.* at ¶ 26.)  During the surgery, the surgeon could not save Mr. Bax's fifth toe and it had to be amputated.  (*Id.* at ¶ 28.)

Following his second surgery, Mr. Bax remained in the hospital for several days, during which time he was given intravenous fluids and medication instructions via written communications, without the aid of an interpreter.  (Doc. No. 31-1 at ¶¶ 23–25.)  Mr. Bax was discharged on October 27, 2015.  (Doc. No. 29-2 at ¶ 29.)  Although DMC had ordered an interpreter to be present at the time of Mr. Bax's discharge, the interpreter did not arrive on time.  (*Id.* at ¶ 30.)

*/////*

On November 12, 2015, Mr. Bax returned to the emergency room at DMC due to continued issues with his left foot. (Doc. No. 29-2 at ¶ 31.) On November 13, 2015, a peripherally inserted central catheter ("PICC") line was put in place for Mr. Bax, during which an interpreter was present. (Doc. No. 31-1 at ¶ 27.) At other times throughout the day, staff conducted various patient education procedures with Mr. Bax, for which an interpreter was not present. (*Id.*) Mr. Bax was admitted to the hospital and underwent a third surgery to his foot on November 14, 2015. (Doc. No. 29-2 at ¶ 32.) An interpreter was present for Mr. Bax's November 14, 2015 surgery. (*Id.* at ¶ 33.) Mr. Bax was subsequently discharged on November 18, 2015. (*Id.* at ¶ 34.)

In sum, the evidence before the court on summary judgment establishes Mr. Bax was provided an interpreter on at least seven different occasions throughout his various hospital stays, on October 16, October 19, October 20, October 22, October 23, November 13, and November 14, 2015. (Doc. No. 21-1 at 12–13.) On two other occasions, DMC requested an interpreter but one did not arrive. In this regard, on October 21, 2015, DMC was informed that no interpreters were available, and on October 27, 2015, the interpreter did not arrive in time before Mr. Bax was discharged. (*Id.*)

Mr. Bax contends that he requested a live interpreter "[a]lmost every day." (Doc. No. 29 at 11.) He further contends that Dr. Wolterbeek issued, and DMC staff disregarded, a "standing order" for a continuous interpreter to be made available for Mr. Bax between October 21 and October 27, 2015. (Doc. No. 31-1 at ¶¶ 8–9.) When an interpreter was not present, DMC staff attempted to communicate with Mr. Bax through other methods, including live VRI interpreters, communication boards, and written notes. (Doc. No. 29-2 at ¶ 14.) Plaintiffs dispute, however, that these other methods were effective. (*Id.*) Mr. Bax asserts that there were problems with the VRI system throughout his hospital stays, that he felt limited in communicating through a communication board, and that it was difficult to communicate in writing with the staff. (*Id.*)

## B. Lucia Pershe Bax's Visit to DMC

On January 12, 2017, Ms. Bax visited the emergency room at 9:58 p.m. with complaints of neck and side pain. (*Id.* at ¶ 54.) Upon her arrival to DMC, Ms. Bax filled out a needs

assessment form, where she indicated a desire for an ASL interpreter. (*Id.* at ¶ 58.) An in-person interpreter was not provided to her, however. (*Id.* at ¶ 60.)

The parties dispute the reason that an in-person interpreter was not provided to Ms. Bax: while defendants contend that an interpreter was unavailable given the late hour and the short time period that Ms. Bax was at DMC, plaintiffs contend that defendants made no attempts to secure an interpreter, even though interpreters may be obtained even at late hours and defendants did not know how long Ms. Bax would be in the hospital when she arrived. (*Id.*) During her stay at DMC, staff communicated with Ms. Bax through VRI and writing. (*Id.* at ¶ 59.) Plaintiffs dispute whether these communication methods were effective. (*Id.*)

After a short examination, medical staff prescribed Ms. Bax Tylenol and Zofran and directed her to follow up with her primary care physician within the next three to five days. (*Id.* at ¶ 56.) Ms. Bax was discharged from the hospital at 12:16 a.m. (*Id.* at ¶ 57.)

## C. Procedural History

On October 6, 2017, plaintiffs brought this action against DMC and Tenet Healthcare, alleging that defendants failed to provide ASL interpreters during plaintiffs' hospital stays, in violation of the ADA, the Rehabilitation Act, the ACA, the Unruh Act, and the CDPA.[3] (Doc. No. 1.) Defendants filed their answer on October 31, 2017. (Doc. No. 7.)

Defendants filed the instant motion for summary judgment on November 20, 2018. (Doc. No. 21.) Specifically, defendant Tenet Healthcare moves for summary judgment in its favor on the ground that it is an improper defendant in this action. In the alternative, defendant Tenet Healthcare moves for partial summary judgment in its favor as to plaintiffs' claims for compensatory damages and for violation of the Unruh Act and the CDPA. Defendant DMC also moves for partial summary judgment as to plaintiffs' claims for compensatory damages and for violation of the Unruh Act and the CDPA.

On December 3, 2018, plaintiffs filed an ex parte application for an extension of time to file their opposition to the motion for summary judgment, which defendants opposed. (Doc. Nos.

---

[3] A claim by a third plaintiff, Mary Birmingham, was resolved by way of an accepted Rule 68 offer of judgment. (*See* Doc. Nos. 20, 28.)

22, 24.)  On December 4, 2018, the court granted plaintiffs' application for extension of time, reset the deadlines for the filing of the opposition and reply, and continued the hearing on the motion.  (Doc. No. 26.)  Plaintiffs filed their opposition on December 14, 2018, and defendants filed their reply on January 2, 2019.  (Doc. Nos. 29, 31.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

1  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

2  nonmoving party.  *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

3       In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

7  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8  *Matsushita*, 475 U.S. at 587 (citations omitted).

9       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

10 court draws "all reasonable inferences supported by the evidence in favor of the non-moving

11 party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is

12 the opposing party's obligation to produce a factual predicate from which the inference may be

13 drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

14 *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a

15 motion for summary judgment.  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745

16 (9th Cir. 2010).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

17 simply show that there is some metaphysical doubt as to the material facts. . . . Where the record

18 taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

20                          **ANALYSIS**

21 **A.      Tenet Healthcare's Motion for Summary Judgment**

22      The court first considers defendant Tenet Healthcare's motion for summary judgment as

23 to all claims brought against it on the grounds that it had no involvement with the relevant events

24 to this lawsuit and is therefore an improper defendant.  (Doc. No. 21-1 at 16–17.)  Tenet

25 Healthcare concedes that its logo may appear on some forms used by DMC, but that DMC is an

26 indirect subsidiary of Tenet Healthcare, and no Tenet Healthcare employees or officials ever met

27 with plaintiffs or influenced plaintiffs' care at DMC.  (*Id.*)

28 /////

                                   8

In their opposition, plaintiffs do not appear to dispute that Tenet Healthcare was not involved in their care. (*See* Doc. No. 29 at 22–23.) Instead, plaintiffs argue that whether Tenet Healthcare was involved in any of the events alleged in the complaint "is not relevant or material" to its liability. (Doc. No. 29-2 at ¶ 38.) Plaintiffs contend that Tenet Healthcare's liability "hinges on its status as an owner under the ADA," which provides that "[n]o individual shall be discriminated against on the basis of disability . . . by any person who *owns* . . . or operates a place of public accommodation." (Doc. No. 29 at 22.)

Plaintiffs' argument is unavailing. "In the context of ADA litigation, Plaintiff has to connect the Defendant to the discriminatory conduct to establish that it is liable." *Grella v. Avis Budget Grp., Inc.*, No. 14-CV-8273 (CM), 2016 WL 638748, at *7 (S.D.N.Y. Feb. 11, 2016) (citation and quotation marks omitted). "It is *conduct*, not identity, that gives rise to liability" under the ADA. *De La Rosa v. Lewis Foods of 42nd Street, LLC*, 124 F. Supp. 3d 290, 296 (S.D.N.Y. 2015) (citation and brackets omitted); *see also Allen v. Pac. Bell*, 212 F. Supp. 2d 1180, 1200 (C.D. Cal. 2002), *aff'd in part*, 348 F.3d 1113 (9th Cir. 2003) (holding that under the ADA a parent corporation is not liable as an employer for the acts of a subsidiary where it exercised "no more control . . . than that typically exercised by the parent corporation in a parent/subsidiary corporate relationship").

Here, no evidence has been presented on summary judgment that Tenet Healthcare engaged in discriminatory conduct against plaintiffs. It is undisputed that all of the events alleged by plaintiffs occurred at DMC. (Doc. No. 29-2 at ¶ 37.) Both plaintiffs testified at their depositions that they had no knowledge regarding the involvement of Tenet Healthcare in any of the events relevant to their claims. (*Id.* at ¶ 39.) Indeed, at the time of their depositions, neither plaintiff had even heard of Tenet Healthcare. (*See* Doc. No. 21-2 at 25:25–26:5; 81:25–82:7); *see also Grella*, 2016 WL 638748, at *7 (granting summary judgment and finding no evidence of discriminatory conduct on the part of defendant Avis because "[w]hile Plaintiff points out that Avis purchased Zipcar, . . . Plaintiff readily admits that all of his dealings were with Zipcar and testified at deposition that he at no point thought he was dealing with Avis nor did he feel that Avis wronged him in any way"). Plaintiffs have otherwise come forward with no evidence that

Tenet Healthcare or any of its employees participated, even in attenuated fashion, with plaintiffs' medical care.[4] *Cf. Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017) (declining to dismiss parent organization of medical facilities because the parent organization "owns and operates the hospitals at which Plaintiffs presented, it houses the network to which the VRI machines are connected, and applies its various policies and procedures to Baptist Hospital, SMH, and affiliated outpatient facilities").

Moreover, plaintiffs' reliance on the decision in *Arizona v. Harkins Amusement Enterprises, Inc.* is misplaced. (*See* Doc. No. 29 at 23.) In *Harkins*, plaintiff and plaintiff-intervenors sued the owner and operator of 21 movie theaters. 603 F.3d 666, 669 (9th Cir. 2010). Plaintiffs alleged that Harkins Amusement Enterprises ("Harkins") discriminated against them on account of their disabilities by failing to offer closed captioning and descriptive narration at its movie theaters. *Id.* at 670. There, however, there was no contention by Harkins that it was not involved in the alleged failure to offer accessibility services. Contrary to plaintiffs' assertion, *Harkins* therefore does not stand for the proposition that ADA liability may be based on ownership alone.

Here, plaintiffs do not allege that Tenet Healthcare discriminated against them, nor do they allege that Tenet Healthcare had sufficient control over DMC such that any discrimination by DMC may be imputed to Tenet Healthcare. Plaintiffs have failed to come forward with any evidence on summary judgment providing a basis for Tenet Healthcare's liability with respect to any of their

/////

---

[4] As stated above, plaintiffs' opposition to Tenet Healthcare's motion for summary judgment is based solely on Tenet Healthcare's status as an "owner." (*See* Doc. No. 29 at 17) ("[T]he basis for liability against Tenet Healthcare hinges on its status as an owner under the ADA."). At the hearing on the pending motion, however, counsel for plaintiffs argued that Tenet Healthcare is involved in providing codes of conduct and model policies to DMC. Even if such evidence were to be sufficient to provide a basis for liability on the part of Tenet Healthcare, no such evidence was referred to in plaintiffs' opposition brief, nor identified in plaintiff's separate statement of facts, or response to defendants' separate statement of facts. (*See* Doc. Nos. 29, 29-2, 29-3.) The court declines to comb through the record in search of evidence establishing a genuine issue of fact. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

asserted causes of action. Accordingly, summary judgment will be granted in favor of defendant Tenet Healthcare as to all of plaintiffs' claims against it.

**B.     DMC's Motion for Partial Summary Judgment**

The court turns next to DMC's motion for partial summary judgment. DMC contends that: (1) there is no evidence before the court on summary judgment of its willful, affirmative misconduct to support plaintiffs' claim of intentional discrimination under the Unruh Act; (2) the CDPA applies only to the denial of physical access to public spaces and is therefore inapplicable here; and (3) plaintiffs cannot recover compensatory damages under the Rehabilitation Act and the ACA because DMC did not act with deliberate indifference. (Doc. No. 21-1 at 10–16.) The court will address each of these arguments in turn below.

1.     Unruh Civil Rights Act Claim

The Unruh Act provides that:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodation, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). Under § 51(f), "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 . . . shall also constitute a violation of this section." "A violation of the Unruh Act may be maintained independent of an ADA claim where a plaintiff pleads 'intentional discrimination in public accommodations in violation of the terms of the Act.'" *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (quoting *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009); *see also Earll v. eBay, Inc.*, No. 5:11-cv-00262-JF (HRL), 2011 WL 3955485, at *3 (N.D. Cal. Sept. 7, 2011). In other words, a plaintiff may prevail on a claim under the Unruh Act under a theory that is coextensive with a claim under the ADA, or alternatively, under a theory that defendant intentionally discriminated against him or her based on one of the protected categories under the statute.

/////

/////

DMC moves for partial summary judgment as to the latter theory of intentional discrimination only.[5] (Doc. No. 21-1 at 15.) To prove intentional discrimination, a plaintiff must put forth evidence of "willful, affirmative misconduct on the part of those who violate the [Unruh] Act." *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853 (2005). DMC argues that there is no evidence of willful, affirmative misconduct to support a claim of intentional discrimination under the Unruh Act. (Doc. No. 21-1 at 15.)

In their opposition to the pending motion, plaintiffs do not dispute that evidence of willful, affirmative misconduct that would establish a violation of the Unruh Act under § 51(b) is lacking here. (Doc. No. 29 at 8–9.) Instead, plaintiffs simply contend that they may seek money damages under the Unruh Act without a showing of intentional discrimination if they assert a violation of the ADA. (*Id.* at 8.) To the extent that plaintiffs ever advanced a theory of intentional discrimination under the Unruh Act, it thus appears that plaintiffs have abandoned such a claim and seek only to pursue their Unruh Act claim under § 51(f). Accordingly, the court will grant DMC's motion for summary judgment as to any claim brought by plaintiffs under the Unruh Act insofar as it is based on a theory of intentional discrimination.

### 2. California Disabled Persons Act Claim

The CDPA provides, in relevant part: "Individuals with disabilities or medical conditions have the same right as the general public to the free use of . . . public buildings, medical facilities . . . public facilities, and other public places." Cal. Civ. Code § 54.

DMC moves for summary judgment as to plaintiffs' claim brought under the CDPA, contending that the statute is inapplicable here because it applies only to the denial of physical access to public places. (Doc. No. 21-1 at 15–16.) *See Fetter v. Bonner*, No. 2:12-cv-2235-GEB-EFB, 2015 WL 164268, at *5 (E.D. Cal. Jan. 13, 2015) (dismissing plaintiff's CDPA claim because it was based on an alleged denial of services, not physical access to a public space); *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1054 (N.D. Cal. 2012) ("The CDPA is

---

[5] Defendants acknowledge that plaintiffs' Unruh Act claim alleging a violation of the ADA under § 51(f) will remain in the case even if its motion for partial summary judgment is granted. (Doc. No. 21-1 at 15 n.2.)

concerned solely with *physical* access to public spaces . . .. Thus, Plaintiff cannot maintain a claim based on the denial of services."); *Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *6 (N.D. Cal. Sept. 13, 2010) (dismissing claim without leave to amend because it was "predicated upon the alleged denial of services, not the denial of access to a public facility").

In their opposition, plaintiffs concede that the CDPA applies only to physical access and that they have not alleged that they were denied physical access to DMC. (Doc. No. 29 at 7 n.4.) Accordingly, the court will grant DMC's motion for summary judgment as to plaintiffs' CDPA claim.

### 3. Compensatory Damages for Federal Law Claims

DMC also moves for partial summary judgment with respect to plaintiffs' claims for compensatory damages under the Rehabilitation Act and the ACA, arguing that plaintiffs are not entitled to such damages because it did not act with deliberate indifference. (Doc. No. 21-1 at 10–15.)

To prevail on a claim under Section 504 of the Rehabilitation Act, plaintiffs must establish that: (1) they are individuals with a disability; (2) they were otherwise qualified to receive the benefits of a program; (3) they were denied the benefits of the program solely by reason of their disability; and (4) the program receives federal financial assistance. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). A claim under the ACA is enforced through Section 504 of the Rehabilitation Act and is subject to the same standards. 42 U.S.C. § 18116(a).

To be entitled to compensatory damages under the Rehabilitation Act and the ACA, plaintiffs must prove intentional discrimination. *Duvall*, 260 F.3d at 1138; *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998). In this context, the standard for intentional discrimination is deliberate indifference. *Duvall*, 260 F.3d at 1138. A defendant acts with deliberate indifference where that defendant: (1) had knowledge that a harm to a federally protected right is substantially likely; and (2) failed to act upon that likelihood. *Id.* at 1139.

/////

/////

13

i. *Plaintiff Mark Bax*

Defendant DMC moves for partial summary judgment on the issue of whether it acted with deliberate indifference necessary for Mr. Bax to recover compensatory damages under the Rehabilitation Act and the ACA. (Doc. No. 21-1 at 11–14.) In this regard, DMC argues that there is no evidence before the court on summary judgment to support such a finding.

In opposition, plaintiffs argue that although DMC provided some interpreters, it nevertheless offered an "apathetic response" and failed to heed Mr. Bax's requests for a live interpreter, which Mr. Bax testified he made "[a]lmost every day." (Doc. No. 29 at 11.) Plaintiffs contend that a DMC staff member should have requested an interpreter as soon as Mr. Bax was identified as deaf, and that it is undisputed that any staff member can initiate the request. (*Id.*)

That DMC did not provide Mr. Bax a live interpreter for every instance in which he requested one does not, on its own, prove deliberate indifference. *See Martin v. Halifax Healthcare Sys., Inc.*, 621 Fed. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference.") (citation omitted); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights. . . . Indeed, construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid."). Instead, a plaintiff must show that hospital staff knew there was a substantial likelihood that they would be unable to communicate effectively without an interpreter, but still made a deliberate choice not to provide one. *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135, 1147–48 (11th Cir. 2014).

On that point, plaintiffs contend that DMC staff deliberately ignored an October 21, 2015 order from Dr. Wolterbeek which stated:

> Order details: Routing, 10/21/15 3:51:00 PM PDT, Continuous, translator, be absolutely sure this patient has a sign interpreter at bedside and wherever he is pushed to on friday morning. Have him/her bedside no later than 0700 translator needs to travel to surgery with patient[.]

14

(Doc. No. 29-1 at 80.)  Plaintiffs characterize this order as a "standing order" that Mr. Bax be provided a live interpreter continuously from October 21 through October 27, 2015, the date when the order was discontinued.  (Doc. No. 29 at 12.)  Despite Mr. Bax's requests and this alleged standing order, plaintiffs contend that DMC staff failed to secure in-person, continuous interpretation services during this period.

DMC disputes that Dr. Wolterbeek issued a "standing order" for a continuous interpreter between October 21 and October 27, 2015.  (Doc. No. 31 at 5.)  DMC argues that the plain text of the October 21, 2015 order directed staff to provide a continuous interpreter only for Mr. Bax's *surgery* scheduled for that Friday.  (Doc. No. 31 at 5.)  As DMC notes, Janice Halloran, DMC's Nursing Support Service Manager, testified at her deposition that the October 21, 2015 order was to ensure that a translator "is there with the patient prior to going to surgery, to surgery, and to wait with the patient when he comes out of surgery."  (Halloran Dep. at 48:14–50:1) (on file).

Plaintiffs, for their part, cite to the deposition testimony of DMC registered nurse Andrea Riemersma, who testified that the order was terminated in the system on October 27, 2015, and that it was therefore "active" from October 21 to October 27, 2015.  (Doc. No. 29 at 12.)  Although Ms. Riemersma did not testify about her understanding of the order, or what "active" meant in this context, the court must draw all inferences from the evidence in favor of plaintiffs on defendants' motion for summary judgment.  Doing so, the court finds that there is at least some evidence before the court from which a jury could conclude that there was a standing order for a continuous interpreter for Mr. Bax from October 21 through October 27, 2015.  Plaintiffs note that with the exception of October 21, 2015, when DMC placed an order but the interpreter did not appear, DMC has provided no evidence that interpreters were unavailable on the other instances Mr. Bax's live interpreter requests went unheeded and DMC staff opted for alternative communication methods.  (Doc. No. 29 at 11–12; *see also* Halloran Dep. at 50:15–24.)  Plaintiffs argue that DMC has offered no evidence on summary judgment explaining why no interpreter was obtained, or what efforts were made to secure one, in all those other instances.  (Doc. No. 29 at 16.)

*/////*

15

Because there is some evidence of a standing doctor's order that Mr. Bax receive the continuous services of an interpreter for the period of October 21 through October 27, 2015, as well as the lack of evidence that DMC made efforts to determine whether it could provide an interpreter each time requested by Mr. Bax, this could suggest a deliberate refusal to accommodate Mr. Bax, rather than mere negligence. *See Duvall*, 260 F.3d at 1140 (finding a triable issue of fact as to deliberate indifference where the defendants denied plaintiff's requests for particular auxiliary aids without making any efforts to determine whether it would have been possible to provide the requested accommodations); *cf. Updike v. Multnomah County*, 870 F.3d 939, 951–52 (9th Cir. 2017) (granting summary judgment for defendant where the failure to provide an interpreter "reflects an absence of effective communication and coordination . . . about the need for an interpreter" rather than a deliberate failure to order an interpreter).

Plaintiffs also argue that DMC staff were deliberately indifferent because they were aware that the other auxiliary aids offered to Mr. Bax—lip reading, note writing, VRI, and a communication board—were ineffective and yet persisted to rely upon them anyway. (Doc. No. 29 at 12.) In this regard, DMC registered nurse Ms. Riemersma conceded during her deposition testimony that communicating with a deaf individual via writing and lip reading is "probably not the most effective" manner of communication. (Doc. No. 29-1, Ex. 7 at 19:24–20:3, 22:15–17). DMC has submitted evidence of written communications exchanged between Mr. Bax and DMC staff demonstrating that Mr. Bax had some ability to communicate in writing. (*See* Doc. No. 21-2 at 54–62.) Plaintiffs argue that such alternatives are ineffective because ASL is essentially a foreign language with its own grammar and syntax. (Doc. No. 29 at 14).

On the whole, although plaintiffs catalog numerous instances throughout his hospital stay in which they contend that Mr. Bax should have had an interpreter but was not provided one (*see* Doc. No. 29 at 17–20), the evidence before the court on summary judgment establishes that DMC supplied an ASL interpreter for Mr. Bax on at least seven separate occasions, and ordered an interpreter on two additional occasions even though the interpreter did not arrive. (Doc. No. 21-1 at 12–13.) It is undisputed that when an interpreter was not present, DMC staff attempted to communicate with Mr. Bax through other methods, including live VRI interpreters,

communication boards, and written notes.  (Doc. No. 29-2 at ¶ 14.)  In this regard, this case is distinguishable from those in which courts have found a triable issue of fact as to deliberate indifference because interpretation services were *never* provided.  *Cf. Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 351–52 (11th Cir. 2012) (finding triable issue of fact as to deliberate indifference where plaintiffs repeatedly asked for interpreters, but were not provided either in-person or VRI interpretation services, and doctor laughed at plaintiff when she stated that her ability to read lips was limited); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (finding a genuine issue of material fact regarding deliberate indifference where the hospital never provided an interpreter despite plaintiff and plaintiff's family members' numerous requests for one over several weeks, and doctor "laughed off" request for an interpreter); *Updike*, 870 F.3d at 957–58 (holding that a reasonable jury could find deliberate indifference where defendant "did not conduct an informed assessment of Updike's accommodation needs," and "knew that Updike was deaf but did not provide Updike with an ASL interpreter, TTY device, or closed captioning for television, despite his repeated requests for these accommodations" during his time in custody and under pretrial supervision); *Falls v. Prince George's Hosp. Ctr.*, No. 97-1545, 1999 WL 33485550, at *10 (D. Md. Mar. 16, 1999) (finding that a jury could conclude that hospital acted with deliberate indifference where hospital did not provide an interpreter at any time during plaintiff's six-day hospital stay, despite multiple requests).

At the same time, this case is also distinguishable from those in which courts have found no triable issue of fact as to deliberate indifference and granted summary judgment in favor of the defendant.  In *McCullum v. Orlando Regional Healthcare System, Inc.*, for example, the Eleventh Circuit affirmed the district court's conclusion that plaintiffs could not prevail on a claim for compensatory damages against hospital staff, noting that neither the patient nor the patient's family members had ever requested interpretation services.  768 F.3d at 1148–49.  In contrast, here, Mr. Bax testified at his deposition that he requested a live interpreter "[a]lmost every day." (Doc. No. 29 at 11.)

Likewise, in *Silva v. Baptist Health South Florida, Inc.*, the district court found no genuine dispute of material fact as to whether defendants acted with deliberate indifference,

17

concluding that "Defendants' failure to obtain a live interpreter or VRI—in light of their efforts to provide alternative aids *and in light of Plaintiffs' failure to contemporaneously complain about the accommodations provided*—at most constituted negligence, and was not a deliberate choice to deny Plaintiffs rights as the law requires."  303 F. Supp. 3d 1334, 1342 (S.D. Fla. 2018) (emphasis added).  Here, in contrast, there is evidence before the court that Mr. Bax did complain contemporaneously about the insufficiency of the accommodations provided to him.  For example, on October 21, 2015, Mr. Bax told DMC staff that the malfunctioning VRI machine was not acceptable to him and he refused to proceed with surgery without a live interpreter present.  (Doc. No. 29-2 at ¶¶ 23, 25.)  Then on October 26, 2015, Mr. Bax refused to sign a medical consent form without an interpreter present.  (Doc. No. 29-1 at 103.)  The note from DMC staff on the consent form states:  "Pt is deaf.  I asked him in writing to initial this infm, pt state he wanted me to get a translator, which I'm unable to do."  (*Id.*)  Unlike in *Silva*, where the court found no evidence showing that defendants knew that plaintiffs' rights were likely being violated, 303 F. Supp. 3d at 1342, here, the evidence before the court could support a finding that DMC was put on clear notice of Mr. Bax's dissatisfaction with the accommodations provided.

Based on the legal framework provided by the cases discussed above, the court finds that the facts here fall somewhere in the middle of the spectrum, and that the factual disputes between the parties in this case do "require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Accordingly, the court will deny DMC's motion for partial summary judgment with respect to Mr. Bax's claims for compensatory damages under the Rehabilitation Act and the ACA.

ii.  *Plaintiff Lucia Pershe Bax*

DMC also moves for partial summary judgment in its favor on the issue of whether it acted with deliberate indifference necessary for Ms. Bax to recover compensatory damages under the Rehabilitation Act and the ACA.  (Doc. No. 21-1 at 14–15.)

DMC argues that the undisputed facts demonstrate that Ms. Bax arrived at DMC's emergency room at 9:58 p.m. on January 12, 2017, and was discharged at 12:16 a.m.  (*Id.* at 14.) Ms. Bax filled out a needs assessment form upon arrival, where she indicated that she desired an

ASL interpreter. (*Id.*) DMC contends that it was unable to obtain an in-person interpreter at such a late hour and given the short time period Ms. Bax was at the hospital. (*Id.*) DMC staff therefore attempted to address Ms. Bax's communication needs through other means, including VRI and written correspondence. (*Id.* at 14–15.) According to DMC, the undisputed evidence on summary judgment establishes that DMC did not refuse to provide Ms. Bax with effective communication or ignore her needs such that DMC could be said to have been deliberately indifferent. (*Id.* at 15.)

In opposition, plaintiffs argue that Ms. Bax requested an interpreter as soon as she arrived at DMC, and therefore DMC staff was immediately put on notice of her need. (Doc. No. 29 at 21.) Moreover, DMC's corporate witness explained that any staff member can make the request for an interpreter. (*Id.*) Plaintiffs further argue that interpreters are not categorically unavailable at night: an emergency medicine physician estimated that it takes four or five hours to acquire an interpreter between 8:00 p.m. and 6:00 a.m. (*Id.*) Although plaintiffs acknowledge that Ms. Bax was discharged after less than three hours at DMC, plaintiffs contend that there is no evidence that DMC staff made any effort at all to request an interpreter, DMC staff could not have known in advance that Ms. Bax would be discharged that quickly, and that there is no evidence that DMC asked Ms. Bax whether she was willing to wait for an interpreter. (*Id.*) DMC staff instead provided Ms. Bax with the VRI machine, which "froze up almost immediately." (Doc. No. 29-1, Ex. 2 at 27:18–28:5.) Because of the technical issues with the VRI, the doctor instead attempted to communicate with Ms. Bax through written notes. (*Id.* at 28:6–29:11.) At her deposition, Ms. Bax testified that she struggled to understand everything that the doctor was attempting to communicate to her in this fashion. (*Id.* at 29:13–25.)

Notwithstanding Ms. Bax's subsequent deposition testimony that she could not understand everything the doctor attempted to communicate to her during her hospital visit on January 12, 2017, there is no evidence before the court on summary judgment that she informed the doctor that she was unable to communicate or that the doctor ignored any such complaints. On the contrary, Ms. Bax testified at her deposition that the doctor attempted to communicate with her through VRI, but that after the machine experienced technical difficulties, "both of us

looked at each other and kind of shook our heads and went: That doesn't work." (Doc. No. 29-1, Ex. 2 at 27:12–14.) There is no evidence that DMC staff insisted that Ms. Bax use the VRI machine in spite of its ineffectiveness. *See Juech v. Children's Hospital and Health System, Inc.*, 353 F. Supp. 3d 772, 784 (E.D. Wisc. 2018) ("Only if the hospital administrators were aware of the alleged problems with the VRI but demanded its use anyway could a reasonable finder of fact conclude that the defendants were deliberately indifferent.").

According to the evidence submitted on summary judgment, the doctor then attempted to communicate with Ms. Bax by exchanging typed notes on a computer. (*Id.* at 28:18–22.) Ms. Bax's recounting of her conversation with the doctor at her deposition does not indicate that there were lapses in communication that were obvious and yet ignored by the doctor:

> THE WITNESS: We wrote. He had asked me something and – he asked me a question. He said, "Where's the pain?"
>
> I said, "My kidney area, my shoulder area," like I said before. And he asked me if I took medication. I told him I didn't know what it was. It was a big, huge name. And he asked me did I need any medicine for the pain. I said, "Oh, please. That would help if I had some. Maybe a refill or whatever to what I had before.
>
> . . . He just kept looking through [the computer] and he couldn't find my medical history, and I went, whoa, surprise.
>
> So we looked through and he would tell me this is that, and I would go, "Wow, that's not there?" I was feeling really upset, and it was like – I was sad. And, you know, and the doctor himself was going, "Let's see. What do we do? I'm not sure." And he was patient too, both of us were. And I was having a hard time breathing. I think it was anxiety or something.
>
> And the doctor asked me the name again, and I just said, "It's a big word," you know. "I don't know." And he went, hmm. I told him the name. I tried to remember how it was spelled. I said it had an "A" in it, and the doctor was trying to figure out which one it was. And then he gave me a refill of some kind, you know, whatever he gave me.

(*Id.* at 28:9–29:11.) Moreover, medical records from Ms. Bax's visit to DMC on January 12, 2017, include detailed notes but provide no indication that the doctor was aware of and ignored Ms. Bax's alleged inability to effectively communicate:

> The patient presents with back pain and posterior neck pain. The onset was Since 2015 and New onset episode in December 2016. The course/duration of symptoms is fluctuating in intensity and

20

worse over the past 12 days.  Type of injury: Fall in 2015.  The location where the incident occurred was at home.  Location: posterior neck.  The character of symptoms is sharp and cramping.  The exacerbating factor is worse with cold temperature.  Prior episodes:  Evaluated in San Francisco in 2015 for the same complaints.  Associated symptoms: nausea, pain to the back of the neck, occasional sensation of SOB with the onset of pain, intermittent brief generalized weakness, subjective fever, denies bowel dysfunction, denies bladder dysfunction and denies altered sensation.  Additional history:  Patient has been out of her Rx medications for two weeks, last refilled acquired in the ED.  Patient's pain often onsets at night.  Patient was seen by her PCP in 2015 for her pain, and had X-ray studies.  Patient was evaluated in San Francisco.  Patient states that her physician told her that she had muscle cramping, patient denies any Fx's.  Patient states that her pain began after she fell in 2015.  Patient has an appt on Feb 6th with her PCP.

(Doc. No. 21-3 at 56.)

Unlike Mr. Bax, who according to the evidence made repeated requests for an interpreter, and refused to sign a consent form or proceed to surgery without an interpreter (*see supra* at 18), there is no evidence before the court that Ms. Bax complained contemporaneously about resorting to written communications.  Nor has Ms. Bax come forward on summary judgment with any evidence otherwise suggesting that DMC staff was aware that the use of written communications was ineffective and persisted to employ those forms of communication with her in spite of that ineffectiveness.  On this basis, the court must find based upon the uncontroverted evidence on summary judgment that DMC was not deliberately indifferent by failing to obtain a live interpreter for Ms. Bax.  *See McCullum*, 768 F.3d at 1148 (affirming summary judgment for defendant as to deliberate indifference where defendant's staff believed they were effectively communicating and medical records did not contradict this belief); *Silva*, 303 F. Supp. 3d at 1342 ("Defendants' failure to obtain a live interpreter or VRI—in light of their efforts to provide alternative aids and in light of Plaintiffs' failure to contemporaneously complain about the accommodations provided—at most constituted negligence, and was not a deliberate choice to deny Plaintiffs rights as the law requires.") (citation and quotation marks omitted).  Accordingly, the court will grant DMC's motion for partial summary judgment with respect to Ms. Bax's claim for compensatory damages.

/////

### 4. Companion Claims

In plaintiffs' opposition to the pending motion, they argue that there is also a triable issue of fact regarding whether DMC was deliberately indifferent in failing to provide live interpreters to plaintiffs in their roles not only as patients, but also as "companions"[6] to one another during their respective visits to the DMC. (Doc. No. 29 at 20, 22.) In their reply, DMC argues that no such theory of liability nor facts in support thereof were pled in plaintiffs' complaint and that the court should therefore dismiss any companion based claims. (Doc. No. 31 at 9.)

The Ninth Circuit has held that plaintiffs cannot proceed on a theory of liability that is raised for the first time at summary judgment. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291–94 (9th Cir. 2000) ("Because [plaintiffs] raised the disparate impact theory of liability for the first time at summary judgment, the district court did not err when it did not allow them to proceed on it."). In *Coleman*, employees brought a disparate treatment claim under the Age Discrimination in Employment Act, but then raised a disparate impact claim for the first time at summary judgment. *Id.* at 1291. The district court refused to allow the employees to proceed on the disparate impact claim. *Id.* The Ninth Circuit affirmed, explaining that "[a]fter having focused on intentional discrimination in their complaint and during discovery, the employees cannot turn around the surprise the company at the summary judgment stage on the theory that an allegation of disparate treatment on the complaint is sufficient to encompass a disparate impact theory of liability." *Id.* at 1292–93.

Unlike *Coleman*, however, plaintiffs here invoked a companion theory of liability by citing to federal regulations regarding companions throughout their complaint (*see* Doc. No. 1 at ¶¶ 37, 61) and by seeking an injunction forbidding defendants from denying "deaf or hard of hearing individuals, *or their companions*, meaningful access to and full and equal enjoyment of

---

[6] Federal regulations implementing Title III of the ADA provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities." 28 C.F.R. § 36.303(c)(1). A "companion" includes "a family member, friend, or associate of an individual seeking access to" a public accommodation "who, along with such individual, is an appropriate person with whom the public accommodation should communicate." *Id.* § 36.303(c)(1)(i).

Defendants' facilities, services, or programs" (*id.* at 15) (emphasis added).  Thus, plaintiff's complaint cannot fairly be characterized as having failed to raise the issue of liability based upon the companion theory of liability.  Moreover, at both of their depositions, Mr. and Ms. Bax testified that the other was present for all or most of their respective hospital stays.  (*See* Lucia Pershe Bax Dep. at 22:22–23:3; Mark Bax Dep. at 30:2–5, 33:20–23, 41:2–12) (on file).  DMC was therefore put on notice as to plaintiffs' companion theories through the course of discovery.  *Coleman*, 232 F.3d at 1294 (holding that even if a plaintiff failed to plead an additional theory in her complaint, she could nonetheless pursue that theory if she made it known during discovery of her intention to pursue recovery under that theory); *cf. Stever v. U.S. Bancorp*, 690 Fed. App'x 491, 492 (9th Cir. 2017) (holding that plaintiff forfeited a theory of liability because it was not alleged in the complaint and there was no indication that he notified defendants about the theory during discovery).[7]  Finally, unlike *Coleman*, where the Ninth Circuit recognized that raising a new disparate impact theory of liability would "require[] that the defendant develop entirely different defenses," 232 F.3d at 1292, here, plaintiffs' claims as companions are analyzed in the same manner as their claims as patients.  *See* 28 C.F.R. § 36.303(c)(1) (requiring provision of appropriate auxiliary aids and services to a deaf individual, including a deaf companion); *see also Sunderland v. Bethesda Health, Inc.*, 184 F. Supp. 3d 1344, 1357 (S.D. Fla. 2016) ("Mrs. Liese's claims differ slightly in that her claims are based on her status as a 'companion' to her husband. She, however, clearly meets the definition of companion in 28 C.F.R. § 36.303(c)(1) and, consequently, her claims are treated the same as the Plaintiffs who received treatment."), *rev'd in part on other grounds*, 686 Fed. App'x 807 (11th Cir. 2017).

Considering the allegations of the complaint, plaintiffs' deposition testimony, and the reality that the same legal standards govern plaintiff's claims brought either as patients in their own right or as companions to each other, the court finds the situation here readily distinguishable from that in *Coleman.*  There is no surprise or prejudice to DMC in permitting plaintiffs to seek compensatory damages not only in their role as patients, but also as companions to one another.

---

[7]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

Accordingly, the court denies DMC's request to dismiss plaintiffs' claims brought pursuant to a companion theory of liability.

## CONCLUSION

For the reasons set forth above:

1. Defendant Tenet Healthcare's motion for summary judgment (Doc. No. 21) is granted as to all of plaintiffs' claims against it;

2. Defendant DMC's motion for partial summary judgment (Doc. No. 21) is granted in part and denied in part;

   i. Summary judgment is granted in DMC's favor with respect to plaintiffs' claim brought under the CDPA;

   ii. Summary judgment is granted in DMC's favor with respect to plaintiffs' claim brought under the Unruh Civil Rights Act, insofar as the claim is based on a theory of intentional discrimination;

   iii. Summary judgment is denied with respect to Mr. Bax's patient claims for compensatory damages under the Rehabilitation Act and the ACA;

   iv. Summary judgment is granted in DMC's favor with respect to Ms. Bax's patient claims for compensatory damages under the Rehabilitation Act and the ACA;

   v. Defendant DMC's request to dismiss plaintiffs' companion claims is denied; and

3. The parties are directed to contact Courtroom Deputy Jami Thorp at JThorp@caed.uscourts.gov within fourteen days of service of this order regarding the rescheduling of the Final Pretrial Conference and Jury Trial dates in this action.

IT IS SO ORDERED.

Dated:   **July 2, 2019**            _Dale A. Drozd_

                                   UNITED STATES DISTRICT JUDGE