1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARK BAX, et al.,                    No.  1:17-cv-01348-DAD-SAB

12              Plaintiffs,

13        v.                              FINDINGS OF FACT AND CONCLUSIONS
                                          OF LAW
14   DOCTORS MEDICAL CENTER OF
     MODESTO, INC.,
15
                Defendant.
16

17

18        This case concerns claims of disability discrimination.  Plaintiffs Mark Bax and Lucia

19   Pershe Bax (collectively "plaintiffs") are deaf and communicate primarily in American Sign

20   Language ("ASL").[1]  They contend that defendant Doctors Medical Center of Modesto, Inc.

21   ("DMC") discriminated against them during their separate hospital visits by not facilitating

22   effective communication in violation of Title III of the Americans with Disabilities Act ("ADA"),

23   Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), Section 1557 of the

24   /////

25   _____

26   [1]  "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ
     from the grammar and syntax of English and other spoken languages.  In many cases, there is no
27   one-to-one correspondence between signs in ASL and words in the English language."  *U.S.
     EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1105 (9th Cir. 2010) (internal citations
28   omitted).

                                          1

1   Patient Protection and Affordable Care Act ("ACA"), and the California Unruh Civil Rights Act

2   ("the Unruh Act").[2]

3          A three-day bench trial in this case commenced on February 4, 2020.  At trial, the court

4   heard from nine witnesses and admitted 132 exhibits into evidence.  (Doc. No. 63.)  The

5   witnesses who were sworn and testified at trial included:  plaintiff Mark Bax, plaintiff Lucia Bax,

6   Andrea Riemersma (a nurse at DMC), Janice Halloran (the nursing support services manager and

7   ADA coordinator at DMC), Dr. Michael Wolterbeek (a foot surgeon with privileges at DMC),

8   LaDonna Martinez (the director of patient care services at DMC), Janelle Moland (a licensed

9   clinical social worker at DMC), Lonnie Vaughn (a diabetes education and care specialist at

10  DMC), and Anna Chalko (a former nurse at DMC).  (*Id.*; Doc. Nos. 68–70.)  In addition, the court

11  admitted the deposition of Blaine Rourke (a nurse practitioner at DMC) in lieu of live testimony.

12  (Doc. No. 70 at 48.)  Following trial, the court directed the parties to submit proposed findings of

13  fact and conclusions of law, which the parties separately filed on March 23, 2020.  (Doc. Nos. 71,

14  72.)

15         Having considered the testimonial evidence and exhibits, the parties' arguments, and the

16  applicable law, the court sets forth the following findings of fact and conclusions of law pursuant

17  to Federal Rule of Civil Procedure 52(a).[3]

18  /////

19  /////

20  /////

21

22  [2]  A third plaintiff, Mary Birmingham, resolved her claims against DMC in this case by accepting
    an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure in late 2018.
23  (*See* Doc. Nos. 20, 28.)

24  [3] The undersigned apologizes for the excessive delay in the issuance of these findings of fact and
    conclusions of law.  This court's overwhelming caseload has been well publicized and the long-
25  standing lack of judicial resources in this district long-ago reached crisis proportion.  That
    situation, which has continued unabated for over eighteen months now, has left the undersigned
26  presiding over 1,300 civil cases and criminal matters involving 735 defendants at last count.
    Unfortunately, that situation sometimes results in the court not being able to issue orders in
27  submitted civil matters within an acceptable period of time. This situation is frustrating to the
    court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

28

1

**FINDINGS OF FACT**

2

**A.      The Parties**

3

          Plaintiff Mark Bax has been deaf since he was four years old.  (Trial Tr. Vol. 1, 25:3–5.)[4]

4

Mr. Bax considers ASL to be his first language and English to be his second language.  (Vol. 1,

5

25:6–8.)  He uses English when texting, and reads English to practice the language.  (Vol. 1,

6

25:16–23.)  Mr. Bax occasionally wears hearing aids to hear ambient sound.  (Vol. 1, 25:9–15.)

7

To communicate with someone over the phone while he is at home, Mr. Bax uses a video relay

8

service, in which a sign language interpreter and Mr. Bax can see each other on a screen, and the

9

interpreter interprets what is being said over the phone.  (Vol. 1, 26:10–20.)  Mr. Bax is married

10

to Lucia Bax.  (Vol. 1, 26:21–23.)

11

          Plaintiff Lucia Bax has been deaf since she was three years old.  (Vol. 1, 77:7–10.)  Mrs.

12

Bax grew up in El Salvador and was educated in the Spanish language until she moved to the

13

United States at the age of thirteen and started learning ASL at a day school for the deaf.  (Vol. 1,

14

75:21–77:4.)  Mrs. Bax considers her first language to be Spanish, her second language to be

15

ASL, and her third language to be English.  (Vol. 1, 77:15–17.)  She can lip read in Spanish a

16

little bit, as that is one of the ways she communicated with her parents who are not deaf.  (Vol. 1,

17

77:24–78:1, 78:20–79:2.)  Mrs. Bax communicates using ASL, though she feels that her skill

18

level with ASL is average.  (Vol. 1, 77:11–14.)  Mrs. Bax also feels that she is not very skilled at

19

writing and reading English because she is still learning and practicing.  (Vol. 1, 77:18–23.)

20

          Defendant DMC is an acute care hospital in Modesto, California, that provides a wide

21

range of medical services for acutely sick patients.  (Vol. 2, 266:9–20.)  DMC is one of three

22

acute care facilities in the central valley region.  (Vol. 2, 266:21–267:3.)

23

          Mr. Bax was a patient at DMC in October and November 2015, with Mrs. Bax as his

24

companion.  Mrs. Bax was a patient at DMC in January 2017, with Mr. Bax as her companion.

25

/////

26

───────────────────

27

[4]  There are three volumes of the reporter's transcript of the trial proceedings in this case that
correspond with the three days of trial:  Vol. 1 (Doc. No. 68); Vol. 2 (Doc. No. 69); and Vol. 3
(Doc. No. 70.)  Subsequent citations to the trial transcript herein will use the volume number

28

rather than the docket number.

1    **B.      DMC's Policies and Procedures for Deaf Patients and Companions**

2             With the stated purpose of accommodating sensory impaired individuals and complying

3    with Section 504 of the Rehabilitation Act and the ADA, DMC initiated a formal Auxiliary Aids

4    and Services Policy in November 2015, which was reviewed in April 2016 and approved on May

5    25, 2016 ("the AAS Policy").  (DX-A at 2898, 2912.)[5]  DMC rolled out the AAS Policy in June

6    2016 in a training to all existing DMC employees.  (DX-B; DX-C; Vol. 2, 270:17–272:24.)  Also

7    in June 2016, Janice Halloran, a nursing support services manager at DMC, was assigned by

8    DMC's CEO to be the hospital's ADA coordinator.  (Vol. 2, 267:4–12.)  As ADA coordinator,

9    Ms. Halloran was tasked with reviewing the AAS Policy and ensuring that it was followed.  (Vol.

10   2, 268:4–11.)  In taking on this role, Ms. Halloran participated in conference calls with ADA

11   coordinators at other facilities to discuss what those other facilities were doing and how their

12   process was working for them.  (Vol. 2, 268:12–21.)  There was no evidence presented at trial in

13   this case to show that there had been an ADA coordinator at DMC before Ms. Halloran took on

14   that role.  At trial, Janelle Moland, a social worker for DMC for over seven years, was asked if

15   she knew who the ADA coordinator was in October 2015 (when Mr. Bax first visited DMC), and

16   she testified that her understanding was that the position had been Ms. Halloran, but that she did

17   not remember when Ms. Halloran was given that position.  (Vol. 2, 317:20–318:3; 326:5–8.)

18   Presumably, Ms. Halloran would have known whether she had a predecessor, especially since she

19   had been working for DMC for thirty years.  Yet Ms. Halloran testified that she did not know

20   who she replaced when she became the ADA coordinator in June 2016, and she did not know

21   /////

22   /////

23

---

24   [5]  The parties did not agree upon any joint exhibits at trial.  Plaintiffs' exhibits are identified
     numerically and are cited herein as PX-1, PX-2, etc.  Defendant's exhibits are identified
25   alphabetically and are cited herein as DX-A, DX-B, etc.  The court notes, however, that because
     plaintiffs' first exhibit was unfortunately divided by counsel into more than sixty subparts, with
26   each subpart identified alphabetically, the subpart exhibits are cited accordingly herein as PX-1A,
     PX-1B, . . . PX-1AA, PX-1AB, . . . PX-1BA, PX-1BB, . . . PX-1CA, PX-1CB, etc.  Specific page
27   numbers are cited using the last digits of the Bates number, omitting the party's identifier and
     leading zeros.
28

1   who the ADA coordinator at DMC was in October 2015.[6]  (Vol. 2, 300:2–6.)  This testimony

2   suggests to the undersigned that there in fact was no ADA coordinator at DMC before Ms.

3   Halloran assumed that role in June 2016.

4           1.      DMC's Practices in Late 2015

5        There was no evidence presented at trial that any formal policy or corresponding formal

6   trainings for staff on auxiliary aids and services existed at DMC before implementation of the

7   AAS Policy in June 2016.  Neither side presented any written policy or documentation of

8   trainings provided to staff prior to June 2016.  The only evidence presented at trial that any such

9   policy existed in 2015 came from Ms. Halloran's testimony that the old policy had the same "sum

10   and substance" as the AAS Policy but the forms used under the AAS Policy, such as an auxiliary

11   aids and services assessment tool, did not exist in 2015.  (Vol. 2, 304:14–24; 306:18–21.)  Several

12   witnesses also testified regarding their experience providing services to deaf patients and

13   companions at DMC before June 2016, in which they assessed the patient's ability to

14   communicate and then used various methods to communicate, including exchanging written

15   notes, using a live interpreter through video remote interpreting ("VRI") services,[7] and using an

16   in-person ASL interpreter provided by an outside vendor that contracted with DMC.  (Vol. 1,

17   113:19–20; 125:7–9; 126:1–12; Vol. 2, 289:16–290:8.)

18        To provide remote ASL interpreters through VRI, DMC contracted with Cyracom, an

19   interpreting service that also provided interpretation over the phone in other languages, such as

20   Spanish.  (Vol. 1, 146:16–23; DX-AO.)  To provide live in-person ASL interpreters, DMC

---

21   [6]  Although not particularly significant to resolution of any of the issues before the court in this

22   case, the court does observe that it found Ms. Halloran's testimony in this regard to be incredible.
    In short, it is difficult, if not impossible, to believe that Ms. Halloran had worked at DMC for

23   thirty years but did not know who she had replaced when she became the ADA coordinator in
    June 2016.

24   

25   [7]  A VRI system is an interpreting service that uses "[r]eal-time, full-motion video and audio over
    a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers

26   high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular
    pauses in communication," and that "display the interpreter's face, arms, hands, and fingers, and

27   the participating individual's face, arms, hands, and fingers, regardless of his or her body
    position."  28 C.F.R. § 36.303(f).  Using VRI, a live ASL interpreter is located remotely and

28   communicates with the doctor and patient through a portable screen located in the hospital.

1  contracted with NorCal Services for the Deaf and Hard of Hearing ("NorCal").  (DX-AP.)

2  NorCal provided a "Communication Services Request Form" for DMC to complete and fax to

3  NorCal to request its interpreter services.  (PX-1B; Vol. 1, 144:3–10.)

4         In terms of staff training before June 2016, Ms. Halloran testified that she was trained on

5  operating the VRI laptops and that the VRI successfully connected to an ASL interpreter and

6  worked appropriately during the training.  (Vol. 2, 295:18–296:6.)  Ms. Moland testified that she

7  was trained to affirmatively take steps to get an interpreter for a patient once that patient was

8  identified as primarily speaking another language.  (Vol. 2, 328:7–11.)  Anna Chalko, a nurse

9  who was working at DMC in late 2015, testified that when she first started working at DMC, she

10  was trained on how to communicate in situations where there might be language barriers, and

11  though the training was not specific to deaf or hard of hearing patients, she learned in that training

12  that DMC has sign language interpreters to use for deaf patients.  (Vol. 3, 390:14–391:4.)  Ms.

13  Chalko also testified that based on that training, she knew that a deaf patient was entitled to an

14  interpreter, but it was her impression and recollection that in 2015 and prior thereto, the patient

15  needed to affirmatively ask for an interpreter.  (Vol. 3, 392:8–17; 392:2–7.)  However, Lonnie

16  Vaughn, a diabetes education and care specialist who has been working at DMC for over thirty

17  years, testified that she would absolutely get an interpreter if she identified that a patient needed

18  one, even if the patient did not specifically request one.  (Vol. 3, 335:20–25; 341:21–342:9.)

19         There was also inconsistent testimony at trial regarding who at DMC had authority to

20  request interpreters from NorCal in 2015.  LaDonna Martinez, the director of patient services at

21  DMC, testified that she signed NorCal request forms when she was a shift manager in late 2015

22  because it was her belief that only shift managers were allowed to request interpreter services.

23  (Vol. 2, 249:16–17; 251:5–252:3.)  However, Ms. Vaughn testified that she had called NorCal to

24  request an interpreter and understood that any staff member at DMC could contact NorCal to

25  request interpreter services.  (Vol. 3, 341:17–342:9.)  Likewise, Ms. Halloran testified that when

26  she needed to communicate with deaf mothers or fathers as a nurse in the neonatal unit at DMC,

27  she would request an interpreter by faxing NorCal a request form herself, or she would ask the

28  social workers at DMC to submit a request to NorCal.  (Vol. 2, 289:16–290:8.)  Andrea

Riemersma, a nurse at DMC for about eighteen years, testified that she interacted with deaf patients or deaf companions a few times and had contacted the social workers at DMC to assist with obtaining a live ASL interpreter on those occasions.  (Vol. 1, 112:10–24.)  The court also notes that one of the faxed NorCal request forms in evidence from October 2015 has Ms. Chalko's signature, and she was not a shift manager.  (PX-1B at 1162.)

2.    DMC's Practices Beginning in June 2016 under the AAS Policy

The AAS Policy states that DMC "personnel will provide qualified sign-language interpreters and/or other appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities," including patients and companions.  (DX-A at 2900.)  Under the AAS Policy, DMC "personnel will inform patients with disabilities . . . of the availability, at no cost to them, of qualified interpreters and/or other auxiliary aids, and will provide each service promptly upon request."  (*Id.*)  The AAS Policy defines "personnel" broadly to include all "employees, independent contractors, and volunteers involved in the delivery of healthcare services" at DMC.  (*Id.* at 2899.)  The AAS Policy further provides guidelines for the initial intake of patients, the provision of interpreting services, addressing the needs of deaf companions, the maintenance of a log pertaining to requests for auxiliary aids or services, and a grievance procedure for dissatisfied patients.  (*Id.* at 2901–2911.)

The AAS Policy states that DMC will provide a qualified sign language interpreter and/or other appropriate auxiliary aids and services in all circumstances where necessary for effective communication as required by the ADA" and outlines a non-exhaustive list of such circumstances, including:

> (a)    determination of a patient's medical history or description of ailment or injury;
>
> (b)    provision of patient rights, informed consent or permission for treatment;
>
> . . .
>
> (d)    diagnosis or prognosis of an ailment or injury;
>
> (e)    explanation of procedures, tests, treatment, treatment options or surgery;

(f)   explanation of medications prescribed including dosage as well as how and when the medication is to be taken and any possible side effects;

(g)   explanation regarding follow-up treatment, therapy, test results or recovery;

(h)   discharge instructions; . . . .

(*Id.* at 2903.)  According to the AAS Policy, "[t]he decision of the method to be used for communication requires the input of the patient[s] and their choice must be given weight."  (DX-A at 2898; Vol. 1, 137:13–138:2.)  DMC staff implement this requirement by using an interactive auxiliary aids assessment tool upon initial intake of patients, which is a form titled "Services for Deaf and Hard of Hearing Persons" that lists the available auxiliary aids and services and prompts patients and companions to identify their preferred means to communicate effectively by circling "yes" or "no" next to each aid or service.  (DX-A at 2901–2902; 2913–15; Vol. 1, 138:24–139:15.)  On a section of that assessment form titled "Waiver," patients and companions can decline DMC's offer to provide a qualified sign language interpreter free of charge to them and can indicate that they prefer a different method of communication or a specific interpreter service. (DX-A at 2915.)

As noted above, in June 2016, all then-existing DMC employees received an initial training on the AAS Policy, which included a presentation of slides that describe the DMC's requirements and responsibilities.  (DX-B; DX-C; Vol. 2, 270:17–272:24.)  For DMC employees hired after the initial rollout, training on the AAS Policy is included as part of DMC's new hire orientation.  (Vol. 2, 272:13–20.)  In addition, all DMC employees receive annual reorientation using an online learning module tool, and completion of the reorientation packet, which includes slides on the auxiliary aids policy, is mandatory for all staff.  (DX-I; DX-J; Vol. 2, 249:23–250:3; 272:21–273:10; 319:10-21.)  As the ADA coordinator, Ms. Halloran created a "cheat sheet" of talking points related to providing auxiliary aids and used that as an additional teaching tool in staff huddles at the beginning of each shift to reinforce the AAS Policy's requirements.  (Vol. 2, 275:11–276:3; DX-E.)

/////

8

1  With regard to auxiliary aids and services, all of these training materials emphasize that

2  staff are required to assess the needs of patients and companions, ensure that the "Services for the

3  Deaf and Hard of Hearing Persons" form is completed, ensure that the completed form becomes

4  part of the patient's medical record, and ensure that the completed form is faxed to the ADA

5  coordinator.  (*See* DX-C at 2924, 2925, 2927, 2930; DX-B at 2789, 2799–2801; DX-E at 2777;

6  DX-I at 2849; DX-J at 2990.)  Those trainings outline the ADA coordinator's responsibilities,

7  including "help[ing] to locate auxiliary aids and services . . . as needs arise," and "maintain[ing] a

8  log of all ADA-related requests," and clarify that after staff notify the ADA coordinator that there

9  is a need for an auxiliary aid, "[t]he ADA coordinator will, in turn, work to help locate the

10  specified aid."  (DX-C at 2921, 2925.)  Notably missing from these training materials are any

11  directives or instructions on what steps the DMC staff members should take to obtain a qualified

12  sign language interpreter themselves—either by utilizing VRI services or by submitting a request

13  for an in-person ASL interpreter from a third-party interpretation service provider.  Such

14  instructions are missing despite the fact that the AAS Policy itself states that "[i]mmediately upon

15  completing the assessment and [the Services for the Deaf and Hard of Hearing Persons form]

16  requirements and determining that a person scheduled to be a patient is a person who is deaf,

17  [DMC] personnel involved with the patient will promptly schedule or otherwise promptly call for

18  a qualified interpreter to be provided."  (DX-A at 2902.)

19  In addition to these training materials, Ms. Halloran also created a document titled

20  "Sensory Impairment Tool Kit Hearing/Visually," which she placed in each nursing unit on every

21  floor to make it easier for staff to access information about available auxiliary aids in one place.

22  (Vol. 2, 278:23–279:23; DX-G.)  That tool kit includes a blank copy of the Services for Deaf and

23  Hard of Hearing Persons assessment form, a health care communication board, a step-by-step

24  guideline for bedside nurses to assess patients with sensory impairments, and a list of auxiliary

25  aids and services with contact and location information.  (DX-G; Vol. 2, 283:8–25.)  In that kit,

26  the following access information is provided with regard to sign language interpreter services:

27  Qualified Sign Interpreters may be reached at:
   - 4 U I SIGN – Fred Hedgewood (Use first) [phone number]

28  - NorCal center on Deafness

9

1      o   Complete the Interpreter Request form, the form
           must be complete and legible.
2      o   Fax completed form to [phone number]

3      VRI – video conference
           •   VRE [sic] computer is available in the House Supervisors
4              office.
                   o   Monday – Friday contact Janice Halloran ext 3913
5                  o   After hours contact the House Supervisor at ext 3791
           •   Coming soon to Each unit
6                  o   Ipads located in each unit
                   o   Each Ipad has instruction for use on the screen
7

8   (DX-G at 2609.)[8]  However, similar to the training materials discussed above, the tool kit did not

9   specify who has authority to contact 4 U I SIGN and NorCal, whether any staff member is

10  authorized to submit requests for interpreters from those providers, or whether any such request

11  must come from a specific staff member, such as the ADA coordinator.  Moreover, despite noting

12  that the NorCal Interpreter Request form must be completed, the tool kit neither attaches a copy

13  of that request form nor provides information regarding where a staff member could locate that

14  form.  Indeed, there are no instructions in the detailed step-by-step guidelines on the next page of

15  the tool kit that direct staff members to call 4 U I Sign or complete and fax a request form to

16  NorCal on their own.  Nevertheless, Ms. Halloran testified that under the AAS Policy, anyone at

17  DMC could call for a live interpreter.  (Vol. 2, 290:22–291:8.)

18          As to VRI services, Ms. Halloran explained that when she prepared and disseminated this

19  tool kit in June 2016, the VRI equipment consisted of a laptop computer, but they had also been

20  trying out iPads with the VRI pre-loaded and anticipated distributing those iPads to each unit,

21  which they did shortly after June 2016.  (Vol. 2, 283 at 3–7; Vol. 1, 146:24–147:4.)  VRI services

22  are currently provided using the iPads.  (Vol. 1, 136: 15–24; Vol. 2, 296:11–13.)  Ms. Halloran

23  also testified that one of the ways DMC is working to further improve its care for deaf patients is

24  /////

25

26  [8]  In February 2016, DMC contracted with a new local company called "4 U I Sign" to provide
    ASL interpreter services.  (See DX-AQ; Vol. 2, 280:4–23, 290:9–21.)  Ms. Halloran testified that
27  the reason she stated "Use first" next to 4 U I Sign is because that company used a less
    cumbersome process of requesting an interpreter by simply making a phone call, and it has a
28  much quicker response time.  (Vol. 2, 280:4–15.)

                                                10

1   by using iPads that have much larger screens, so the patient can see a larger image of the

2   interpreter.  (Vol. 2, 297:13–20.)

3   **C.      Mr. Bax's Hospital Visits to DMC in October and November 2015**

4           Mr. Bax received in-patient medical care at DMC beginning late in the evening on

5   October 13 through October 27, 2015, and again on November 12 through November 18, 2015, to

6   treat his diabetes and a wound infection on his foot, which required three separate surgeries and

7   eventually led to the amputation of his fifth toe (commonly referred to as the pinky toe).

8           At trial, the parties presented incomplete, contradictory, and inconsistent accounts of what

9   happened during Mr. Bax's hospitalizations with regard to the provision of auxiliary aids and

10  services for him as a patient and for Mrs. Bax as his companion.  In finding the facts as follows,

11  the court has considered the reliability, credibility, and truthfulness of the witnesses who testified

12  at trial (including plaintiffs, DMC staff who provided care for Mr. Bax during his visits, and the

13  surgeon who operated on Mr. Bax's foot), and the extent to which their testimony is corroborated

14  by documentary evidence admitted at trial (including Mr. Bax's medical records, NorCal

15  interpreter request forms, and NorCal invoices).

16          1.      Mr. Bax's October 2015 Hospitalization

17          In mid-October 2015, while visiting California for the first time, Mr. Bax was

18  experiencing pain and numbness in his foot, was limping and had difficulty walking.  (Vol. 1,

19  27:10–28:5.)  On the evening of October 13, 2015, Mrs. Bax, his then-girlfriend, saw him limping

20  with pained expressions and became very worried, so she told him that they needed to go the

21  emergency room.  (*Id.*)  Mrs. Bax testified that she did not know that Mr. Bax had a bad staph

22  infection in his toe when they first went to the emergency room at DMC; Mr. Bax had told her

23  that his toe was dirty and infected, though the situation was awkward because they were just

24  dating at the time.  (Vol. 1, 102:18–25.)

25                  a.      *October 13: Emergency Department Evaluation*

26          Mr. Bax's medical record shows that he was seen by the triage nurse at 8:54 p.m. and by

27  the emergency department physician at 10:48 p.m. on October 13, 2015.  (DX-N at 1459.)  Mr.

28  Bax signed a consent form acknowledging receipt of DMC's "Notice of Privacy Practices" and

1    "Conditions of Service" at 11:29 p.m.  (PX-1C at 1305.)  He also signed a form indicating that he

2    had received a notice about his Medicare rights and understood those rights.  (*Id.* at 1326.)

3           According to Mr. Bax, when he arrived at DMC, he gestured that he cannot hear and

4    wrote "ADA interpreter" on a note to DMC staff, who responded by putting up a finger gesturing

5    for Mr. Bax to wait and that they would take care of it.  (Vol. 1, 28:6–14.)  Mrs. Bax also testified

6    that she made the gesture of writing and patted her ear to request an interpreter, but the nurse just

7    sat there.  (Vol. 1, 79:15–19.)  When his name was called, the Baxes were taken to a room where

8    staff looked at Mr. Bax's foot.  (Vol. 1, 28:15–16.)  Mr. Bax testified that neither he nor Mrs. Bax

9    had any communication with the staff because there was no interpreter, and they became very

10   emotional and frustrated.  (Vol. 1, 28:15–24.)  Mr. Bax hollered "where's the interpreter," and

11   was again told by staff using the one finger gesture to wait.  (Vol. 1, 28:24–29:1.)  The Baxes

12   waited for at least an hour before Mr. Bax was discharged from the emergency department,

13   admitted to the hospital, and moved to a patient room on another floor.  (Vol. 1, 29:2–4; *see also*

14   DX-N at 1462 (noting Mr. Bax's discharge from DMC's emergency department and admission to

15   DMC's "1 Medical" hospital shortly after 2 a.m. on October 14, 2015); PX-1E at 1921).

16          In contrast to Mr. Bax's testimony that he was unable to have *any* communication with

17   staff in the emergency department, his medical record includes an "Emergency/Urgent Care"

18   record, which states his chief complaint and describes the history of his complaint in

19   considerable detail as follows:

20              The patient presented with skin infection.  The onset was 3 days
                ago.  The course/duration of symptoms is worsening.  Location: left
21              foot.   The character of symptoms is redness, ulceration.   Risk
                factors consist of history of borderline diabetes.  Therapy today:
22              prescription medications including unknown antibiotic.  Associated
                symptoms: hyperglycemia.  Patient was seen at St. Francis hospital
23              in Hayward 3 days ago and prescribed antibiotics, but he does not
                remember the name of the medication.   Symptoms have become
24              worse since then.  Patient's blood sugar was 468 tonight.  Patient
                has elevated blood sugar when he has an infection, the last time he
25              had an infection his blood sugar was elevated for 2 weeks.

26   (DX-N at 1459.)  That record also states that the patient is deaf and that he provided that history

27   /////

28   /////

12

1    through written notes.  (*Id.*)[9]

2         It is undisputed that DMC did not provide an interpreter for the Baxes on October 13,

3    2015.  There was no evidence submitted at trial—whether it be a NorCal request form, a NorCal

4    invoice, a call record from Cyracom, a note in his medical record, or witness testimony—to

5    suggest that DMC's emergency department staff requested interpreter services for Mr. Bax in the

6    late evening of October 13, 2015.  There is also no notation in Mr. Bax's medical record

7    documenting that he or Mrs. Bax had requested an ASL interpreter at any point during the few

8    hours that he was in the emergency department that night.

9         The Baxes' testimony is the only evidence before the court to suggest that the Baxes had

10   requested an interpreter while in the emergency department on October 13, 2015.  The court not

11   only finds the Baxes to be poor historians with contradicting and inconsistent accounts of what

12   happened during their hospitalizations, the court also questions the credibility of the Baxes as

13   witnesses for reasons described herein.  As discussed below, during some days of his

14   hospitalization, Mr. Bax explicitly refused to sign consent forms without an interpreter and

15   refused to proceed with surgery without an interpreter—all of which is well documented by DMC

16   staff and physicians in Mr. Bax's medical record.  Yet, Mr. Bax signed various consent forms on

17   October 13, 2015, including the notice regarding his Medicare rights, which is the same form that

18   he refused to sign without an interpreter at the end of his October hospitalization.  That later

19   refusal shows that Mr. Bax not only knew how to request an interpreter, he also demonstrated his

20   willingness to refuse to sign the same Medicare notice if an interpreter was not provided.  In the

21   court's view, because Mr. Bax signed the Medicare notice on October 13, 2015, rather than

22   refusing to sign it without an interpreter as he did a week later, the reasonable inference to be

23   drawn from that evidence is that Mr. Bax did not request an interpreter on October 13, 2015.

24   _____

25   [9]  Included in Mr. Bax's medical record are copies of some written notes, which reflect that he
     answered written questions and provided staff with fairly detailed information, including the
26   name of his primary care doctor, that he was visiting from Missouri, that it was his first time in
     California, that he came to attend his girlfriend's cousin's wedding, that he first noticed his foot
27   getting red on Sunday morning, that he went to urgent care on Sunday and was told he had a germ
     infection in his foot and was given antibiotics, and that he had been diagnosed with borderline
28   diabetes several years earlier.  (DX-AN at 1318–21; Vol. 1, 54:24–18.)

1        In addition, based on the documented history of Mr. Bax's complaint in the medical

2  record, which was obtained through written notes, the court finds that Mr. Bax was able to

3  communicate with the emergency department staff despite not having an ASL interpreter.

4  Although Mr. Bax testified that there are significant differences between ASL and English

5  leading to many misunderstandings, and that he was "unable to write in English a good enough

6  sentence for their comprehension of what [he] was going through" and had difficulty

7  understanding the staff's responses, he did not testify that he had informed emergency department

8  staff of these difficulties and limitations.  (Vol. 1, 29:8–13.)  Mr. Bax did not present any other

9  evidence to suggest that while he was in the emergency department on October 13, 2015, his

10  communication with DMC staff via written notes was ineffective.

11        b.    *October 14:  Admission, Diabetes Diagnosis, and Patient Education*

12        Mr. Bax was admitted to the DMC hospital in the early hours of October 14, 2015 after

13  being discharged from the emergency department.  (DX-N at 1462.)  Medical records reflect that

14  between midnight and 2:30 a.m., a physician evaluated Mr. Bax and determined that he had

15  uncontrolled diabetes and needed a podiatry consult to assess his left foot, which showed

16  erythema (redness of the skin) and had dry and crusted blood between the fourth and fifth toes.

17  (DX-O at 1282–1283.)  That physician noted:  "I discussed this plan with patient and also

18  patient's wife who is currently at bedside, she is also deaf.  Most of the information has been

19  written now."  (*Id.* at 1283.)  Mrs. Bax testified that she did not know that Mr. Bax had diabetes,

20  but it was not stressful or concerning for her to learn that Mr. Bax was diabetic.  (Vol. 1, 101:18–

21  102:9.)

22        Later that morning, at approximately 8:14 a.m., a nurse completed admission

23  documentation for Mr. Bax based on information he had provided by writing answers to questions

24  on paper.  (DX-W at 1486.)  Around 8:18 a.m., Mr. Bax received patient education on safety,

25  medication, diabetes, and infection prevention; the teaching method for that education was "using

26  point picture board and writing down information for patient," along with demonstration and

27  printed materials.  (PX-1J at 2515.)  The patient education record notes that Mr. Bax verbalized

28  his understanding of the education.  (*Id.*)

It is undisputed that DMC did not provide an interpreter for the Baxes on October 14, 2015.  Mr. Bax testified that he requested an interpreter every single day during his hospitalization from October 14 through October 27, 2015 because "writing is not enough explanation for [him] to understand clearly since [he has] limited proficiency in English."  (Vol. 1, 32:24–33:4.)  However, at his deposition, Mr. Bax testified that he asked for a live interpreter "almost every day."  (Vol. 1, 57:3–5.)  There are no notations in Mr. Bax's medical record documenting that he or Mrs. Bax requested an ASL interpreter at any point on October 14, 2015.  There is also no evidence in the medical record that Mr. Bax informed DMC that he was not able to fully understand written notes because he had limited proficiency in English, nor did Mr. Bax testify that he had informed DMC of this limitation.  Whereas, the medical record does state that Mr. Bax had verbalized his understanding of the patient education and demonstrations.  (PX-1J at 2515.)

Accordingly, in light of that patient education record and Mr. Bax's inconsistent testimony regarding how often he requested interpreters—"almost every day" (deposition testimony) or "every single day" (trial testimony)—the court finds by a preponderance of the evidence that Mr. Bax did not request an interpreter on October 14, 2015.  In addition, Mr. Bax did not present any evidence at trial suggesting that his communication with DMC staff via written notes on October 14, 2015 was ineffective, or that he had informed DMC staff that he felt communicating using written notes was ineffective for him.

c. *October 15:  Patient Education, Mr. Bax Requested an Interpreter to Translate Consent Form for Surgery*

At 2:26 a.m. on October 15, 2015, a nurse assessed Mr. Bax's foot, noting that "[p]atient has a black necrotic area underneath foot towards toe area," and though not clear what method of communication was used, the nurse also noted that "[p]atient states that foot is getting better as pink inflamed area was past patient's knee per patient."  (PX-1K at 1530.)

Mr. Bax received additional patient education at various times throughout the day on October 15, 2015, and the patient education record states that he was taught by staff "using picture board and writing down information for patient," and that Mr. Bax "communicated

15

1   through writing information and questions down as well." (PX-1L at 2512–14.)  There is no

2   evidence that Mr. Bax had requested an interpreter for these teachings, or that he informed DMC

3   nursing staff that he was unable to understand the patient education.  To the contrary, the nursing

4   notes in the patient education record suggest that Mr. Bax was engaged, wrote down information,

5   and asked questions.  Accordingly, Mr. Bax has not shown by a preponderance of the evidence

6   that the communication method used for his patient education on this day was ineffective for him.

7         At 6:58 p.m., a nurse entered a nursing note in Mr. Bax's medical record noting that

8   "[patient] does not want to sign consent without interpreter[;] interpreter will be contacted."  (PX-

9   1K at 1530.)  The nurse did not specify which consent form she referred to in this note.  The

10  reference appears to be to a surgical consent form because Mr. Bax's first surgery was scheduled

11  for the following day, October 16, 2015, and he subsequently signed that consent form for that

12  surgery.  (*See* PX-1C at 1322–23.).  In addition, there is a NorCal request form in evidence

13  showing that DMC signed a request form on October 15, 2015 to request an ASL interpreter

14  starting at 7:30 a.m. on October 16, 2015 for Mr. Bax, and the specific reason for the appointment

15  was stated as "sign language interpreter for surgery."  (PX-1B at 1163.)  The shift manager who

16  signed the request form, LaDonna Martinez, testified that the interpreter was requested for

17  October 16, 2015 "for surgical consent."  (Vol. 2, 251:9–25.)  The court therefore finds by a

18  preponderance of the evidence that on the evening of October 15, 2015, Mr. Bax requested that an

19  interpreter be provided before he would consent to the surgery scheduled for the following day,

20  and in response, DMC requested an ASL interpreter from NorCal for that purpose.

21         d.   *October 16: First Debridement Surgery, In-Person Interpreter Provided*

22         At 7:30 a.m. on October 16, 2015, Mr. Bax received additional patient education, and the

23  patient education record states that Mr. Bax asked questions and was eager and willing to learn,

24  and that he "is able to read and write."  (PX-1L at 2512.)

25         Later that morning, Mr. Bax underwent a debridement surgical procedure, in which

26  necrotic (dead) tissue was removed.  (Vol. 242: 3–14; PX-1O.)  In addition to the NorCal request

27  form showing that DMC requested an ASL interpreter for Mr. Bax's debridement surgery (PX-1B

28  at 1163), there is a NorCal invoice billing DMC for five hours of interpreting services provided

16

1  on October 16, 2015, from 8:30 a.m. through 1:30 p.m.  (DX-AR at 1271.)  With the requested

2  interpreter having been provided, Mr. Bax signed the consent to surgery form for the "left foot

3  debridement with possible toe #5 amputation" procedure to be performed by Dr. Wolterbeek,[10]

4  although the translator attestation section of that form was left blank.  (PX-1C at 1322–23.)

5       The court also heard trial testimony from Dr. Wolterbeek regarding whether he

6  communicated with Mr. Bax using an interpreter for the first debridement surgery, but that

7  testimony was confusing at best and not credible at worst.  Dr. Wolterbeek testified that he had no

8  specific recollection of his interactions with Mr. Bax and that he relied on his operative reports

9  and his notes in the medical record to answer the questions posed to him at trial, stating that "all

10  [he] know[s] is what is in the written chart," but nevertheless, he "somehow remember[s] in [his]

11  head not having a translator for the first surgery."  (Vol. 2, 201:12–24.)  Dr. Wolterbeek did

12  remember that he communicated with Mr. Bax by typing on an iPad and handing the iPad back

13  and forth, and through that method, he told Mr. Bax that his foot had a big infection, his pinky

14  and fourth lateral toe were in jeopardy, and he needed surgery.  (Vol. 2, 213:2–21.)  Dr.

15  Wolterbeek testified that he told Mr. Bax that he would do everything he could to save those toes,

16  consistent with his operative report, which states:  "I told [him] I will do the best I can to save the

17  lateral toe, but #5 and #4 toe are little bit dusky going in the surgery today."  (Vol. 2, 213:21; PX-

18  1O at 1999.)  Dr. Wolterbeek could not remember if Mrs. Bax was present in the room at the

19  time, but he knew that Mrs. Bax was also deaf and did not recall using the iPad to type notes with

20  her.  (Vol. 2, 213:22–214:5.)

21       Adding to the confusion, Dr. Wolterbeek testified that this interaction with Mr. Bax was

22  the first and only time he has used this form of communication—passing typed notes back and

23  forth on an iPad—in the hospital setting to communicate with a patient.  (Vol. 2, 214:19–215:18.)

24  Dr. Wolterbeek testified that in general, talking with a patient about surgery is important, and he

25  would ideally want a translator to communicate with a patient in that patient's primary language,

26  "but if there is urgency in the matter, [he] would not postpone things."  (Vol. 2, 183:11–16.)  Dr.

27  _____

28  [10]  Dr. Wolterbeek is not an employee of DMC; he is a self-employed foot surgeon, specializing in diabetic foot salvage, and he has privileges at DMC.  (Vol. 2, 172:2–10; 241:15–19.)

1    Wolterbeek provided as an example that "an acute diabetic foot infection may not necessarily be

2    able to wait and [he] must operate in a reasonable amount of time." (Vol. 2, 183:17–22.) The

3    doctor testified that Mr. Bax's first surgery was to "try[] to put the fire down," and he would not

4    necessarily want to wait for an interpreter for that type of surgery. (Vol. 2, 216 at 5–10.) But

5    when asked at trial if he had wanted an interpreter to communicate with Mr. Bax, Dr. Wolterbeek

6    testified that he did not feel an interpreter was necessary—not because there was a sense of

7    urgency or rush to operate—but because they were doing fine communicating back and forth.

8    (Vol. 2, 189:4–11.) According to Dr. Wolterbeek, Mr. Bax never indicated directly to him that he

9    wanted an interpreter. (Vol. 2, 189:22–25.) When prompted by the court for clarification in this

10   regard, Dr. Wolterbeek clarified that although he remembered that Mr. Bax had wanted an

11   interpreter for the *second* surgery, he was not aware that Mr. Bax had requested an interpreter for

12   the first debridement surgery. (Vol. 2, 189:13–190:12.)

13          Even though the translator section of the consent form for the first surgery was left blank

14   and Dr. Wolterbeek recalled not having an interpreter present for that surgery, in light of Mr.

15   Bax's initial refusal to sign the consent form without an interpreter coupled with his subsequent

16   signing of the form, and the corresponding NorCal request form and invoice billing DMC for five

17   hours of interpreter services on October 16, 2015, the court finds that the evidence presented at

18   trial established that DMC did in fact provide an ASL interpreter for Mr. Bax in connection with

19   his first debridement surgery.

20              e.    *October 17:  Post-Operative Discussion with Dr. Wolterbeek, Patient
                      Education, and Interpreter Requested by DMC for Diabetes Teaching*
21

22          Dr. Wolterbeek entered a physician progress note in Mr. Bax's medical record at

23   2:35 p.m. on October 17, 2015, noting: "No complaints. We discuss the situation with especially

24   the 5th toe. (typed back and forth on iPad)." (PX-1O at 1978.) That physician progress note also

25   states that the assessment and plan was for Mr. Bax to return to the operating room on October

26   21, 2015 for a second surgery "for closure and amputation of toes as needed." (PX-1Q at 1980.)

27   Dr. Wolterbeek testified that he told Mr. Bax how bad the situation was with his toe, that Mr. Bax

28   was definitely at risk of losing his toe, and that he would try to save it. (Vol. 2, 218:18–219:12.)

18

1    Dr. Wolterbeek testified that post-operative discussions with patients are important, but he did not

2    feel an interpreter was required for this post-operative discussion because Mr. Bax was speaking

3    English on the iPad and he thought Mr. Bax was understanding what was being said.  (Vol. 2,

4    224:24–225:5.)  Dr. Wolterbeek further testified that he assumes that when he writes the English

5    language to a patient, and the patient writes back in English, that the patient understood his

6    English.  (Vol. 2, 230:5–12.)

7          Mr. Bax had also received patient education around 8:00 a.m. on Saturday, October 17,

8    2015, and both Mr. and Mrs. Bax were taught patient education around 10:15 p.m. that evening.

9    (PX-1Y at 2510.)  The patient education record states that the teaching method was

10   "communicates by writing," and notes that Mr. Bax "return[ed] demonstration and instruction

11   correctly."  (*Id.*)  In the early afternoon that day, Mr. Bax also met Lonnie Vaughn, a diabetes

12   education and care specialist who teaches patients and their families about caring for patients with

13   diabetes.  (Vol. 3, 335:24–25, 358:17–24; DX-AA at 1529.)  Ms. Vaughn entered a nursing note

14   in Mr. Bax's medical record stating that Mr. Bax and his significant other, Mrs. Bax, were both

15   deaf and new to diabetes management and care.  (Vol. 3, 335:24–25; DX-AA at 1529.)  Ms.

16   Vaughn testified that she assessed Mr. Bax's communication abilities, and for the type of hands-

17   on teaching that she does with patients, she believed a sign language interpreter was the only

18   effective way for them to communicate with each other.  (Vol. 3, 336:7–19, 337:12–16.)  In

19   addition, Ms. Vaughn testified that she wrote on a clipboard to introduce herself to the Baxes, and

20   Mrs. Bax used the clipboard in response to indicate that Mr. Bax needed an interpreter.  (Vol. 3,

21   324:6–15.)  Ms. Vaughn also testified, consistent with her nursing note, that she called NorCal

22   and left a message to request an interpreter, and she faxed a request form to NorCal requesting an

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1    interpreter for Mr. Bax's diabetes education scheduled for a few days later, on Monday, October

2    19, 2015.  (Vol. 3, 335:24–25; DX-AA at 1529.)[11]

3         Other than Mr. Bax's testimony at trial that he requested an interpreter "every single day,"

4    which conflicted with his deposition testimony that he requested interpreters "almost every day,"

5    Mr. Bax did not present any evidence to show that he specifically requested an interpreter for his

6    patient education with nurses and his post-operative discussion with Dr. Wolterbeek on October

7    17, 2015.  In addition, Mr. Bax did not present any evidence to suggest that his communication

8    with Dr. Wolterbeek by typing notes back and forth on the iPad or his written communications

9    with DMC nursing staff on October 17, 2015 were ineffective, or that he had informed DMC staff

10   that he felt communicating in this way was ineffective for him.  With respect to his diabetes

11   education with Ms. Vaughn, however, the court finds both that Mrs. Bax requested an interpreter

12   on Mr. Bax's behalf, and that Ms. Vaughn had submitted a request to NorCal for an interpreter

13   the following Monday, October 19, 2015 for that diabetes education.

14              f.    *October 18:  Patient Education*

15        In the morning and evening of October 18, 2015, Mr. and Mrs. Bax received patient

16   education on wound care, medication, hygiene, and fall safety, among other topics, and the

17   patient education record indicates that both asked questions and received printed materials.  (PX-

18   1Y at 2508.)  There is no indication in the medical record that either Mr. or Mrs. Bax informed

19   the nurses providing the patient education on this day that the communication method being used

20   for the education was ineffective or that they requested an interpreter for that education.  In

21   contrast, when Ms. Vaughn was assessing Mr. Bax the day before, Mrs. Bax specifically

22

23   [11]  The court notes that neither party admitted into evidence a NorCal request form that would
     correspond to Ms. Vaughn's nursing note (i.e., a request form signed and dated October 16, 2015
24   requesting that an interpreter be provided on October 19, 2015).  There is, however, a NorCal
     invoice that purports to be for three hours of interpreter services provided for Mr. Bax on October
25   19, 2015 between "7–10pm" for "high blood sugar and bone infection of foot."  (PX-1AB at
     1272; DX-AR at 1272.)  Ms. Vaughn testified that because she requested an interpreter for
26   October 19, 2015, and she indeed met with Mr. Bax and an interpreter on that day for diabetes
     education, including discussing high blood sugar issues, she believed that this invoice
27   corresponds to her request even though she did not request an interpreter for between 7–10 at
     night.  (Vol. 3, 360:16–362:23.)
28

                                                    20

1   requested an interpreter on his behalf for that diabetes teaching.  Thus, the court finds by a

2   preponderance of the evidence that neither Mr. nor Mrs. Bax requested an interpreter for the

3   patient education provided on October 18, 2015, or for any other reason on that date.  In addition,

4   Mr. Bax has not shown by a preponderance of the evidence that the communication method used

5   for his patient education on this day was ineffective for him.

6                              g.   *October 19:  Physical Therapy, MRSA Diagnosis*

7        According to his medical records, Mr. Bax received an initial evaluation for physical

8   therapy in the afternoon on October 19, 2015.  (PX-1AF at 2037.)  The rehabilitative services

9   record documenting this evaluation noted that Mr. Bax is deaf and that the physical therapist used

10  "written communication" to communicate with him.  (*Id.*)

11       A progress note in Mr. Bax's medical record from hospitalist Dr. Upinder Rohewal notes

12  that on October 19, 2015, test results from a swab taken of Mr. Bax's wound infection came back

13  positive for Methicillin-resistant Staphylococcus aureus ("MRSA").  (PX-1AA at 1290.)

14  According to the progress note, which states "[t]hrough sign language, the family is at the

15  bedside," Dr. Rohewal met with the Baxes and communicated using an interpreter that day.  (*Id.*)

16  The progress note was dictated by Dr. Rohewal at 1:18 p.m. in the afternoon, but it does not

17  specify when Dr. Rohewal met with the Baxes.  (*Id.*)

18       At some point on the morning of October 19, 2015, Anna Chalko, one of the nurses who

19  had been caring for Mr. Bax and who had primarily communicated with him by writing notes

20  back and forth with pen and paper—a method she felt had been working "really well"—informed

21  Mr. Bax that he was MRSA positive through written notes.  (Vol. 3, 385:9–387:9; DX-AA at

22  1528.)  Through these notes, Ms. Chalko explained to Mr. Bax that his care would stay the same,

23  but more precautions would have to be taken so the MRSA would not get transported.  (Vol. 3,

24  386:24–387:9.)  According to Ms. Chalko, Mr. Bax did not indicate that he was dissatisfied with

25  communicating in writing; on the contrary, Ms. Chalko recalled that the communication was

26  "very pleasant" and that they communicated a lot because they went through a lot of computer

27  paper.  (Vol. 3, 387:10–17.)  Ms. Chalko testified that Mr. Bax's demeanor changed when his

28  isolation Styrofoam lunch tray (a MRSA precaution) was delivered, and she received a written

                                          21

note from Mr. Bax stating that he requested an interpreter, had been requesting one all day, and was going to sue the "F***ing hospital." (DX-AA at 1528.)  As documented in her nursing note, Ms. Chalko then explained to the Baxes the reason for the isolation meal tray, but Mr. Bax was upset by the isolation and complained that he was being discriminated against.  (*Id.*)  Ms. Chalko told Mr. Bax that she would work on getting an interpreter.  (Vol. 3, 389:13–14.)  Ms. Chalko then signed a NorCal interpreter request form on October 19, 2015 to request an interpreter for 10:00 a.m. to noon on October 20, 2015 for "diabetes education / teaching of insulin."  (Vol. 3, 388:11–15; PX-1B at 1162.)

According to Ms. Chalko, when she left at the end of her shift that evening around 7:30 p.m., she remembers that there was an interpreter standing in the doorway to Mr. Bax's hospital room wearing a disposable yellow gown (another MRSA precaution) and communicating with him from that distance, which was upsetting to Mr. Bax.  (Vol. 3, 400:18–405:10.)  Ms. Chalko remembers that she was in Mr. Bax's room giving patient reports for about thirty minutes, while the interpreter was there, and that when she left for the night, the interpreter was still there.  (Vol. 3, 403:11–405:10.)

The court finds that the evidence admitted at trial presents an incomplete picture with regard to interpreters provided for Mr. Bax on October 19, 2015.  Mr. Bax did not have an interpreter during his afternoon physical therapy evaluation, though he did have an interpreter when he met with Dr. Rohewal at some point before 1:18 p.m. when Dr. Rohewal dictated the progress note for that day.  Despite apparently having an interpreter while meeting with Dr. Rohewal, Mr. Bax did not have an interpreter when Ms. Chalko exchanged written notes with him about his MRSA diagnosis that morning or when Mr. Bax became upset about his isolation lunch tray around midday.  In addition, there is neither a NorCal request form nor a NorCal invoice for interpreter services provided during any daytime hours on October 19, 2015 to corroborate Dr. Rohewal's progress note noting the use of an interpreter that day.  There is a NorCal invoice purporting to bill DMC for three hours of interpreting services provided between 7:00–10:00 p.m. that night, which would seem to corroborate Ms. Chalko's testimony that she saw an interpreter signing with Mr. Bax before she left at the end of her shift around 7:30 p.m.

1    But, because the description on that invoice states "high blood sugar and bone infection of foot,"

2    Ms. Vaughn testified that she believed that invoice corresponded to her diabetes teaching on

3    October 19, 2015.  (*See* footnote 9, supra.)  However, despite Ms. Vaughn's testimony and her

4    October 16, 2015 nursing note indicating that she faxed a NorCal form requesting an interpreter

5    for Mr. Bax on October 19, 2015, there was no such request form admitted into evidence at trial,

6    and there was no record of Mr. Bax actually receiving diabetes teaching with Ms. Vaughn on

7    October 19, 2015.

8           Thus, the court finds that in his written communication with Ms. Chalko on October 19,

9    2015, Mr. Bax had requested an interpreter.  Though not entirely clear from the evidence

10   presented at trial who from DMC requested an interpreter for that evening, it appears that an

11   interpreter was in fact provided later that night for Mr. Bax.

12                   h.    *October 20:  In-person Interpreter Provided for Diabetes Education and*
                           *Group Meeting with Dr. Wolterbeek, Dr. Rohewal, and Nursing Staff*
13

14          Ms. Vaughn testified that because Mr. Bax had questions about his care plan and

15   treatment, including the surgery scheduled for the next day, Ms. Vaughn arranged for an

16   interpreter to be present at a group meeting on October 20, 2015 at 10:00 a.m. with the Baxes and

17   "all the people that would be involved with planning his care and treatment and discharge."  (Vol.

18   3, 338:25–340:5.)  This group meeting included Mr. Bax's surgeon Dr. Wolterbeek, hospitalist

19   Dr. Rohewal, nurse manager LaDonna Martinez, nurse Andrea Riemersma, diabetes care

20   specialist Ms. Vaughn, a case manager, and a social worker.  (*Id.*)  Ms. Vaughn testified that

21   when she called the doctors to arrange this group meeting, she told them that an interpreter would

22   be at the meeting and she stressed the importance of using interpreters to communicate with Mr.

23   Bax.  (Vol. 3, 352:25–353:20.)  In a progress note dated October 20, 2015  at 11:49 a.m., Dr.

24   Wolterbeek documented the meeting, noting:  "Translator here.  No complaints.  Long discussion

25   about the situation."  (PX-1AJ at 1968.)  In that progress note, Dr. Wolterbeek also stated the

26   assessment/plan as:  "Gangrene foot.  Will [go] to surgery tomorrow for debridement with likely

27   toe 5 amputation.  No questions remain."  (DX-S at 1421.)  Dr. Rohewal documented the meeting

28   /////

23

1   in a progress note that he dictated at 11:46 a.m. that day, noting "[t]ime spent more than 25

2   minutes in discussing the patient's case via interpreter with sign language." (PC-1AH at 1291.)

3          A nursing note entered by Ms. Vaughn on October 20, 2015 states that she had arranged

4   for the interpreter from NorCal, and the interpreter arrived at 10:00 a.m. for the group meeting.

5   (DX-AA at 1527.) This nursing note corresponds to the NorCal request form signed by Ms.

6   Chalko on October 19, 2015, requesting an interpreter be provided on October 20, 2015 between

7   10:00 a.m. and noon for "Diabetes Education / teaching of insulin." (PX-1B at 1162.) That

8   request in turn corresponds with a NorCal invoice billing DMC for two hours of interpreting

9   services on October 20, 2015 between 10:00 a.m. to noon for "Diabetes Education / Insulin

10  Teaching." (DX-AR at 1273.) Ms. Vaughn testified at trial that after the group meeting

11  concluded, she met with Mr. Bax to provide teaching regarding insulin and diabetes. (Vol. 3,

12  365:17–24.)

13         Ms. Vaughn also stated in her nursing note that she called NorCal and arranged for an

14  interpreter to also come the next day, October 21, 2015, from 9:30 a.m. to 1:30 p.m. because Mr.

15  Bax requested an interpreter for before, during, and after his second surgery, which was

16  scheduled for October 21, 2015. (DX-AA at 1527; Vol. 3, 366:11–20.) Ms. Vaughn testified that

17  her nursing note corresponds to the NorCal request form signed by Ms. Martinez on October 20,

18  2015, requesting that an interpreter be provided between 9:30 a.m. and 2:00 p.m. on October 21,

19  2015 for "surgery." (PX-1B at 1161, 1335; Vol. 3, 367:23–368:19.) Ms. Martinez testified that

20  she signed this request form to have an interpreter present for Mr. Bax's second surgery. (Vol. 2,

21  254:19–255:4.)

22         In addition, Ms. Vaughn noted in her nursing note that Dr. Rohewal would order insulin

23  pens for Mr. Bax because Ms. Vaughn planned to teach the Baxes about patient insulin

24  preparation and injections at 10:00 a.m. on October 22, 2015 with an interpreter. (Vol. 3,

25  368:20–369:13; DX-AA at 1527; DX-AB at 2062.) Accordingly, she filled out a NorCal request

26  form to request an interpreter be provided on October 22, 2015 from 10:00 a.m. to 11:00 a.m. for

27  "teaching," and Ms. Martinez signed that request form on October 20, 2015. (Vol. 3, 369:14–

28  370:18; Vol. 2, 355:5–13; PX-1B at 1160, 1334.)

1    Mr. Bax's medical record includes a nursing note dated October 20, 2015 at 11:15 a.m.,

2    stating: "Deaf translator here at [sic] translated consent by sign [patient] verbalized

3    understanding." (DX-AA at 1528.) The court notes, however, that there is not a consent form

4    signed by Mr. Bax on October 20, 2015 in evidence that would correspond with this note.

5    Nonetheless, considering all of the exhibits and testimony regarding the group meeting

6    and diabetes teaching on October 20, 2015, the court finds by a preponderance of the evidence

7    that DMC had provided the Baxes with a live ASL interpreter on that day.

8                    i.    *October 21: In-Person Interpreter Not Available, VRI Attempted, Second*
                          *Surgery Rescheduled*
9

10    Despite DMC's requests for an in-person interpreter for October 21, 2015, NorCal did not

11    provide an interpreter for Mr. Bax as requested. Janelle Moland, a social worker who assisted

12    with Mr. Bax's care, testified that she called NorCal that morning and spoke with a NorCal

13    representative who confirmed that NorCal received DMC's request but was unable to provide an

14    interpreter on that day. (Vol. 2, 321:21–322:10.) Ms. Moland documented her communication

15    with NorCal in her case management/social services assessment in Mr. Bax's medical record.

16    (DX-X at 2051.) That assessment record also notes: "[Social services] manager and lead social

17    worker took video translation program through Cyracom in [patient's] room to communicate lack

18    of physically present interpreter. [Patient] declines to have surgery today without the presence of

19    interpreter. [Patient] refuses video interpreting system as method of communication." (*Id.*) Ms.

20    Moland testified that immediately before taking the Cyracom laptop to Mr. Bax's room, she and

21    her manager Sonia Alves opened the program, connected to a live ASL interpreter, and ensured

22    the connection was working well. (Vol. 2, 322:11–323:6.) Ms. Moland testified that she

23    remembered Mr. Bax did not want to use the VRI, but she did not recall how he conveyed to them

24    that he was declining that service. (Vol. 2, 323:14–18; 328:22–329:2.)

25    Andrea Riemersma, the nurse who cared for Mr. Bax on that day, testified that she was

26    briefly in the room when Ms. Moland and Ms. Alves tried to use the VRI with Mr. Bax and she

27    recalled that the VRI was slow to setup, but she could not remember whether there were any

28    issues with the screen being slow. (Vol. 1, 114:12–115:4.) According to Ms. Riemersma's

nursing note for October 21, 2015, she spoke with Andrea Perkins in social services at 9:00 a.m. who notified her that the "regular service used for interpreting for the deaf was not available." (DX-AB at 2062.)  That nursing note documents the VRI attempts, noting that social services tried VRI with Mr. Bax twice that day—once at 10:30 a.m., but he refused and complained it was too slow, and again at 1:45 p.m. after social workers adjusted the live video, but he refused to use the VRI at that time as well.  (*Id.*)

At 1:43 p.m., Dr. Rohewal dictated a progress note indicating that he spent more than 35-40 minutes at Mr. Bax's bedside with Ms. Martinez and that they "discussed with the patient with writing down in detail" and "tried to answer all his questions with writing down."  (PX-1AR at 1292.)  That progress note also states:  "Patient wants to speak with interpreter and Dr. Wolterbeek again and hence would not go for surgery at this point.  We have spoken with Mark [Medina], the interpreter, who came yesterday and spoke with Dr. Wolterbeek, but patient had agreed to the consent, but again, he has questions."  (*Id.*)  Dr. Rohewal noted that although Mr. Bax had already been given a detailed explanation of the planned procedure, Mr. Bax wanted to discuss the plan again through the interpreter and refused to use VRI.  (*Id.*)

Mr. Bax testified at trial that he grew frustrated with the VRI because the screen was pixelated and would lose connection and freeze, so he felt the communication was not effective. (Vol. 1, 31:17–32:9; 38:3–39:3.)  Ms. Riemersma testified that Mr. Bax was upset and did not want surgery.  (Vol. 1, 128:14–24.)  Her nursing note also documents that Mr. Bax had refused to proceed with surgery as scheduled and that she notified Dr. Wolterbeek of his refusal.  (DX-AB at 2062.)

Dr. Wolterbeek then saw Mr. Bax at 2:35 p.m. and notified him that the next available date for surgery was in two days, on Friday, October 23, 2015 at 9:00 a.m.  (*Id.*)  According to Mr. Bax, Dr. Wolterbeek communicated to him that delaying the surgery would increase the chance that he would lose his toe.  (Vol. 1, 59:21–60:3.)  On the contrary, Dr. Wolterbeek testified at trial that the second debridement surgery was not urgent because Mr. Bax was on a wound vacuum machine that would continue to do its job, and if Mr. Bax's toes were going to

/////

1  die, they would die regardless of whether the surgery was performed as scheduled or two days

2  later.  (Vol. 2, 225:12–226:16, 237:11–19.)

3          Mr. Bax's medical record includes a "nursing communication" order entered by Dr.

4  Wolterbeek at 3:51 p.m. on October 21, 2015, which states:  "Continuous, translator, be

5  absolutely sure this patient has a sign interpreter at bedside and whereever [sic] he is pushed to on

6  Friday morning.  Have him/her bedside no later than 0700 translator needs to travel to surgery

7  with patient THANK YOU SOOOOO MUCH."  (PX-1AX at 601.)  Countering plaintiffs'

8  characterization at trial that this order was a "standing order" or a "continuous order," Dr.

9  Wolterbeek testified that he made a "nursing communication," and he did not consider that

10  nursing communication to be a standing order.  (Vol. 2, 186:19–25.)  According to Dr.

11  Wolterbeek, his intent was to have an interpreter provided for Mr. Bax's surgery on Friday, not to

12  have an interpreter continuously every day.  (Vol. 2, 193:18–19, 195:17–196:8.)  Dr. Wolterbeek

13  explained that the word "continuous" is added by a default in the software and that he "absolutely

14  did not write the word 'continuous.'"  (Vol. 2, 191:5–19.)[12]  Dr. Wolterbeek further explained

15  that nursing communication orders remain active in the system for nurses to view until the patient

16  is discharged.  (Vol. 2, 193:12–17.)  Indeed, the "end date/time" on Dr. Wolterbeek's October 21,

17  2015 nursing communication order is October 27, 2015, the date of Mr. Bax's discharge from

18  DMC.  (PX-1AX at 601.)

19          The record of Dr. Wolterbeek's nursing communication order shows that Ms. Riemersma

20  reviewed this order at 4:11 p.m. that day.  (*Id.*)  As Ms. Riemersma noted in her nursing note, she

21  notified Ms. Martinez that an interpreter would be needed for the surgery on October 23, 2015

22  between 7:30 a.m. to noon.  (DX-AB at 2062.)  Ms. Martinez testified that on October 21, 2015,

23  she signed a request form requesting an interpreter for pre-op and post-op in connection with Mr.

24  /////

---

25  [12]  Consistent with Dr. Wolterbeek's trial testimony that nursing communication orders start with

26  the word "continuous" by default, the court notes that the word "continuous" appears in the only
   other nursing communication order admitted into evidence.  (*See* PX-1CS at 12, 13.)  There, the

27  word "continuous" appears in Dr. Bojta's nursing communication order regarding the discrete
   event of Mr. Bax's discharge in November 2015 and specifying the time when an interpreter

28  would arrive.  (*Id.*)

1   Bax's surgery on Friday morning, October 23, 2015.  (PX-1B at 1158, 1332; Vol. 2, 255:21–
2   256:12.)

3       The court finds by a preponderance of the evidence that although an in-person interpreter
4   was not provided on October 21, 2015, DMC had requested an interpreter from NorCal, who was
5   unable to provide one on that day, and that DMC attempted to use VRI with Mr. Bax as an
6   alternative means of communicating effectively.  The court credits Mr. Bax's testimony,
7   however, that he refused to use the VRI because the VRI laptop had connectivity issues causing
8   the screen to freeze and pixelate, such that he could not communicate effectively through use of
9   the remote interpreter.

10          j.      *October 22:  Diabetes Teaching, In-Person Interpreter Provided*

11      As noted above, Ms. Vaughn planned to meet with the Baxes at 10:00 a.m. on October 22,
12   2015, with an interpreter for diabetes teaching, and she completed a NorCal request form, which
13   Ms. Martinez signed on October 20, 2015, requesting an interpreter for that teaching.  (Vol. 3,
14   368:20–370:18; Vol. 2, 355:5–13; DX-AA at 1527; DX-AB at 2062; PX-1B at 1160, 1334.)
15   There is also a NorCal invoice billing DMC for two hours of interpreting services provided
16   between 10:45 am and 12:45 p.m. on October 22, 2015 for "teaching."  (PX-1AZ at 1274; DX-
17   AR at 1274.)

18      According to Mr. Bax's medical record, the Baxes did in fact receive that diabetes
19   teaching as scheduled with Ms. Vaughn and an ASL interpreter on October 22, 2015.  (PX-1BA
20   at 2502.)  Ms. Vaughn's patient education record lists the topics she covered with the Baxes on
21   October 22, 2015, including how to monitor blood glucose levels, how to address hyperglycemia
22   and hypoglycemia, how to inject insulin, how to use a "sharps" container, and insulin storage.
23   (*Id.*)  Ms. Vaughn testified that Mrs. Bax was actively engaged in this teaching session.  (Vol. 3,
24   370:19–371:17.)  Mrs. Bax testified that she remembered attending a training with Mr. Bax
25   during his October hospitalization at DMC in which a diabetes specialist spoke to them about Mr.
26   Bax's diabetes, and she was able to understand the information communicated through the live
27   interpreter.  (Vol. 1, 102:11–17.)

28   /////

1       In addition, Dr. Rohewal saw Mr. Bax on October 22, 2015, with an interpreter present.

2  A progress note dictated by Dr. Rohewal on October 22, 2015 at 1:02 p.m. notes that Mr. Bax had

3  been given diabetes education and that through a sign language interpreter, Mr. Bax reported to

4  Dr. Rohewal "no new complaints of any worsening pain" and that he "want[ed] to get over the

5  surgery tomorrow." (PX-1AY at 1294.)[13]

6       Accordingly, the court finds that DMC provided the Baxes with an in-person ASL

7  interpreter on October 22, 2015.

8          k.    *October 23:  Second Surgery, In-Person Interpreter Provided*

9       As noted above, Ms. Martinez signed a NorCal request form to have an interpreter

10  provided for pre-op and post-op in connection with Mr. Bax's surgery on Friday morning,

11  October 23, 2015. (PX-1B at 1158, 1332; Vol. 2, 255:21–256:12.) That request corresponds

12  with a case management services note from October 22, 2015, noting that a NorCal interpreter

13  had been arranged for October 23, 2015 "to support [patient's] surgical process." (DX-X at

14  2051.) There is also a NorCal invoice billing DMC for three hours of interpreting services

15  provided from 7:50 a.m. to 12:50 p.m. on October 23, 2015 for "surgery pre-op/post-op." (DX-

16  AR at 1275.)

17       Mr. Bax signed a consent to surgery form at 9:10 a.m. on October 23, 2015, specifically

18  consenting to a "left foot debridement with fifth toe amputation, patch graft and possible fourth

19  toe amputation" to be performed by Dr. Wolterbeek. (PX-1C at 1322–23.) That consent form

20  was also signed by the ASL interpreter at 9:10 a.m., attesting to the translation provided and to

21  Mr. Bax's understanding and agreement to the terms of the consent form. (*Id.* at 1323.)

22       On October 23, 2015, Dr. Wolterbeek operated on Mr. Bax's foot for a second time and

23  amputated Mr. Bax's pinky toe. (PX-1BE at 1997.) Dr. Wolterbeek's operative report notes that

24  he "utilized a sign translator for [Mr. Bax] to understand the plan" and that Mr. Bax "understands

25  that [toe] #5 is necrotic and [toe] #4 may be required to be removed to be able to get the wound

26

---

27  [13] It does not appear from Mr. Bax's medical record that he was seen by Dr. Wolterbeek on October 22, 2015. Dr. Wolterbeek's progress note on October 22, 2015 does not mention seeing Mr. Bax that day; rather, the assessment/plan is noted as "[a]waiting surgery tomorrow when sign

28  translation can take place." (PX-1AJ at 1968.)

1    closed." (*Id.*)  Dr. Wolterbeek testified that "necrotic" is the definition of cell death, and it means

2    that the toe is destroyed and no longer viable; essentially, the toe is dead.  (Vol. 2, 231:21–232:3.)

3    Mrs. Bax testified that it was horrible seeing Mr. Bax's toe turn black and eventually be

4    amputated; she grieved over it and felt very emotional.  (Vol. 1, 103:5–13.)

5         Dr. Rohewal dictated a progress note at 12:34 p.m. noting that he saw Mr. Bax after

6    surgery and "communicated with the patient through a sign language interpreter," and "the patient

7    is feeling better [and] [h]e is hungry."  (PX-1BD at 1405–1406.)  Dr. Rohewal also noted that

8    special orthotics were ordered for Mr. Bax because Dr. Wolterbeek recommended that Mr. Bax

9    walk around with his left heel touching the ground, not his entire left foot.  (*Id.*)

10        Based upon the evidence presented at trial, the court finds that DMC provided the Baxes

11   with an in-person ASL interpreter on October 23, 2015.

12                   l.    *October 24:  Rehabilitation Services from Physical Therapist*

13        According to a rehabilitation services evaluation in his medical records, Mr. Bax was

14   evaluated by a physical therapist in the afternoon on October 24, 2015.  (DX-Y at 1500.)  The

15   physical therapist noted in that evaluation record that "[s]econdary to [patient's] hearing

16   impairment, all communication is through writing, unless staff knows sign language."  (*Id.*)  The

17   physical therapist also noted that Mr. Bax was experiencing a great deal of pain, a 10 out of 10 on

18   the pain scale, when his foot was in the dependent position.  (*Id.*)  Mr. Bax also complained of

19   this foot pain to Dr. Rohewal, who dictated a progress note that afternoon, noting:  "The patient

20   complaining of foot pain while he tries to keep the foot down.  Patient had some pain while using

21   orthotics.  He will need re-fitting tomorrow."  (PX-1BH at 1074.)  Dr. Rohewal did not specify in

22   that progress note how he communicated with Mr. Bax that day.  At trial, Mr. Bax did not present

23   any evidence to suggest that his written communications with the physical therapist or his

24   communications with Dr. Rohewal on that day were ineffective for him.

25        The court notes that in addition to there being no mention of an interpreter in Mr. Bax's

26   medical record for October 24, 2015, there are no NorCal request forms or NorCal invoices in

27   evidence that would suggest that DMC requested an interpreter for that day.  The court therefore

28   finds that DMC did not request an interpreter for the Baxes on October 24, 2015.  However, aside

1   from Mr. Bax's inconsistent testimony that he requested an interpreter "every single day," there is

2   also no evidence suggesting that Mr. Bax had specifically requested an interpreter on October 24,

3   2015, or that he felt communicating in writing with the physical therapist was not effective.

4   Given that Mr. Bax had requested interpreters previously and that his requests had been

5   documented in his medical record by DMC nursing staff, the court finds the absence of any

6   mention of a request by Mr. Bax in the medical record on October 24, 2015, to be persuasive

7   evidence that he did not request an interpreter on that day.

8        The court also is not persuaded that Mr. Bax requested an interpreter every day because

9   his testimony suggests that, at least to some degree, communicating with an interpreter was

10  difficult because he was hooked up to an IV and had cords stuck all around his fingers and hands.

11  In that regard, Mr. Bax's testimony at trial—that he could sign with one hand and did not find it

12  difficult to sign despite the IVs and cords—contradicted his deposition testimony, in which he

13  was asked "[h]ow many times did you ask for a live interpreter," and he answered:

14              Almost every day.  And also I had a hard time communicating
            because they had the IV in me, stuck all over my fingers and hands
15          and cords all around.  And so it was just really frustrating just to
            navigate all of that just to even try to communicate because they
16          had an IV with a cord, you know, going all around me.  So it was
            hard to move to sign to communicate.
17

18  (Vol. 1, 57:1–12.)  This contradiction and inconsistency in testimony casts doubt on the veracity

19  of Mr. Bax's trial testimony that he had requested an interpreter every single day of his

20  hospitalization at DMC.

21       Based upon all of the evidence presented at trial, the court finds by a preponderance of the

22  evidence both that DMC did not request an interpreter for Mr. Bax on October 24, 2015 and that

23  Mr. Bax did not request an interpreter from DMC on that date.

24              m.      *October 25:  Additional Rehabilitative Services from Physical Therapist*

25       Mr. Bax received further rehabilitative services from a physical therapist the afternoon of

26  October 25, 2015.  (PX1-BL at 1509.)  The physical therapist entered a progress note noting that

27  they communicated in writing, and in particular, Mr. Bax had stated in writing that he needed

28  pain medication.  (*Id.*)  The physical therapist also noted that Mr. Bax demonstrated a good

1  understanding of the status of his non-weight bearing left foot, and that he was pleasant and
2  cooperative with treatment.  (*Id.* at 1510.)  There is no evidence in the record that Mr. Bax
3  requested an interpreter on October 25, 2015 or that he told the physical therapist that
4  communicating in writing was ineffective for him.

5  Dr. Rohewal dictated a progress note that afternoon noting that Mr. Bax was "complaining
6  of minimal pain in the lower foot, otherwise, no complaints of any chest discomfort," though Dr.
7  Rohewal did not specify how Mr. Bax communicated his complaint of lower foot pain.  (PX-1BK
8  at 1298.)

9  The court finds on this evidence that DMC did not provide an interpreter for the Baxes on
10  October 25, 2015, and the Baxes did not request an interpreter for that day either.  In addition,
11  Mr. Bax has not shown by a preponderance of the evidence that his written communications with
12  the physical therapist or his communications with Dr. Rohewal on October 25, 2015, were
13  ineffective for him.

14            n.    *October 26:  Rehabilitative Services and Refusal to Sign Medicare Notice*

15  Dr. Rohewal dictated a progress note at 12:49 p.m. on October 26, 2015, noting that Mr.
16  Bax was feeling better and had no fever, but did have some pain and discomfort while walking.
17  (DX-T at 1952.)  Dr. Rohewal's progress note does not suggest that an interpreter was present
18  during that assessment or that Mr. Bax requested an interpreter.  With regard to Mr. Bax's
19  "chronic deafness," Dr. Rohewal noted that "[p]atient has been provided with a sign language
20  interpreter almost every day, especially whenever patient requests it.  He is happy with care.  We
21  try to answer all his questions with either writing or through an interpreter."  (*Id.*)

22  Mr. Bax received additional rehabilitative services at 12:32 p.m. on October 26, 2015, and
23  the physical therapist noted that they again communicated in writing.  (DX-Y at 1507–08.)  The
24  physical therapist noted that Mr. Bax received education on shoe fitting and weight bearing
25  restrictions, and that "extra time [was] needed for writing instructions [due to patient] being
26  hearing impaired."  (*Id.* at 1508.)  In addition, the physical therapist gave Mr. Bax a sheet of
27  instructions for him to exercise at home, and after being shown each exercise, Mr. Bax performed
28  each one.  (*Id.*)  There is no indication in the rehabilitative services record that Mr. Bax was

1   dissatisfied with the communication used, that the written communication was ineffective for

2   him, or that he requested an interpreter for these rehabilitative services.

3         By contrast, at 3:15 p.m. that afternoon, Mr. Bax was asked to sign a notice regarding his

4   Medicare rights, and he refused to do so without an interpreter.  (PX-1BP at 1327.)  An

5   unidentified DMC staff member with the initials "S.M." wrote the following note on the unsigned

6   Medicare notice:  "[Patient] refused to sign.  [Patient] is deaf.  I asked him in writing to initial this

7   [notice], patient state[d] he wanted me to get a translator, which I am unable to do."  (*Id.*)  There

8   is no evidence that in response to Mr. Bax's refusal to sign the notice, DMC requested an

9   interpreter for the purpose of translating this Medicare notice for him, despite his request for an

10  interpreter.  At trial, Mr. Bax testified that he does not remember seeing this Medicare notice.

11  (Vol. 1, 37:1–8.)  However, the court notes that this Medicare notice is identical to the Medicare

12  notice that Mr. Bax had already signed on the evening of October 13, 2015, when he was seen in

13  the emergency department.  (*Compare* PX-1BP at 1327 *with* PX-1C at 1326.)

14        Based on the evidence admitted at trial, the court finds that Mr. Bax requested an

15  interpreter on October 26, 2015 to translate for him the Medicare notice he was asked to sign, and

16  in response, DMC did not take any steps to obtain an interpreter on that night for that purpose.

17              o.    *October 27:  Case Manager Assessment and Discharge*

18        Mr. Bax was discharged from DMC on the morning of October 27, 2015.  The day before,

19  in preparation for his discharge, Ms. Martinez signed a NorCal request form to have an interpreter

20  on October 27, 2015 at 11:00 a.m. for "discharge teaching."  (PX-1B at 1330; Vol. 2 at 256:13–

21  23.)[14]  That request form names the requestor as "Rina."  (PX-1B at 1330; Vol. 2 at 256:13–23.)

22  There is also a NorCal invoice billing DMC for two hours of interpreting services for Mr. Bax on

23  October 27, 2015 beginning at 9:15 a.m. for "discharge teaching," and that invoice also states that

24  the requestor was "Rina."  (DX-AR at 1276.)  Despite the discrepancy in the requested time and

25  _____

26  [14]  Ms. Martinez testified that discharge teaching is when the care providers "go[] over the
    patient's after hospital care, when to follow up with physician, medications, teaching about . . .

27  the next dose due for medications, [a]ny kind of equipment that patients need to be successful at
    home, [and] [a]ny other follow-up care with primary care physicians or the surgeon."  (Vol. 2,

28  256:25–257:5.)

33

1   the invoiced time, it appears that this request form and this invoice correspond with each other.

2   There is conflicting evidence, however, regarding whether Mr. Bax actually received interpreting

3   services in connection with his discharge on October 27, 2015.

4   　　　　On the one hand, Mr. Bax testified that with regard to his October hospitalization, he did

5   not have an interpreter until the day he was discharged—i.e., he had an interpreter for his

6   discharge on October 27, 2015.  (Vol. 1, 36:14; 40:7–15.)  There is also a handwritten progress

7   record by a hospitalist dated October 27, 2015 at 9:40 a.m. stating "[patient] seen and examined.

8   Questions answered thru [sic] interpreter.  [*Illegible*] for [discharge] [follow-up] with Dr.

9   Wolterbeek as for his recommendation and hospitalist [in] 1 week."  (PX-1BX at 1285.)  At 10:09

10   a.m. that morning, the hospitalist dictated a discharge summary noting that Dr. Wolterbeek had

11   cleared Mr. Bax with non-weight bearing status on his left foot, that Mr. Bax's diabetes was

12   better controlled, that various diabetes supplies were given to Mr. Bax, and that "[f]rom acute

13   standpoint, he is stable for discharge."  (PX-1BU at 1280–1281.)  The hospitalist noted that all of

14   Mr. Bax's questions were answered and that he "was stressed upon the good control of the blood

15   sugars and he was questioning whether officially he has diabetes and he was told yesterday, he

16   does have diabetes."  (*Id.* at 1281.)  The hospitalist also noted that Mr. Bax was scheduled to see

17   Dr. Wolterbeek on November 10, 2015 for a surgical follow up and possible removal of his

18   stitches.  (*Id.*)  This evidence, coupled with the NorCal invoice for interpreting services on this

19   day, suggests that Mr. Bax did have an interpreter for his discharge on October 27, 2015.

20   　　　　On the other hand, a case manager met with Mr. Bax at 10:30 a.m. on October 27, 2015

21   and noted in a case management reassessment record:  "Patient to discharge today.  [Front-

22   wheeled walker] has been delivered.  I wrote messages to patient on clipboard.  He stated he can

23   do his own dressings and nursing plans to send him home with some supplies.  He doesn't feel

24   he'll need HHS.  Plans to have girlfriend [Mrs. Bax] help."  (DX-X at 2055.)  The case manager

25   also entered another reassessment note at 10:53 a.m. that morning noting that "[follow up]

26   appointments have been made and patient relates he'll have a way there," though the case

27   manager did not specify in this latter note the method of communication she used with Mr. Bax.

28   (*Id.* at 2054.)

In addition, Ms. Halloran testified that for the October 27, 2015 invoice, DMC "paid that interpreter for time coming down, even though the patient was discharged." (Vol. 2, 313:6–14.) Without pointing to any supporting documentary evidence and ignoring the hospitalist's record described above, Ms. Halloran testified that DMC "had arranged for an interpreter but somehow [Mr. Bax] left the building before the interpreter arrived." (Vol. 1, 154:19–24.) It is not clear to the court what the basis is for Ms. Halloran's trial testimony that the interpreter arrived after Mr. Bax's discharge. Ms. Halloran testified that discharging a patient before the interpreter arrived "would not be optimal[,] [b]ut if a patient says they're going to leave, they will leave." (Vol. 1, 154:25–155:4.) Ms. Halloran's suggestion that Mr. Bax somehow self-discharged, before DMC was ready to discharge him, is not supported by the other evidence admitted during the trial of this case. In any event, the court is flummoxed by the parties' apparent agreement that the interpreter arrived after Mr. Bax left the hospital. (*See* Vol. 3, 443:8–10 (defense counsel stated in closing argument that "all we know is that the interpreter didn't show up until after Mr. Bax had been discharged"); *see also* Doc. No. 54 (final pretrial order listing as an undisputed fact that DMC "ordered an in-person ASL interpreter on October 27, 2015 in connection with [Mr.] Bax's discharge but the interpreter did not arrive in time")).[15]

The court finds that DMC requested an interpreter for the Baxes on October 27, 2015, the interpreter arrived at DMC that day, and DMC paid for that interpreter. As to whether interpreting services were actually provided, the hospitalist notes that he used an interpreter, but the case manager wrote on a clipboard to communicate, and Mr. Bax testified that he had an interpreter for discharge, but Ms. Halloran testified that the interpreter arrived after Mr. Bax left. In light of these irreconcilable discrepancies, the court finds that neither party has established by a

---

[15] The court pauses to note that neither of the parties was particularly careful in stating their undisputed facts in their pretrial statements, and mistakes were made as a result. Indeed, during closing argument at trial, the court highlighted an anomaly between the supposedly undisputed facts and the evidence presented at trial with regard to interpreter services provided on a date during Mr. Bax's November hospitalization, and defense counsel admitted that in retrospect, they had made a mistake in their pretrial statement. (Vol. 3, 445:9–446:7.) Thus, although the undisputed facts stated in the court's final pretrial order are normally accepted as true without the parties having to present evidence to establish those facts, the court is reluctant to rely solely on those purportedly undisputed facts in making its factual findings in this case.

1   preponderance of the evidence whether Mr. Bax actually received interpreting services in

2   connection with his discharge from DMC.

3              p.      *Summary of Interpreter Services during Mr. Bax's October Hospitalization*

4              Though Mr. Bax claimed that he requested an interpreter every day during the 15 days of

5   his hospitalization in October 2015, the court finds that he requested in-person interpreter services

6   on eight of those days.  In turn, DMC requested interpreters from NorCal on seven of those days,

7   and interpreters were provided on six of them.  As for the two days on which Mr. Bax requested

8   but was not provided an in-person ASL interpreter:  (1) DMC had requested an interpreter for Mr.

9   Bax's second surgery as originally scheduled, but NorCal informed DMC on that day that they

10  could not provide one, leading DMC staff to attempt to communicate with Mr. Bax by using VRI;

11  and (2) DMC did not request an interpreter to translate a Medicare notice, which Mr. Bax had

12  refused to sign without an interpreter present even though he had signed the same notice without

13  an interpreter present on his first night at DMC.

14         2.      Mr. Bax's November 2015 Hospitalization

15             On November 12, 2015, Mr. Bax had a surgical follow-up appointment with Dr.

16  Wolterbeek in his office and was provided an ASL interpreter for that visit.  (Vol. 1, 40:16–41:1.)

17  Dr. Wolterbeek testified that when patients come to his office, he provides interpretation services

18  if they are needed.  (Vol. 2, 178:21–23.)  As to Mr. Bax's post-operative appointment on

19  November 12, 2015, Dr. Wolterbeek testified that his notes mention that an interpreter was used,

20  but he did not know offhand who specifically requested the interpreter or who paid for the

21  interpreter's services.  (Vol. 2, 178:24–179:14.)

22             Mr. Bax testified that Dr. Wolterbeek told him to go back to the emergency department at

23  DMC for admission to the hospital because his foot had started to swell and show signs of an

24  infection, so he needed to have surgery again to drain the toe.  (Vol. 1, 40:16–41:1.)  Mr. Bax and

25  Mrs. Bax went to the emergency room that same day.  (Vol. 1, 40:25–41:1.)

26             a.      *November 12:  Emergency Department Evaluation, Hospital Admission*

27             At 7:32 p.m. on November 12, 2015, Mr. Bax was seen by the triage nurse in the

28  emergency department at DMC who noted Mr. Bax's chief complaint as "[s]ent by Dr.

Wolterbeek for wound evaluation of left foot." (DX-AF at 1753.)  At 7:48 p.m., Mr. Bax was
seen by an emergency room physician who noted in his physician note that he "[c]onversed via
writing since patient is deaf," and that Mr. Bax presented with possible cellulitis on his left foot,
which had swelling, redness, and discharge.  (*Id.*)  The physician diagnosed Mr. Bax with a post-
operative infection, counseled Mr. Bax and Mrs. Bax regarding the diagnosis and treatment plan,
discharged Mr. Bax from the emergency department for admission to the hospital, and
transitioned Mr. Bax's care to a hospitalist.  (*Id.* at 1756.)  The hospitalist saw Mr. Bax and
dictated a note at 10:21 p.m. that night noting that Mr. Bax "is awake, comfortable,
communicates by writing as he is chronically deaf." (DX-AE at 1205.)  At trial, Mr. Bax did not
present any evidence to suggest that his written communications with the emergency department
physician or the hospitalist on the night of November 12, 2015, were ineffective for him

Mr. Bax testified that he requested an interpreter every single day during his November
hospitalization.  (Vol. 1, 41:10–13.)  But neither the emergency physician's note nor the
hospitalist's note include any mention of Mr. Bax requesting an interpreter on this occasion.  In
addition, Mr. Bax signed a consent form acknowledging receipt of the "Conditions of Service" at
7:11 p.m. on November 12, 2015 and acknowledging receipt of the "Notice of Privacy Practices"
at 8:00 p.m. that night—apparently without an interpreter to translate those forms—even though
he had previously refused to sign some consent forms without an interpreter present during his
October hospitalization.  (PX-1C at 1174–78.)  This trial evidence suggests that Mr. Bax did not
request an interpreter on the evening of November 12, 2015.

Moreover, Mr. Bax had an interpreter when he met with Dr. Wolterbeek earlier that day to
discuss the need for further surgery on his left foot.  Although Mr. Bax testified at trial that his
communication with hospital staff during his November hospitalization was exactly the same as it
was in October, with staff wanting him to write back and forth instead of providing an interpreter,
the court finds that Mr. Bax's testimony in this regard is not wholly credible.  (Vol. 1, 41:11–19.)
At his deposition, Mr. Bax testified that his second hospitalization was "different than the first
time" because "when the doctor came in he had the interpreter with him, [] right there," and Mr.
Bax "felt so much better" and "relieved" that it was "going to be easy for [him] to communicate

1   with [his] doctor and understand what's going on and understand [] what the surgery is about."

2   (Vol. 1, 66:7–67:1.)  Mr. Bax further testified that "[t]he second time [he] had an interpreter

3   explain why they were doing what they were doing [a]nd so [he] felt much more comfortable,

4   much more relieved and things went much more smoothly because of that, because it was easier

5   to communicate," and "the second time . . . was much, much better."  (Vol. 1, 67:7–20.)

6          Accordingly, the court finds by a preponderance of the evidence both that DMC did not

7   request an interpreter for Mr. Bax on November 12, 2015 and that Mr. Bax did not request an

8   interpreter from DMC on that date.

9                  b.     *November 13:  Patient Education, Consent to Catheter Procedure*

10         At 9:47 a.m. on Friday, November 13, 2015, Mr. Bax received patient education from

11  nurse Fletcher Flieder, who noted "[r]equested interpreter, Charge Nurse is aware," in the result

12  comments section of that patient education record but did not specify who requested the

13  interpreter—Mr. Bax or nurse Flieder.  (PX-1CH at 1035.)

14         There is a NorCal request form dated November 13, 2015[16] for "pre-surgery counselling /

15  interpretation."  (PX-1B at 1192.)  That form caused considerable confusion at trial because it has

16  "ASAP" written for the appointment date, "Now" written for the start time and "Open" for the

17  end time, and "F" circled for the day of the week, but "every day" is handwritten right beneath

18  that selection on the form.  (*Id.*)  The court was left without any clarification because none of the

19  individuals listed on that request form—nurse Flieder as the requestor and site contact person,

20  Sue Franklin as the authorizer, Dr. Bojta as the doctor, or Mark Medina as the interpreter—

21  testified at trial.  Nevertheless, it appears that on November 13, 2015, DMC requested that an

22  interpreter be provided to communicate with Mr. Bax as soon as possible from NorCal.

23         There is also evidence in Mr. Bax's medical record suggesting that NorCal provided an

24  interpreter during part of that day.  At 10:20 a.m., Mr. Bax signed a consent to surgery form for a

25  "peripherally inserted central catheter" procedure.  (PX-1C at 1255–56.)  The translator

26

27  _____

    [16]  Although the date written in next to the authorizing signature states "11/13/2014," the
28  accompanying fax cover sheet states the date as "11/13/15," and the parties did not dispute at trial
    that the year 2014 in the date was written by mistake.

attestation section of that form was left blank.  (*Id.* at 1256.)  Yet, corresponding with this procedure, there is a NorCal invoice billing DMC for 3.25 hours of interpreting service on November 13, 2015 between 11:30 a.m. and 2:45 p.m. for "[peripherally inserted central catheter] line put in place."  (DX-AR at 1234.)  Further evidencing that Mr. Bax had an interpreter during that time, Mr. Bax's medical record shows that he was evaluated by case management and social services at 12:15 p.m. to address his living arrangements, ability to function independently, post-hospital care, and related issues, and the evaluator noted that he "[spoke with] patient through sign language interpreter."  (DX-AD at 854.)

However, the evidence in Mr. Bax's medical record from the late afternoon and evening of November 13, 2015 show that Mr. Bax did not have an in-person ASL interpreter.  At 3:29 p.m., social services noted in Mr. Bax's record that they received a referral from the nurse "regarding [patient] needing translator for American Sign Language," and that "[social services] provided the live feed translator using the computer," but the nurse "reports the [patient] was unhappy about the internet connection and the [patient] requests to have a translator present in the room to make the communication more clear."  (*Id.* at 856.)  That note also states that social services "notified [nurse] to call NorCal for interpreter for [patient]," and the nurse reported that "she will let [social services] know if she needs further assistance."  (*Id.*)  At 7:38 p.m., nurse Flieder noted communication with Mr. Bax "using writing board" in an "activities of daily living" assessment record.  (DX-AH at 1815.)  At 8:08 p.m., nurse Flieder noted in another assessment record that "social services brought in Wi-Fi computer interlink ASL interpreter to bedside."  (*Id.* at 1814.)  Nurse Flieder did not note whether Mr. Bax was similarly dissatisfied with the VRI services that evening.  Mr. Bax testified at trial that during his November hospitalization, the VRI was not effective, writing was not effective, and his "only chance to understand was to have an actual live sign language interpreter to explain to [him], to educate [him] on how [he] could recover."  (Vol. 1, 42:10–20.)

Based upon this evidence, the court finds that DMC provided an in-person interpreter for Mr. Bax during the day on November 13, 2015 for his catheter procedure and case management assessment with social services, but for the evening assessments, DMC provided only remote

39

1 | interpreters using VRI.  Given that Mr. Bax's testimony regarding the VRI connectivity issue is

2 | substantiated by the social services note in his medical record on that day, the court also finds

3 | both that Mr. Bax complained to DMC that the VRI services were not effective for him and that

4 | the VRI was not in fact an effective method of communication for him.  Although DMC

5 | requested an interpreter with an apparently open-ended time frame, DMC did not present any

6 | evidence at trial that NorCal was unable to provide an interpreter that evening.

7 |         c.    *November 14:  Third Surgery, In-Person Interpreter Provided*

8 |       At 8:42 a.m. on November 14, 2015, Mr. Bax signed a consent to surgery form for the

9 | "left foot debridement with wound closure" procedure to be performed by Dr. Wolterbeek.  (PX-

10 | 1C at 1257–58.)  That consent form was also signed by the ASL interpreter, Mark Medina,

11 | attesting to the translation provided and to Mr. Bax's understanding and agreement to the terms of

12 | the consent form.  (*Id.* at 1258.)

13 |       Aside from the apparently open-ended request submitted by DMC on November 13, 2015,

14 | there is not a separate NorCal request form in evidence specifically indicating the request for an

15 | interpreter with respect to Mr. Bax's surgery on November 14, 2015.  There is, however, a

16 | NorCal invoice billing DMC for eight hours of interpreting between 5:00 a.m. and 1:00 p.m. on

17 | November 14, 2015 for "emergency surgery."  (DX-AR at 1233.)

18 |       At 1:33 p.m. that afternoon, Dr. Wolterbeek dictated his operative report for this surgery,

19 | which describes in detail the procedure he performed, though he does not mention his

20 | communications with Mr. Bax in that report.  (PX-1CL at 822–23.)  Mr. Bax does not dispute that

21 | he had an interpreter on this day.  (Vol. 1, 41 at 11–19) (Mr. Bax testifying that "the interpreter

22 | showed up while [he] was in surgery").

23 |       In addition, Mr. Bax received patient education at 10:49 a.m. on November 14, 2015, and

24 | the patient education record notes that they had an interpreter on site for that teaching.  (PX-1CN

25 | at 1033.)

26 |       Accordingly, the court finds that DMC provided an in-person ASL interpreter for the

27 | Baxes on November 14, 2015.

28 | /////

1          d.        *November 15:  Patient Education, Physical Therapy*

2          At 9:00 a.m. on November 15, 2015, Mr. Bax received further patient education regarding

3  wound care, diabetes care, and other topics, and the patient education record notes that the

4  teaching method used was "writing on Pad for communication."  (PX-1CQ at 1031.)  At 10:10

5  a.m. that morning, Mr. Bax received further patient education regarding how to use crutches, and

6  the patient education record notes the teaching method was demonstration and explanation.  (*Id.*

7  at 1030.)  Neither of these patient education records mention that Mr. Bax was dissatisfied with

8  the method of communication used, that he had difficulties understanding, or that he requested an

9  interpreter.  Rather, both of these patient education records noted that Mr. Bax verbalized his

10  understanding of the education.  (*Id.* at 1030–31.)  Accordingly, Mr. Bax has not shown by a

11  preponderance of the evidence that the communication method used for his patient education on

12  this day was ineffective for him.

13          As noted, the Baxes testified that they requested interpreters for Mr. Bax every day during

14  his November hospitalization.  (Vol. 1, 42:10–13.)  For the reasons explained above, the court

15  finds that Mr. Bax's testimony in this regard was not wholly credible.  The court similarly

16  questions the veracity of Mrs. Bax's testimony.  According to Mrs. Bax, an interpreter was never

17  provided during Mr. Bax's November hospitalization.  Specifically, Mrs. Bax testified that she

18  kept reminding the doctors and everyone about needing an interpreter, and "it never happened."

19  (Vol. 1, 84:15–21.)  Given the documentary evidence and Mr. Bax's own testimony to the

20  contrary, Mrs. Bax's testimony in this regard lacks credibility.

21          Accordingly, the court finds by a preponderance of the evidence both that DMC did not

22  request an interpreter for the Baxes on November 15, 2015 and that the Baxes did not request an

23  interpreter from DMC on that date.

24          e.        *November 16:  New Lunch Tray Requested by Mr. Bax*

25          At 3:00 p.m. on November 16, 2015, a nursing assistant annotated Mr. Bax's medical

26  chart by adding a note documenting her interactions with Mr. Bax with regard to his lunch tray

27  that day.  (DX-AJ at 410.)  According to the nursing assistant's chart annotation, Mr. Bax was

28  dissatisfied with the lunch tray he had been given around 2:00 p.m. that day.  (*Id.*)  Mr. Bax called

1   the nursing assistant in to his room and wrote her a note telling her that the food was cold.  (*Id.*)

2   She wrote back asking if Mr. Bax would like her to heat up his food or if he would like something

3   else, to which he wrote back that he wanted a new lunch tray.  (*Id.*)  However, the cafeteria staff

4   told the nursing assistant that all the hot food had been thrown away, so the nursing assistant

5   instead provided Mr. Bax with a sandwich and fries, which is what he wanted to eat.  (*Id.*)

6        Aside from this apparently effective communication and interaction regarding Mr. Bax's

7   lunch tray, there are no other documents in evidence documenting events that occurred on

8   November 16, 2015.

9        Accordingly, the court finds both that DMC did not request an interpreter for the Baxes on

10  November 16, 2015 and that the Baxes did not request an interpreter from DMC on that date.

11            f.       *November 17:  DMC Preparing for Mr. Bax's Discharge*

12       On November 17, 2015, in preparation for Mr. Bax's hospital discharge the following day,

13  DMC requested an interpreter from NorCal.  There is a nursing communication order entered at

14  2:55 p.m. on November 17, 2015 by nurse Anali Spradlin made at the direction of hospitalist Dr.

15  Julianna Bojta.  (PX-1CS at 13.)  That nursing communication order states:  "Per Dr Bojta,

16  [patient] is discharged in system for 11/18/15 in the am. . . . Dr. Bojta spoke with Dr. Wolterbeek

17  and [patient] may go home with PO antibiotics.  Follow discharge instructions.  Mark Medina a

18  sign language interpreter will be here at 1000 am."  (*Id.*)  However, that nursing communication

19  order has an "end time" just several minutes later at 3:12 p.m.  (*Id.*)  It appears that nurse Spradlin

20  terminated that order because at the same time, 3:12 p.m., she entered a different nursing

21  communication order changing the time of Mr. Bax's discharge and of the interpreter's arrival.

22  (*Id.* at 12.)  Specifically, the nursing communication order entered at 3:12 p.m. states:

23           Per Dr Bojta, [patient] is discharged in system for 11/18/15 when
             translator is able to be here which is after 1 pm. . . . Dr. Bojta spoke
24           with Dr. Wolterbeek and [patient] may go home with PO
             antibiotics.  Follow discharge instructions.  Mark Medina a sign
25           language interpreter will be here after 1 pm.

26  (*Id.*)

27       Nurse Spradlin also signed a NorCal request form requesting an interpreter on November

28  18, 2015 for a minimum of two hours, starting between 12:30 – 1:00 p.m., for "Discharge

42

1  Instructions / Interpretation."  (PX-1B at 1260.)  It appears from the fax communication result

2  report that this request form was faxed to NorCal at 3:11 p.m. on November 17, 2015.  (*Id.* at

3  1261.)  There is also a handwritten note on the fax confirmation page stating: "confirmed fax:

4  11/17/15 @ 1520 [3:20 p.m.] w/ Becky & awaiting conf[irmation] for Mark Medina."  (*Id.*)

5      There are no documents in evidence documenting any interactions or communications

6  with Mr. Bax on November 17, 2015, let alone any evidence to show that DMC's

7  communications with him on that date were ineffective for him.

8      Accordingly, the court finds both that DMC did not request an interpreter for the Baxes

9  for November 17, 2015 and that the Baxes did not request an interpreter from DMC for that date.

10      g.      *November 18:  Discharge, In-Person Interpreter Provided*

11      At 11:12 a.m. on November 18, 2015, a hospitalist noted in a progress note that Mr. Bax

12  would be discharged from the hospital that day, that Mr. Bax would follow up with doctors in

13  Missouri, and that he would likely need to be off from work for two more months according to

14  surgeon, Dr. Wolterbeek.  (DX-AI at 1734–36.)  The hospitalist also noted that the nurse was

15  "waiting [for] translator for reviewing discharge summary."  (*Id.* at 1736.)

16      As noted above, on November 17, 2015, DMC requested an interpreter for Mr. Bax's

17  November 18 discharge.  (PX-1B at 1260.)  Corresponding with DMC's request, there is a

18  NorCal invoice billing DMC for 2.5 hours of interpreting on November 18, 2015 between 12:30

19  p.m. and 3:00 p.m. for "discharge instructions."  (DX-AR at 1235.)

20      Accordingly, the court finds that DMC provided the Baxes with an in-person interpreter

21  on November 18, 2015.

22      h.      *Summary of Interpreter Services for Mr. Bax's November Hospitalization*

23      Though Mr. Bax claimed that he requested an interpreter every day during the seven days

24  of his hospitalization in November 2015, the court finds that he requested in-person interpreter

25  services on only three of those days.  In turn, DMC requested interpreters from NorCal and

26  interpreters were provided on those three days.  On one of those days, the interpreter was there

27  during the day but not in the evening.  As a result, DMC provided a remote interpreter using VRI

28  /////

43

1    for Mr. Bax in the evening, but those services were ultimately not effective for Mr. Bax because

2    of connectivity issues.

3           DMC also presented evidence that it requested and provided an in-person ASL interpreter

4    for an outpatient community diabetes class on November 25, 2015 for Mr. Bax, but that Mr. Bax

5    did not show up for that class.  There is a NorCal invoice billing DMC for just one hour on

6    November 25, 2015 noting that the client did not show up.  (DX-AR at 1236.)  Ms. Vaughn, the

7    diabetes educator who taught that class, testified that Mr. Bax did not show up that day and that

8    DMC still had to pay for the interpreter.  (Vol. 3, 374:17–23.)  Ms. Vaughn also testified that she

9    called Mrs. Bax, who informed her that Mr. Bax was working out of town and that was why he

10   could not attend the class on that day.  (Vol. 3, 377:16–17.)

11   **D.    Mrs. Bax's Hospital Visit to DMC in January 2017**

12          In the late evening on January 12, 2017, Mrs. Bax went to the emergency room at DMC as

13   a patient because she was experiencing pain in her kidney, back, and neck.  (Vol. 1, 88:4–10,

14   89:19–90:19.)  In the weeks prior to her visit to DMC, Mrs. Bax had run out of a prescription pain

15   medication, and she wanted to get a refill of the medication from DMC.  (Vol. 1, 98:15–99:9.)

16   According to DMC's medical records for Mrs. Bax, she was admitted to DMC at 9:58 p.m. on

17   January 12, 2017.  (DX-AV at 35.)  At 10:10 p.m. that night, consistent with the AAS Policy,

18   DMC staff had Mrs. Bax fill out the Services for Deaf and Hard of Hearing Persons assessment

19   form, in which she indicated that she was deaf and wanted an ASL interpreter and closed caption

20   TV.  (Vol. 1, 91:8–92:23; PX-3B; DX-AV at 43–45.)  Mrs. Bax was accompanied by her

21   companion Mr. Bax, who helped her fill out the assessment form.  (Vol. 1, 92:4–9.)

22          At 10:03 p.m. that night, Mrs. Bax was evaluated by a triage nurse, who documented Mrs.

23   Bax's chief complaint of "right kidney pain and 'shocking' sensation to back of neck" in her

24   medical record.  (PX-3 at 1819; Rourke Dep. 18:7–24; 24:15–25.)  At 10:56 p.m., Mrs. Bax was

25   /////

26   /////

27   /////

28   /////

1   evaluated by an emergency room physician assistant, Blaine Rourke.  (Rourke Dep. 4:10–12, 8:4–

2   14, 16:6–18:6; 24:15–25; PX-3 at 1819.)[17]

3         At his deposition, Mr. Rourke testified that he did not remember treating Mrs. Bax and

4   that reviewing her medical records from her visit to DMC did not refresh his recollection in that

5   regard.  (Rourke Dep. 16:19–17:8; 29:18–20.)  Rourke explained that according to the emergency

6   department physician note in Mrs. Bax's medical record, he (Rourke) performed the care for Mrs.

7   Bax, and he authenticated the information entered into this note by his scribe.[18]  (Id. at 17:11–

8   18:6; 19:13–25.)  Under "Basic Information" in that note, Mr. Rourke's scribe entered the

9   "History source" as "Patient, Interpreter, Deaf interpretation via interpreter service on iPad

10  device."  (DX-AV at 52; PX-3 at 1819; Rourke Dep. 19:13–25.)  Under "[a]dditional review of

11  symptoms information," Mr. Rourke or his scribe entered:  "limited due to patient's deafness,

12  used iPad to translate with ASL services."  (Id.)  However, Mr. Rourke explained that this phrase

13  "limited due to patient's" communication/language barrier is a phrase used any time there is such

14  a barrier because "it may not always be possible to gain absolute complete communication with

15  the patient when there is a barrier."  (Rourke Dep. 30:1–31:6.)  Mr. Rourke explained further that

16  this phrase is included in medical charts even when a certified translator is used because even

17  then, patients "may curtail some of their answers or something may be lost in translation."  (Id. at

18  30:16–25.)

19        Mr. Rourke recalled the iPad device referenced in this physician note, specifically

20  recalling that the iPad was in a case that had a swivel base that allowed the screen to stand upright

21  _____

22  [17]  Mr. Rourke was not available to testify at the trial of this case.  In lieu of Mr. Rourke's live
    testimony, the court admitted the certified original transcript of his deposition into evidence in its
    entirety without objection.  (Vol. 3, 379:4–17.)

23

24  [18]  Mr. Rourke explained that "scribes" are either pre-med, pre-physician assistant, or pre-nursing,
    students who desire healthcare experience, and are selected to participate in the scribe program.

25  Scribes are in the room with the physician assistants while the patient is being assessed/evaluated.
    During the assessment, the scribes enter information into the charting system based on what the

26  physician assistant tells them during the assessment of the patient.  (Rourke Dep. 12:18–14:19.)
    The physician assistant reviews the scribe's entries to ensure accuracy and then "authenticates"

27  them.  (Id. at 12:10–17.)  Some fields of information would regularly be entered by the scribe,
    and other fields, like the diagnosis, were entered by the physician assistant himself after the

28  assessment of the patient was concluded.  (Id.)

45

1    in portrait mode, with a screen that was probably eight to ten inches, and the iPad connected by

2    video and audio to a translation service with an ASL interpreter.  (*Id.* at 20:1–15.)  Mr. Rourke

3    had used the iPad device on a regular basis at DMC and found the device to be effective in

4    communicating with deaf patients.[19]  (*Id.* at 20:16–25.)  Mr. Rourke also had a practice of asking

5    patients at the end of the visit before the ASL interpreter ended the session if they had any

6    questions or if there were any problems with the communication.  (*Id.* at 21:2–22:4.)  In addition,

7    the interpreters would always ask the patients if they understood, if they had any questions, and if

8    there were any problems with the communication before ending the session.  (*Id.* at 21:2–20;

9    31:13–25.)  In his experience using the iPad device with deaf patients at DMC, Mr. Rourke

10   recalled that the image was clear and not choppy, and the connection did not cut out.  (*Id.* at 23:1–

11   7.)

12        In his physician note, Mr. Rourke or his scribe documented the history of the back pain

13   and posterior neck pain that Mrs. Bax presented with that evening.  (PX-3 at 1819.)  Specifically,

14   the initial onset of her pain was in 2015, when she fell while at home; she was evaluated at that

15   time for her pain by her primary care physician in San Francisco, who took x-rays and told her

16   she had muscle cramping; there was a new onset episode in December 2016 and her symptoms of

17   sharp pain and cramping were fluctuating in intensity and had gotten worse recently, exacerbated

18   by the cold temperature; her pain often onsets at night; and she had associated symptoms of

19   nausea, pain to the back of the neck, occasional sensation of shortness of breath, intermittent brief

20   generalized weakness, and subjective fever, though she denied bowel dysfunction, bladder

21   dysfunction, and altered sensation.  (PX-3 at 1819; Rourke Dep. 16:14–17:5; 24:1–6.)  That

---

22   [19]  Mr. Rourke explained that prior to using these iPads to communicate with deaf patients, DMC
23   would bring in ASL interpreters if the patient requested one.  (Rourke Dep. 22:5–10.)  Mr.
     Rourke specifically recalled that there was a phone number that the charge nurse would call to
24   contact a translation service, and then the service would send an interpreter to the hospital, though
     it "could take anywhere from one to several hours to get someone who was available to show up
25   in the emergency room to translate," and "it was often difficult to get someone to show up in a
     timely manner during night shifts."  (*Id.* at 22:11–25.)  In addition, Mr. Rourke remembered that
26   even after DMC started using VRI services on the iPads, a deaf patient could request a live ASL
27   interpreter and that request would normally be granted.  (*Id.* at 36:4–13.)  Mr. Rourke confirmed
     that if a deaf patient came into the emergency department late at night and requested a live
28   interpreter, DMC would still contact a live interpreter.  (*Id.*)

1   physician note includes the additional history that Mrs. Bax "has been out of her Rx medications

2   for two weeks, last refill acquired in the [Emergency Department]," and that she had an

3   appointment scheduled with her primary care physician for February 6, 2017.  (PX-3 at 1819.)

4        Despite this level of detail in her medical record, Mrs. Bax testified that she remembered

5   that a doctor attempted to use VRI to communicate with her, but the VRI was not effective

6   because the screen kept freezing and was not clear.  (Vol. 1, 99:10–17.)  Mr. Bax also testified

7   that during his wife's visit to the emergency department on this occasion, the iPad was not

8   effective and was freezing, and he had to hold it because the staff did not know how to put the

9   iPad on the stand.  (Vol. 1 at 44:25–45:25.)  As a result, according to Mr. Bax, they tried to write

10  notes instead.  (*Id.* at 45:24–25.)  But according to Mrs. Bax, she did not write notes with the

11  doctor about her pain.  (Vol. 1, 99:21–100:6.)

12       Mrs. Bax also testified that she felt she was unable to communicate to the doctor that she

13  needed a refill of her pain medication.  (Vol. 1, 98:19–23.)  Contrary to Mrs. Bax's testimony in

14  this regard, her medical record reflects that physician assistant Rourke prescribed two pain

15  medications for her, before ordering her discharged at 11:27 p.m. on January 12, 2017.  (PX-3 at

16  1814; Rourke Dep. 23:8–24:14.)

17       In total, Mrs. Bax's visit to DMC as a patient in January 2017 lasted just a few hours.

18  Mrs. Bax signed a consent form acknowledging receipt of the "Conditions of Service" shortly

19  after 10:00 p.m. that night, and she signed the section of that form acknowledging receipt of the

20  "Notice of Privacy Practices" several minutes after midnight, so the date and time next to Mrs.

21  Bax's signature in that section of the form is January 13, 2017 at 00:11 (12:11 a.m.).  (DX-AV at

22  41.)  According to the "Depart Summary" in her medical records, Mrs. Bax was discharged from

23  DMC at 12:17 a.m. on January 13, 2017.  (*Id.* at 58.)

24       According to Mrs. Bax, during those few hours, she made requests for an ASL interpreter,

25  but never received one.  (Vol. 1, 93:6–11.)  Mrs. Bax felt that her communication was limited,

26  and she did not understand her treatment plan.  (Vol. 1, 93:12–22.)  Mrs. Bax also testified that

27  being limited in her communication made her feel "so emotional" and "more frustration than

28  ever."  (Vol. 1, 93:24–94:8.)  Mrs. Bax testified that what happened at DMC on January 12, 2017

1   still affects her because she feels so sad and heartbroken, and she feels scarred from not having an

2   interpreter during that emergency department visit.  (Vol. 1, 94:9–17.)

3           However, in the court's view, Mrs. Bax's testimony in this regard was not wholly credible

4   and appeared to be exaggerated and inauthentic.  There were no nursing notes or physician notes

5   in her medical record corroborating her testimony that she complained contemporaneously to

6   DMC staff about not having an in-person ASL interpreter, or that she was dissatisfied with the

7   VRI services that were provided to her.  Throughout Mrs. Bax's testimony at trial, she repeated

8   that she did not have an interpreter and that she was so frustrated, even though that response was

9   not relevant to the questions being posed by counsel.  Moreover, on cross-examination, defense

10  counsel impeached Mrs. Bax's trial testimony with excerpts from her own deposition testimony.

11  For example, Mrs. Bax testified at trial that she was not in a car accident that caused pain to her

12  neck and kidney in 2016, though she had previously testified at her deposition that she had been

13  in a car accident and had suffered from whiplash and chronic pain for quite some time, and she

14  thought the accident happened in 2016.  (Vol. 1, 97:7–22.)  In addition, Mrs. Bax testified at the

15  trial of this action that she could not communicate that she needed a refill of pain medication and

16  that she was not sure if DMC provided a refill on that night, but at her deposition, Mrs. Bax

17  testified that the doctor at DMC provided her a refill of her prescription pain medication.  (Vol. 1,

18  98:99–99:9.)  Indeed, as noted, Mrs. Bax's medical record reflect that physician assistant Rourke

19  prescribed two pain medications for Mrs. Bax upon on her discharge from DMC.  (Rourke Dep.

20  23:8–20; PX-3 at 1814.)  Further, some of Mrs. Bax's testimony at trial was internally

21  inconsistent.  For example, Mrs. Bax testified that when she was experiencing her pain in January

22  2017, she told Mr. Bax "[l]et's go to DMC," despite her unhappiness with how Mr. Bax was

23  treated at that hospital in late 2015.  (Vol. 1, 103:17–25.)  But she also testified that "it was a

24  surprise" that they went to DMC and it was her husband, Mr. Bax, who contacted DMC, and that

25  she followed what he wanted to do because they are married.  (Vol. 1, 104:4–105:6.)  Adding to

26  the confusion in this regard, Mrs. Bax then testified that Mr. Bax did not want to go to DMC in

27  January 2017.  (Vol. 1, 105:4–8.)

28  /////

1   As to any emotional distress that Mrs. Bax may feel from her experience at DMC, she

2   confirmed in her trial testimony that she did not seek out any doctors or psychologists at any point

3   regarding any such distress.  (Vol. 1, 110:3–16.)  As to other sources of potential emotional

4   distress, according to Mrs. Bax, she suffers from pain in her neck and kidney on a daily basis.

5   (Vol. 1, 105:19–22.)  In addition, the Baxes provide care and education for Mrs. Bax's adult son,

6   who has an unspecified illness, struggles to communicate as a deaf person, and becomes

7   emotional and frustrated.  (Vol. 1, 108:23–110:2.)

8   As to Mr. Bax's experience during his wife's visit to DMC in January of 2017, Mr. Bax

9   testified that before they left DMC, he asked a nurse why the interpreter did not show up and was

10   told by written note that the process went so fast the interpreter did not have a chance to come.

11   (Vol. 1, 70:13–71:2.)  According to Mr. Bax, he felt as if DMC wanted to avoid paying for an

12   interpreter and did not even request one, which made him feel like nothing had changed since his

13   visit to DMC in late 2015.  (*Id.*)

14   However, there was no evidence presented at trial that Mrs. Bax had requested a live, *in-*

15   *person* ASL interpreter, as opposed to a live, *remote* ASL interpreter, which DMC provided using

16   the VRI iPad.  Mrs. Bax testified that she requested an interpreter that night.  (Vol. 1, 99:19–20.)

17   Importantly, she did not specify that she wanted an in-person interpreter.  Although Mrs. Bax also

18   testified that in general, she "always like[s] a live human being as [her] interpreter in person face

19   to face," she did not convey that particular preference to DMC on January 12, 2017 according to

20   the evidence introduced at trial.  (*Id.*)

21   **CONCLUSIONS OF LAW**

22   **A.**   **Disability Discrimination in Public Accommodations under Title III of the ADA**

23   1.   <u>Legal Standard</u>

24   Title III of the ADA prohibits discrimination in public accommodations.  42 U.S.C. §§

25   12181, *et seq.*  Specifically, Title III provides that "[n]o individual shall be discriminated against

26   on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

27   privileges, advantages, or accommodations of any place of public accommodation by any person

28   who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C.

49

§ 12182.  To prevail on a disability discrimination claim under Title III, a plaintiff must prove

that:  "(1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that

owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public

accommodations by the defendant because of her disability."  *Molski v. M.J. Cable*, Inc., 481 F.3d

724, 730 (9th Cir. 2007) (citing 42 U.S.C. §§ 12182(a)-(b)).

   Under Title III, discrimination includes

> a failure to take such steps as may be necessary to ensure that no
> individual with a disability is excluded, denied services, segregated
> or otherwise treated differently than other individuals because of
> the absence of auxiliary aids and services, unless the entity can
> demonstrate that taking such steps would fundamentally alter the
> nature of the good, service, facility, privilege, advantage, or
> accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(iii).  Federal regulations implementing Title III of the ADA provide

that "[a] public accommodation shall furnish appropriate auxiliary aids and services where

necessary to ensure effective communication with individuals with disabilities.  This includes an

obligation to provide effective communication to companions who are individuals with

disabilities."  28 C.F.R. § 36.303(c)(1).[20]

   For individuals who are deaf or hard of hearing, the term "auxiliary aids and services"

includes "[q]ualified interpreters on-site or through video remote interpreting (VRI) services;

notetakers; real-time computer-aided transcription services; written materials; exchange of written

notes; . . . ; or other effective methods of making aurally delivered information available to

individuals who are deaf or hard of hearing; . . . and other similar services and actions."  *Id.* §

36.303(b)(1).  However, "[t]he type of auxiliary aid or service necessary to ensure effective

communication will vary in accordance with the method of communication used by the

individual; the nature, length, and complexity of the communication involved; and the context in

which the communication is taking place."  *Id.* § 36.303(c)(1)(ii).  The regulations further provide

that "[a] public accommodation should consult with individuals with disabilities whenever

---

[20]  A "companion" includes "a family member, friend, or associate of an individual seeking access to" a public accommodation "who, along with such individual, is an appropriate person with whom the public accommodation should communicate."  *Id.* § 36.303(c)(1)(i).

1   possible to determine what type of auxiliary aid is needed to ensure effective communication, but

2   the ultimate decision as to what measures to take rests with the public accommodation, provided

3   that the method chosen results in effective communication." *Id.* However, "[t]he regulations do

4   not require [the public accommodation] to provide the specific aid or service requested by [the

5   disabled individual]; the regulations make clear that "'the ultimate decision as to what measures

6   to take rests with the public accommodation,' so long as the measures provide effective

7   communication." *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 963 (9th Cir. 2019)

8   (quoting 28 C.F.R. § 36.303(c)(1)(ii)) (reversing the district court's grant of summary judgment

9   because there was a genuine issue of material fact as to whether a real estate association that

10  hosted a live continuing education course for realtors provided any auxiliary aids or services to

11  ensure effective communication for a deaf realtor who requested, but was denied, an ASL

12  interpreter for the course); *see also McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d

13  1135, 1147 (11th Cir. 2014) ("The regulations do not require healthcare providers to supply any

14  and all auxiliary aids even if they are desired or demanded.").

15      Plaintiffs bear the burden to prove that a defendant failed to provide an auxiliary aid or

16  service necessary to ensure effective communication. *Siegel v. Dignity Health*, No. 14-cv-02561-

17  PHX-SPL, 2018 WL 11277609, at *4 (D. Ariz. Jan. 5, 2018) (granting summary judgment in

18  favor of the defendant medical center based upon undisputed evidence that the plaintiff patient

19  could read and write English and communicated with non-deaf individuals by writing notes, and

20  that while at the medical center, he "declined to utilize defendant's VRI system and elected to

21  instead use handwritten notes and his son to communicate with defendant's staff").

22      To prevail on Title III claims, plaintiffs must also establish that they have standing to

23  pursue injunctive relief because "[t]he enforcement provisions of Title III provide only for

24  injunctive relief.  Damages are not available to individuals." *Pickern v. Holiday Quality Foods

25  Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002) (citing 42 U.S.C. § 12188(a)); *see also Wander v. Kaus*,

26  304 F.3d 856, 858 (9th Cir. 2002) ("Damages are not recoverable under Title III of the ADA—

27  only injunctive relief is available for violations of Title III.")  Accordingly, a plaintiff must satisfy

28  not only the familiar Article III standing requirements of injury-in-fact, traceability, and

51

1   redressability, but also establish that there is "a sufficient likelihood that he will be wronged again

2   in a similar way," i.e., that he faces a "real and immediate threat of repeated injury." *Ervine v.*

3   *Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) (quoting *Fortyune*

4   *v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)).  Such a real and immediate

5   threat can be established by a plaintiff who shows that "he intends to return to a noncompliant

6   place of public accommodation where he will likely suffer repeated injury" or that he "has visited

7   a public accommodation on a prior occasion" and "is currently deterred from visiting that

8   accommodation by accessibility barriers." *See id.* (citations omitted).

9           2.      Plaintiffs' Claims that DMC Violated Title III of the ADA

10          As a preliminary matter, the court addresses whether plaintiffs have standing to maintain

11  their claims under Title III of the ADA and concludes that they do not.

12          Here, the injunctive relief that plaintiffs seek—namely, revised training of DMC staff to

13  ensure compliance with DMC's obligations to deaf and hard of hearing patients and companions

14  in accordance with state and federal antidiscrimination laws—has already been ordered by the

15  court.  On December 7, 2018, in response to then-plaintiff Birmingham's notice of acceptance of

16  DMC's Rule 68 offer of judgment, the court entered judgment on her disability discrimination

17  claims in her favor and against DMC and issued an injunction requiring DMC to take several

18  actions to ensure effective communication for deaf patients and companions.  (Doc. No. 28 at 2–

19  3.)  In light of that detailed and extensive injunction, the Baxes do not have any remaining claim

20  for injunctive relief.  In other words, the Baxes have not requested that the court require DMC to

21  undertake any additional actions, beyond those that are already required by the injunction issued

22  by the court on December 7, 2018.

23          Thus, because the Baxes' claim for injunctive relief has been mooted by the court's

24  December 7, 2018 order issuing that same injunctive relief, the court concludes that Mr. and Mrs.

25  Bax no longer have standing to maintain their claims under Title III of the ADA.  *See Lopez v.*

26  *Botach*, No. 2:20-cv-003440-SVW, 2020 WL 7786582, at *3 (C.D. Cal. Nov. 2, 2020) ("[A]n

27  ADA claim is moot if no ADA violations exist when the court is asked to grant injunctive

28  relief.") (citing *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011)); *see also Silva v.*

1    *Baptist Health S. Fla., Inc.*, 838 F. App'x 376, 385 (11th Cir. 2020) (holding that district court

2    properly dismissed the plaintiffs' ADA claim for lack of standing where "the district court did not

3    clearly err in finding that, at least since 2015, [defendant] Baptist had implemented policies at its

4    hospitals that mandated providing live, in-person ASL interpreters upon a patient's or a guest's

5    request," and thus plaintiffs had not established a real and immediate threat of future injury).

6           Accordingly, the court will dismiss plaintiffs' ADA claims due to a lack of jurisdiction.

7    **B.     Disability Discrimination under Section 504 of the Rehabilitation Act**

8           1.     Legal Standard

9           Section 504 of the Rehabilitation Act prohibits disability discrimination "in any program

10   or activity receiving Federal financial assistance," including health care services and benefits.  29

11   U.S.C. § 794; 45 C.F.R. § 84.1; *see also Ervine*, 753 F.3d at 868 ("Section 504 of the

12   Rehabilitation Act prohibits organizations that receive federal funds, including health care

13   providers, from discriminating against individuals with disabilities.").  Specifically, Section 504

14   of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . .

15   shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

16   benefits of, or be subjected to discrimination under any program or activity receiving Federal

17   financial assistance."  29 U.S.C. § 794.

18          The federal regulations effectuating Section 504 prohibit a recipient of federal financial

19   assistance from discriminating "on the basis of handicap" in providing any aid, benefit, or service.

20   45 C.F.R. § 84.4(a).  The regulations specify that prohibited discriminatory actions include:  (i)

21   denying "a qualified handicapped person the opportunity to participate in or benefit from the aid,

22   benefit, or service;" (ii) affording such an opportunity "that is not equal to that afforded others;"

23   (iii) providing a service "that is not as effective as that provided to others;" and (iv) providing

24   different or separate services.  *Id.* § 84.4(b)(1).  The regulations clarify, however, that "to be

25   equally effective," the aids, benefits, and services "are not required to produce the identical result

26   or level of achievement for handicapped and nonhandicapped persons," but they "must afford

27   handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to

28   /////

1   reach the same level of achievement, in the most integrated setting appropriate to the person's

2   needs." *Id.* § 84.4(b)(2).[21]

3       Accordingly, Section 504 and its implementing regulations impose an "'affirmative

4   obligation' for health care providers who receive federal funds to make their services accessible

5   to people with disabilities." *Spiva v. Walmart*, No. 6:18-cv-1024-MK, 2019 WL 1063386, at *6

6   (D. Or. Jan. 18, 2019), *report and recommendation adopted*, 2019 WL 1062371 (Mar. 6, 2019)

7   (quoting *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2018)).

8       To prevail on a Section 504 claim, plaintiffs must establish that:  (1) they are individuals

9   with a disability; (2) they were otherwise qualified to receive the benefits of a program; (3) they

10  were denied the benefits of the program solely by reason of their disability; and (4) the program

11  receives federal financial assistance.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir.

12  2001).

13      As to remedies, the Rehabilitation Act provides that the "remedies, procedures, and rights

14  set forth in title VI of the Civil Rights Act of 1964 . . . shall be available" to plaintiffs pursuing

15  claims under Section 504.  29 U.S.C. § 794a(a)(2).  This includes "compensatory damages,

16  injunctive relief, and other forms of relief traditionally available in suits for breach of contract,"

17  but not punitive damages.  *Steele v. Success Acad. Charter Sch., Inc.*, No. 19-cv-5659-AJN, 2020

18  WL 6424566, at *4 (S.D.N.Y. Nov. 1, 2020) (citing *Barnes v. Gorman*, 536 U.S. 181, 187

19  (2002)).  As the Ninth Circuit has recognized, plaintiffs "may pursue the full panoply of

20  _____

21  [21] Though neither party addressed the regulations promulgated by the U.S. Department of Health
    and Human Services ("HHS") pertaining specifically to recipients of federal funds in providing

22  health, welfare, and other social services—45 C.F.R. § 84.52—the court notes that there are
    several affirmative obligations outlined in those regulations as well.  "[W]here necessary to afford

23  such persons an equal opportunity to benefit from the service in question," health care providers
    "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking

24  skills," which may include interpreters for persons with impaired hearing.  45 C.F.R. § 84.52(d).
    When providing "notice concerning benefits or services or written material concerning waivers of

25  rights or consent to treatment," health care providers "shall take such steps as are necessary to
    ensure that qualified handicapped persons, including those with impaired sensory or speaking

26  skills, are not denied effective notice because of their handicap."  *Id.* § 84.52(b).  Moreover, with
    regard to emergency services, "[a] recipient hospital that provides health services or benefits shall

27  establish a procedure for effective communication with persons with impaired hearing for the
    purpose of providing emergency health care."  *Id.* § 84.52(c).

28

1    remedies, including equitable relief and monetary damages."  *Smith v. Barton*, 914 F.2d 1330,

2    1338 (9th Cir. 1990) (citing *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d

3    1103, 1107 (9th Cir. 1987)).  In addition to available remedies, "the court, in its discretion, may

4    allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  29 U.S.C. §

5    794a(b).

6          But, to be entitled to compensatory damages under the Rehabilitation Act, including

7    damages for emotional harm, plaintiffs must prove intentional discrimination.  *Duvall*, 260 F.3d

8    at 1138; *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *see also Sheely v. MRI*

9    *Radiology Network, P.A.*, 505 F.3d 1173, 1199 (11th Cir. 2007) (noting that "emotional damages,

10   like other forms of compensatory damages, are designed to make the plaintiff whole").[22]  In this

11   context, the standard for intentional discrimination is deliberate indifference.  *Duvall*, 260 F.3d at

12   1138.  A defendant acts with deliberate indifference where it:  (1) had knowledge that a harm to a

13   federally protected right was substantially likely; and (2) failed to act upon that likelihood.  *Id.* at

14

15   ───────────────

     [22]  The court notes that the Ninth Circuit has not addressed the question of whether emotional
16   damages are an available remedy under Section 504 of the Rehabilitation Act.  One district court
     within the Ninth Circuit has addressed this question and, relying on the Eleventh Circuit's
17   decision in *Sheely*, concluded that "[c]ompensatory damages, under § 504 of the Rehabilitation
     Act, include emotional distress damages."  *Toth v. Barstow Unified Sch. Dist.*, No. 12-cv-02217-
18   TJH-DTB, 2014 WL 7339210, at *4 (C.D. Cal. Dec. 22, 2014) (citing *Sheely*, 505 F.3d at 1204).
     Similarly, though the Third Circuit has not addressed this question, a district court within that
19   circuit recently relied on the reasoning in *Sheely* and held that "Title II of the ADA and Section
     504 of the [Rehabilitation Act] allow plaintiffs to recover damages for emotional harm where
20   there is evidence of intentional discrimination."  *Swogger v. Erie Sch. Dist.*, No. 1:20-cv-128-
     SPB, 2021 WL 409824, at *9 (W.D. Pa. Feb. 5, 2021) (noting that "the First, Second and Seventh
21   Circuits have apparently arrived at the same conclusion [as the Eleventh Circuit in *Sheely*], albeit
     in opinions which did not expound on the courts' reasoning"); *see, e.g.*, *Carmona-Rivera v.*
22   *Commonwealth of Puerto Rico*, 464 F.3d 14, 17 (1st Cir. 2006) ("We have previously held that
     under Title II [of the ADA], non-economic damages are only available where there is evidence 'of
23   economic harm or animus toward the disabled.'") (citation omitted); *Tsombanidis v. W. Haven*
     *Fire Dep't*, 352 F.3d 565, 580–81 (2d Cir. 2003) (affirming the district court's award of
24   compensatory damages "in its entirety," which included an award of compensatory damages for
     emotional pain and suffering under Title II of the ADA).  Although the Fifth Circuit has recently
25   disagreed with the reasoning in *Sheely* and held that emotional distress damages are not available
     under the Rehabilitation Act in its opinion in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948
26   F.3d 673, 679 (5th Cir. 2020), this court is not persuaded by the Fifth Circuit's analysis and
     instead agrees with the majority of courts which have concluded that such damages are available
27   in connection with a claim brought under the Rehabilitation Act.

28

                                                      55

1139.  A plaintiff can satisfy the first element of the claim by showing that he alerted the

defendant to his need for accommodation and the second element by showing that the defendant

failed to act as "a result of conduct that is more than negligent, and involves an element of

deliberateness."  *Id.*

2.    Plaintiffs' Claims that DMC Violated Section 504 of the Rehabilitation Act

Plaintiffs argue that "for medically significant interactions, where there was no interpreter

or no attempt to get an interpreter, [] there would be liability here."  (Vol. 3, 421:5–8.)  But this

position is not tethered to the applicable legal standard for liability under the Rehabilitation Act.

Disability discrimination claims brought under the Rehabilitation Act are "governed by

the same substantive standard of liability" as claims brought against public entities under Title III

of the ADA.  *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830 (11th Cir. 2017).

"Under this standard, a hospital violates the [Rehabilitation Act] and ADA when it 'fails to

provide appropriate auxiliary aids and services to a deaf patient, or a patient's deaf companion,

where necessary to ensure effective communication.'"  *Silva*, 838 F. App'x at 380–81 (quoting

*Silva*, 856 F.3d at 831) (internal quotation marks omitted).  But, it is important to recognize that

under the law "[d]eaf patients are not 'entitled to an on-site interpreter every time they ask for it."

*Silva*, 856 F.3d at 835; *see also McCullum*, 768 F.3d at 1147 ("The regulations do not require

healthcare providers to supply any and all auxiliary aids even if they are desired or demanded.").

"If effective communication under the circumstances is achievable with something less than an

on-site interpreter, then the hospital is well within its ADA and [Rehabilitation Act] obligations to

rely on other alternatives."  *Id.* at 836.  Title III entities are not required to honor an individual's

choice of auxiliary aid.  Rather, the entity "should consult with individuals with disabilities

whenever possible to determine what type of auxiliary aid is needed to ensure effective

communication, but the ultimate decision as to what measures to take rests with the [entity],

provided that the method chosen results in effective communication."  28 C.F.R. §

36.303(c)(1)(ii).  Whether the particular aid provided is effective "largely depends on context,

including, principally, the nature, significance, and complexity of treatment."  *Liese v. Indian

River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012).

56

1    Here, there is no dispute that because the Baxes are deaf, they are both individuals with a

2    disability.  (Doc. No. 54 at 2, 3.)  There is also no dispute that because DMC receives federal

3    financial assistance, it is subject to the provisions of Section 504 of the Rehabilitation Act.  (Doc.

4    No. 54 at 4.)  Although the parties dispute whether the Baxes were denied the benefits of DMC's

5    health care services because of their deafness, the court finds that the Baxes have not met their

6    burden of proof as to this element of their Rehabilitation Act claim.

7    With respect to Mr. Bax's hospitalizations, the Baxes did not establish at trial that DMC

8    failed to provide appropriate auxiliary aids and services to ensure effective communication.

9    Although not required to, in every instance but one during Mr. Bax's October hospitalization,

10   DMC honored Mr. Bax's requests for an in-person ASL interpreter by requesting one from

11   NorCal.  When Mr. Bax had not explicitly requested an interpreter, DMC staff used other

12   methods of communication (writing notes, typing notes on an iPad, and using a communication

13   board), and the detailed notes in Mr. Bax's medical record strongly suggest that those methods

14   were indeed effective in the context of those particular interactions.  Although Mr. Bax testified at

15   trial that written notes were not effective for him overall, there was no evidence presented

16   showing that Mr. Bax had contemporaneously complained to DMC staff that those alternative

17   aids were ineffective methods of communication for him during those interactions.  Given the

18   several instances in which Mr. Bax explicitly requested an interpreter—including in when he

19   refused to proceed with surgery and refused to sign a consent forms without one—the reasonable

20   inference to be drawn is that if Mr. Bax was dissatisfied when alternative means of

21   communication were offered and/or used, he would have expressed that discontent

22   contemporaneously.  Indeed when Mr. Bax complained and requested an interpreter, DMC in turn

23   requested interpreters from NorCal.

24   The only instance in which Mr. Bax established that he had requested an interpreter and

25   DMC did not in turn request one from NorCal involved his refusal to sign a Medicare notice that

26   he had already signed the week before.  Plaintiffs argue that DMC should not be given "partial

27   credit"—i.e., that DMC should not be absolved of its obligations to provide auxiliary aids and

28   services for Mr. Bax to have effective communication for every medically significant event.  But

57

1    DMC cannot be held to a standard of perfection in this regard.  *See Miller v. Christ Hosp.*, No.

2    1:16-cv-937, 2019 WL 6115211, at *5 (S.D. Ohio Nov. 18, 2019) (concluding that issues of fact

3    preclude summary judgment for either party on the effective communication issue and noting that

4    "while [defendant's] efforts have proven imperfect, perfection is not the applicable standard").

5    Given that Mr. Bax had already signed the same Medicare notice, and that he was provided an in-

6    person interpreter the very next day after his refusal to sign the notice, the court concludes that

7    Mr. Bax has failed to establish that he was "denied effective notice because of [his] handicap" in

8    this instance.  *See* 45 C.F.R. § 84.52(b).  In short, in light of these circumstances, this single

9    instance of DMC not requesting an interpreter to translate a notice, which Mr. Bax had already

10   signed the week before, does not constitute disability discrimination.[23]

11        On the one day that NorCal was unable to fulfill DMC's request for an interpreter (for Mr.

12   Bax's second surgery as originally scheduled), DMC tried to use the VRI laptop with Mr. Bax,

13   but the connectivity issues rendered that service ineffective for him.  DMC attempted to

14   troubleshoot the issues with the VRI.  Specifically, the social workers successfully connected

15   with a remote interpreter on the laptop while they were in the social services office, but when the

16   laptop was brought to Mr. Bax's room, the screen continued to freeze and pixelate, impeding his

17   ability to communicate effectively.  In response, DMC did not insist on providing only remote

18   interpreters using the VRI laptop with Mr. Bax; rather, DMC continued to pursue in-person ASL

19   interpreters for Mr. Bax and provided them.  Given those circumstances, the court concludes that

20   this instance of the VRI not working effectively is insufficient to support plaintiffs' claims of

21   disability discrimination.  *See Juech v. Children's Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 722,

---

[23]  The court pauses to note that even if it were to conclude that this single instance of DMC failing to request an interpreter for Mr. Bax upon request constituted disability discrimination, plaintiffs have nevertheless failed to show that this instance also constituted deliberate indifference by DMC.  Plaintiffs cannot obtain compensatory damages on their Rehabilitation Act claim without establishing that DMC intentionally discriminated against them by acting with deliberate indifference.  Indeed, the court previously granted summary judgment in DMC's favor as to Mrs. Bax's claim for compensatory damages under the Rehabilitation Act and ACA because it found DMC was not deliberately indifferent during her hospitalization.  (Doc. No. 36 at 21.) The court similarly now concludes that plaintiffs have failed to meet their burden of showing that DMC acted with deliberate indifference during Mr. Bax's hospitalizations, given the many instances in which DMC provided Mr. Bax with an in-person ASL interpreter at his request.

782 (E.D. Wis. 2018) ("Although the Court rejects the notion that any temporary failure or glitch in a VRI system is tantamount to discrimination, VRI systems that regularly lag or produce muddled images can eventually become discrimination if they consistently result in ineffective communication."); *see also Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 818 (11th Cir. 2017) (noting that the jury could find deliberate indifference with respect to the plaintiff's Rehabilitation Act claim where the plaintiff's "nurses relied on the VRI, but the picture on the VRI screen was blurry and not cognizable, thereby thwarting the effectiveness of the VRI," and yet "the nurses chose to continue using the VRI without correcting the deficiency").

As to his November 2015 hospitalization, Mr. Bax established that he had requested an interpreter on three of the seven days he was at DMC, and DMC in turn requested and provided an in-person interpreter on each of those days. On one of those days, however, DMC promptly requested an interpreter, and NorCal provided one during the day but not during the evening when a nurse completed an assessment of Mr. Bax's activities of daily living. Despite DMC's efforts to use VRI on that occasion, those services were ineffective for Mr. Bax at that time because of connectivity issues. In light of the fact that DMC requested an interpreter "ASAP" and open-ended on that date, the fact that DMC provided an interpreter earlier that day and for eight hours the following day beginning at 5:00 a.m., and the fact that DMC attempted to use VRI during the evening assessment but did not insist on using VRI in lieu of requesting interpreters for Mr. Bax, the court concludes that DMC did not discriminate against Mr. Bax on the basis of his disability merely by failing to provide an in-person interpreter for an "activities of daily living" assessment on that one evening.

As to Mrs. Bax's hospital visit as a patient in January 2017, Mrs. Bax did not establish that DMC failed to provide her with appropriate auxiliary aids and services to ensure effective communication. Notably, although Mrs. Bax completed DMC's assessment form to indicate her request for an ASL interpreter, she did not specify on that form that she was requesting an *in-person* interpreter. Moreover, Mrs. Bax did not testify or produce any evidence suggesting that she had requested an *in-person* ASL interpreter from DMC in some other way. According to her medical records and her own testimony, Mrs. Bax was provided with a remote interpreter using a

1   VRI iPad.  Mr. Rourke, the physician assistant who cared for Mrs. Bax that evening, testified that

2   in his past experiences using the VRI iPads, he found the device to be effective in communicating

3   with deaf patients.  The court did not find Mrs. Bax's testimony to the contrary—that the VRI

4   was ineffective—to be credible, particularly given the level of detail set forth in Mr. Rourke's

5   physician assistant's note documenting their communications regarding Mrs. Bax's chief

6   complaint and history, and his testimony that both he and the remote interpreters had a practice of

7   asking the patient if there were any questions or issues with the communication before ending the

8   remote session.  There were no notes in Mrs. Bax medical record indicating that she experienced

9   any communication issues or difficulties with the VRI iPad services.  For the several reasons

10  explained above, the court finds that Mrs. Bax was simply not a reliable witness.

11       In sum, the court concludes that the Baxes have failed to establish that DMC violated the

12  Rehabilitation Act by discriminating against them on the basis of their disability.

13  **C.     Disability Discrimination under Section 1557 of the ACA**

14       1.     <u>Legal Standard</u>

15       Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited

16  under . . . [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or

17  be subjected to discrimination under, any health program or activity, any part of which is

18  receiving Federal financial assistance."  42 U.S.C. § 18116(a).  Section 1557 states that the

19  enforcement mechanisms of Section 504 of the Rehabilitation Act shall apply to disability

20  discrimination claims under the ACA.  *Id.*  Section 1557 also provides for the Secretary of HHS

21  to promulgate regulations implementing that section.  *Id.* § 18116(c).

22       The first regulations promulgated to enforce Section 1557 of the ACA became effective

23  on July 18, 2016 and provided that

24           [a] covered entity shall take appropriate steps to ensure that
             communications with individuals with disabilities are as effective
25           as communications with others in health programs and activities, in
             accordance with the standards found at 28 CFR 35.160 through
26           35.164 [applicable to Title II of the ADA].  Where the regulatory
             provisions referenced in this section use the term "public entity,"
27           the term "covered entity" shall apply in its place.

28  /////

60

45 C.F.R. § 92.202 (effective July 18, 2016 to August 17, 2020).[24]  That is, since July 18, 2016, disability discrimination claims under the ACA have been subject to the standards of Title II of the ADA, which prohibits disability discrimination by public entities (42 U.S.C. §§ 12131, *et seq.*), and its regulatory provisions (28 C.F.R. §§ 35.160–35.164).  *See* 45 C.F.R. § 92.202.[25]

Similar to the provisions of Title III of the ADA and Section 504 of the Rehabilitation Act, the implementing regulations for Title II of the ADA provide that "[a] public entity shall take appropriate steps to ensure that communications" with disabled persons "are as effective as communications with others."  28 C.F.R. § 35.160(a)(1).  Specifically, the Title II regulations provide that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including . . . companions, . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  *Id.* § 35.160(b)(1).

However, unlike Title III, which provides that "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication," *id.* § 36.303(c)(1)(ii), the regulations implementing Title II provide for deference to the disabled individual.  *See Updike*, 870 F.3d 939, 949–950.  Pursuant to the Title II regulations, "[i]n determining what types of auxiliary aids and services are

---

[24]  The regulations of 45 C.F.R. § 92.202 were re-designated as 45 C.F.R. § 92.102, effective on August 18, 2020.  *See* 45 C.F.R. § 92.102.

[25]  On September 8, 2015, HHS's Office for Civil Rights ("OCR") issued a notice of proposed rulemaking to implement Section 1557 of the ACA and invited comments with a comment period ending on November 9, 2015.  Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54172 (Sept. 8, 2015).  In that proposed rule, OCR "considered whether to incorporate the standards in the regulation implementing Title II of the ADA or in the regulation implementing Title III of the ADA, or the standards in both regulations," and noted that one of the limited differences between those two standards is "the obligation under the Title II regulation to give primary consideration to the choice of an aid or service requested by the individual with a disability."  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375-01, 31421 (May 18, 2016).  Ultimately, OCR proposed to apply Title II standards to all entities noting that OCR "believe[s] it is appropriate to hold all recipients of Federal financial assistance from HHS to the higher Title II standards as a condition of their receipt of that assistance."  *Id.*  In a final rule dated May 18, 2016, HHS finalized the proposed rule, with an effective date for the regulatory changes of July 18, 2016.  *Id.*

1   necessary, a public entity shall give primary consideration to the requests of individuals with

2   disabilities."  28 C.F.R. § 35.160(b)(2).  As the Ninth Circuit noted,

3               [t]he Appendix to the ADA regulations also makes clear that the
                public entity has a duty to ensure effective communications and
4               establishes a required deference that must normally be given to a
                disabled person's personal choice of aid and service:
5
6                     The public entity shall honor the choice [of the individual
                      with a disability] unless it can demonstrate that another
7                     effective means of communication exists or that use of the
                      means chosen would not be required under § 35.164.
8                     Deference to the request of the individual with a disability is
                      desirable because of the range of disabilities, the variety of
9                     auxiliary aids and services, and different circumstances
                      requiring effective communication.

10  *Updike*, 870 F.3d at 950 (quoting 28 C.F.R. § pt. 35, App. A (2009) (alteration in original)).  A

11  covered entity is not required "to take any action that it can demonstrate would result in a

12  fundamental alteration in the nature of a service, program, or activity or in undue financial and

13  administrative burdens."  28 C.F.R. § 35.164.

14          Thus, pursuant to those regulations adopting Title II standards for ACA disability

15  discrimination claims—effective as of July 18, 2016—where a disabled person's choice of

16  auxiliary aid is not honored, it is the *defendant* that bears the burden to demonstrate either that

17  another effective means of communication existed or that providing the preferred aid would

18  fundamentally alter the services or result in undue financial and administrative burdens.

19  Whereas, under the Rehabilitation Act and Title III of the ADA, *plaintiffs* bear the burden to

20  demonstrate that they were denied benefits and services and that defendant failed to provide an

21  auxiliary aid or service necessary to ensure effective communication.  Before July 18, 2016,

22  Section 1557 of the ACA provided only that the enforcement mechanisms of Section 504 of the

23  Rehabilitation Act applied to disability discrimination claims under the ACA.  Consequently, for

24  alleged acts of disability discrimination that occurred prior to July 18, 2016, plaintiffs bear the

25  burden of proof on Section 1557 claims, just as they do with respect to disability discrimination

26  claims under Section 504 of the Rehabilitation Act.

27          The remedies available under Section 1557 of the ACA are coextensive with the remedies

28  available under Section 504 the Rehabilitation Act.  *Puerner v. Hudson Spine & Pain Med. P.C.*,

                                            62

1    No. 17-cv-03590-ALC, 2018 WL 4103491, at *5 (S.D.N.Y. Aug. 28, 2018) (finding that a

2    plaintiff whose requests for an ASL interpreter were refused by the defendant was "entitled to

3    monetary damages for violations of the [Rehabilitation Act]," and "[b]ecause the ACA adopts the

4    [Rehabilitation Act's] enforcement mechanisms, she is likewise entitled to damages for violations

5    of the ACA"); *Bustos v. Dignity Health*, No. 17-cv-02882-PHX-DGC, 2019 WL 3532158, at *4

6    (D. Ariz. Aug. 2, 2019) (concurrently analyzing plaintiff's entitlement to compensatory damages

7    under both the ACA and the Rehabilitation Act based on the defendant's failure to accommodate

8    plaintiff's request for an ASL interpreter); *Tokmenko v. MetroHealth Sys.*, No. 1:18-cv-2579,

9    2020 WL 5629093, at *3 (N.D. Ohio Sept. 21, 2020) (analyzing a deaf patient's claims against a

10   hospital for allegedly failing to provide effective auxiliary aids and services brought under Title

11   III of the ADA, the ACA, and the Rehabilitation Act, and noting that although "there are

12   important distinctions among the three statutory claims," determining whether a plaintiff is

13   entitled to compensatory damages under "the ACA and the Rehabilitation Act must be analyzed

14   in tandem").

15         Accordingly, to recover compensatory damages on a claim brought under Section 1557 of

16   the ACA, plaintiffs must prove intentional discrimination.  *See Duvall*, 260 F.3d at 1138; *see also*

17   *Wade v. Univ. Med. Ctr. of S. Nevada*, No. 2:18-cv-01927-RFB-EJY, 2020 WL 6318883, at *4

18   (D. Nev. Oct. 28, 2020) (denying summary judgment for the defendant medical center on

19   plaintiff's ACA claim where "a reasonable juror could conclude that [defendant] failed to

20   properly investigate whether their alternative means of communication were actually providing

21   effective communication to [p]laintiff") (citing *Updike*, 870 F.3d at 954 ("A denial of a request

22   without investigation is sufficient to survive summary judgment on the question of deliberate

23   indifference.")).  As with the Rehabilitation Act, courts may allow plaintiffs who prevail on

24   claims brought under Section 1557 of the ACA to recover reasonable attorneys' fees as part of

25   costs.  *See* 42 U.S.C. § 18116(a); 29 U.S.C. § 794a(b).

26         2.    Plaintiffs' Claims that DMC Violated Section 1557 of the ACA

27         As a preliminary matter, the court first addresses plaintiffs' argument that DMC should be

28   held to the higher, deferential "primary consideration" standard for Mr. Bax's hospitalization

                                              63

1   even though regulations imposing that standard were not yet in effect.  Plaintiffs contend that the

2   court should give deference to HHS's regulations implementing Section 1557 of the ACA

3   (codified in 45 C.F.R. § 92.202) based on the decision in *Skidmore v. Swift & Co.*, 323 U.S. 134

4   (1944), in which the Supreme Court held that the weight of deference afforded by courts to

5   agency interpretations of statutes and applicable regulations depends on "the thoroughness

6   evident in its consideration, the validity of its reasoning, its consistency with earlier and later

7   pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.*,

8   323 U.S. 134 (1944).  In reliance on the decision in *Skidmore*, the Ninth Circuit has also

9   recognized that "[t]he interpretation and construction of a statute and its applicable regulations by

10  the agency charged with their administration is entitled to deference from the courts." *Alcaraz v.*

11  *Block*, 746 F.2d 593, 606 (9th Cir. 1984).

12          In support of their argument, plaintiffs cite a district court decision in *Callum v. CVS*

13  *Health Corp.*, 137 F. Supp. 3d 817 (D.S.C. 2015).  But in *Callum*, defendant CVS moved to

14  dismiss a customer's ACA claim and that court was asked to decide whether CVS falls within the

15  meaning of a "health program or activity" receiving federal funds, as that phrase is used in the

16  ACA, such that CVS could be held liable under that statute.  *Callum*, 137 F. Supp. 3d at 848–849.

17  In that context, the court looked to HHS's proposed regulations because they contained

18  "numerous definitions and explanations for the statutory language of Section 1557, including

19  'health program or activity.'" *Id.* at 849.  Specifically, the district court in *Callum* afforded

20  *Skidmore* deference to the definition and interpretation of that phrase in the proposed regulations

21  "[b]ecause the statute is silent as to the meaning of 'health program or activity' and because HHS

22  has yet to promulgate final regulations." *Id.*  Here, however, plaintiffs have not pointed the court

23  to any ambiguous statutory provision in the ACA at issue in this case, or any purported

24  *interpretation* by HHS of any such ambiguous statutory provision that would make deference to

25  the agency's interpretation appropriate.  Determining DMC's liability in this case does not

26  depend on the court's resolution of any unclear or undefined provisions in the ACA such that

27  deference to HHS's currently applicable regulations would be warranted.

28  /////

64

1           In further support of their argument that this court should afford *Skidmore* deference in

2    this case, on March 25, 2021, plaintiffs filed a request for leave to file a notice of supplemental

3    authority with the court, specifically to direct the court's attention to a recent decision from the

4    Second Circuit in *Vega-Ruiz v. Northwell Health*, 992 F.3d 61 (2d Cir. 2021).  In *Vega-Ruiz*, the

5    circuit court vacated the district court's dismissal of the plaintiff's disability discrimination claim

6    brought under the ACA on statute of limitations grounds because the district court erred in relying

7    on the shorter (3-year) statute of limitations period of the Rehabilitation Act rather than the longer

8    (4-year) "catch-all" limitations period for federal statutes like the ACA that do not specify a

9    limitations period.  992 F.3d at 63, 64.  In concluding that plaintiff's ACA claim in that case was

10   timely and that "a plaintiff bringing a claim under the ACA presents a different case than a

11   plaintiff alleging the same harm under the Rehabilitation Act," the Second Circuit briefly

12   addressed *Skidmore* deference in a footnote, noting that "[w]hile this case is not wholly dependent

13   upon the distinctions between the Rehabilitation Act and the ACA, the proposed regulations that

14   took effect after Vega-Ruiz's alleged harm are persuasive."  *Id.* at 65, n. 5.  The appellate court

15   further noted that "[i]t is not unreasonable to give the then-proposed, now-realized distinctions

16   between the Rehabilitation Act and the ACA some weight as we contemplate Vega-Ruiz's

17   appeal."  *Id.*  However, the circuit court did not elaborate on how or in what way it was persuaded

18   by the proposed regulations, or the extent to which those proposed regulations were given weight

19   in their analysis.  Moreover, the court's analysis focused solely on the statute of limitations

20   applicable to ACA claims—it did not address the merits of the plaintiff's ACA claim.  For these

21   reasons, the decision in *Vega-Ruiz* is not persuasive authority with respect to any issue that must

22   be resolved by this court as to plaintiffs' ACA claim brought in this case.

23          DMC argues that deference under *Skidmore* would be inappropriate given that here the

24   regulations had been proposed for only a month before Mr. Bax's hospitalization, and to hold

25   DMC—a Title III entity—to the more demanding standards previously imposed only on Title II

26   entities would be a violation of DMC's due process rights.

27          The court concludes that *Skidmore* deference is not appropriate here.  Notably, when

28   HHS's Office for Civil Rights ("OCR") proposed the regulations implementing the ACA, it

1    specifically noted in its notice of proposed rulemaking that it "typically looks to the ADA for

2    guidance in interpreting Section 504," and it recognized the critical difference between the

3    standards applicable under Title II of the ADA and those applicable under Title III of the ADA.

4           OCR considered whether to incorporate the standards in the
     regulation implementing Title II of the ADA or in the regulation
5           implementing Title III of the ADA, or the standards in both
     regulations.  As summarized by the Department of Justice,
6           standards regarding effective communication under both
     regulations are very similar.  There are, however, limited
7           differences between the Title II and Title III regulations, regarding
     limitations on the duty to provide a particular aid or service and the
8           obligation under the Title II regulation to give primary
     consideration to the choice of an aid or service requested by the
9           individual with a disability.

10   Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54172, 54186 (Sept. 8, 2015).

11          In proposing to apply Title II standards to the ACA, OCR explained that, "[a]lthough

12   OCR could apply Title II standards to States and local entities and Title III standards to private

13   entities, [OCR] believe[s] it is appropriate to hold all recipients of Federal financial assistance

14   from HHS to the higher Title II standards as a condition of their receipt of that assistance."  *Id*.

15   To be clear, in this proposed regulation—proposing that the Title II "primary consideration"

16   standard apply to the ACA—OCR was not interpreting or defining ambiguous provisions of the

17   ACA.  The relevant statutory language in Section 1557 of the ACA provides that "an individual

18   shall not, on the ground prohibited under . . . [the Rehabilitation Act], be excluded from

19   participation in, be denied the benefits of, or be subjected to discrimination under, any health

20   program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C.

21   § 18116(a).  That statute also provides that the enforcement mechanisms of the Rehabilitation Act

22   shall apply to disability discrimination claims under the ACA.  *Id.*  OCR acknowledged that it

23   looked to the regulations implementing the ADA for guidance in interpreting Section 504 of the

24   Rehabilitation Act.  OCR further acknowledged that those ADA regulations impose different

25   standards for Title II entities than for Title III entities.  By proposing (and later finalizing)

26   regulations to affirmatively impose Title II standards on *all* covered entities under the ACA, OCR

27   was not clarifying or interpreting the ACA's statutory text as having already imposed those

28   standards.  Rather, in exercising its authority to promulgate regulations implementing the ACA,

1   OCR decided that in its belief, it is appropriate *to hold* all covered entities to the higher standard

2   of Title II.  Importantly, OCR did not state that the ACA *already held* all covered entities to that

3   heightened standard.  In other words, the regulations themselves did not purport to have

4   retroactive effect.  In its final rule dated May 18, 2016, HHS set an effective date of July 18, 2016

5   for the regulatory changes.  *Id.*  As of that effective date, Title III entities, like DMC, are held to

6   the higher standards of Title II with regard to providing effective communication for individuals

7   with disabilities.[26]

8          Accordingly, the court concludes that the heightened deferential standard of Title II of the

9   ADA applies only to Mrs. Bax's ACA claim with regard to her hospitalization in January 2017.

10  That heightened standard does not apply to Mr. Bax's ACA claim for his hospitalizations in the

11  fall of 2015.

12              a.    *Mr. Bax's ACA Claim – Non-Deferential "Consult With" Standard*

13          As noted above as to Mr. Bax's Rehabilitation Act claim, for those same reasons the court

14  concludes that Mr. Bax failed to demonstrate that DMC denied him benefits and services by

15  failing to provide an auxiliary aid or service necessary to ensure effective communication for him.

16  Accordingly, the court concludes that plaintiff has not met his burden of proof as to his ACA

17  claim.  Because the court concludes that DMC did not discriminate against Mr. Bax on the basis

18  of his disability, the court will enter judgment in DMC's favor on that claim.

19              b.    *Mrs. Bax's ACA Claim – Deferential "Primary Consideration" Standard*

20          Under the deferential standard applicable to Mrs. Bax's hospitalization, if Mrs. Bax had

21  shown that DMC did not honor her choice of auxiliary aid, the burden of proof would shift to

22

23  [26]  The court notes that another district court has addressed OCR's proposed regulations in the
    context of ACA's prohibition on gender discrimination when evaluating a plaintiff's claim of
24  discrimination that allegedly occurred before those regulations became final and effective.  *See*
    *Baker v. Aetna Life Ins. Co.*, 228 F. Supp. 3d 764 (N.D. Tex. 2017).  In *Baker*, the court
25  dismissed a plaintiff's claim under Section 1557 of the ACA that her health insurer discriminated
    against her on the basis of gender identity when it denied her benefits "on the basis that surgery to
26  treat Gender Dysphoria does not qualify as treatment of an illness."  228 F. Supp. 3d at 767.  The
    court concluded that plaintiff's claim was not cognizable because her insurer allegedly denied
27  benefits in 2015, and the proposed regulations defining "on the basis of sex" to include gender
    identity did not become effective until July 18, 2016, at the earliest.  *Id.* at 768.
28

1   DMC to show that another effective means of communication existed or that providing the

2   preferred aid would fundamentally alter the services or result in undue financial and

3   administrative burdens.  Here, however, Mrs. Bax has not shown that her choice of auxiliary aid

4   was not honored by DMC.  As explained above, the evidence at trial established that Mrs. Bax

5   requested an ASL interpreter and that is what she received.  To the extent Mrs. Bax would have

6   preferred an *in-person* interpreter be provided, rather than the remote interpreter via VRI that she

7   received, she did not communicate that preference to DMC.  Mrs. Bax did not present any

8   evidence to show that she specifically requested an in-person interpreter.  Accordingly, the fact

9   that DMC did not provide an in-person interpreter for Mrs. Bax does not constitute a failure to

10  honor her choice.  In addition, for the reasons already stated, the court concludes that Mrs. Bax

11  failed to establish that the VRI services DMC provided during her hospitalization were not

12  effective.

13          Because the court concludes that DMC did not discriminate against Mrs. Bax on the basis

14  of her disability, the court will enter judgment in DMC's favor on Mrs. Bax's ACA claim.

15  **D.       Disability Discrimination under the Unruh Act**

16          1.      Legal Standard

17          The Unruh Act provides that:

18                  All persons within the jurisdiction of this state are free and equal,
                    and no matter what their sex, race, color, religion, ancestry, national
19                  origin, disability, medical condition, genetic information, marital
                    status, or sexual orientation are entitled to the full and equal
20                  accommodation, advantages, facilities, privileges, or services in all
                    business establishments of every kind whatsoever.
21

22  Cal. Civ. Code § 51(b).  Under § 51(f), "[a] violation of the right of any individual under the

23  federal Americans with Disabilities Act of 1990 . . . shall also constitute a violation of this

24  section."  Cal. Civ. Code § 51(f).  "Any violation of the ADA necessarily constitutes a violation

25  /////

26  /////

27  /////

28  /////

1    of the Unruh Act." *Molski*, 481 F.3d at 731 (citing Cal. Civ. Code § 51(f)).[27]  The Unruh Act

2    provides for injunctive relief, recovery of monetary damages, including actual damages for each

3    offense "up to a maximum of three times the amount of actual damage but in no case less than

4    four thousand dollars," and an award of attorneys' fees that may be determined by the court.  Cal.

5    Civ. Code § 52(a).  However, "[t]he litigant need not prove she suffered actual damages to

6    recover the independent statutory damages of $4,000." *Molski*, 481 F.3d at 731.  In addition, "[a]

7    plaintiff who establishes a violation of the ADA, [] need not prove intentional discrimination in

8    order to obtain damages under section 52." *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 665

9    (2009).

10         "Because a claim for damages under the Unruh Act looks to past harm," Unruh Act claims

11    remain active even if a plaintiff's ADA claims have been rendered moot.  *Arroyo v. Aldabashi*,

12    No. 16-cv-06181-JCS, 2018 WL 4961637, at *5 (N.D. Cal. Oct. 15, 2018) (finding that although

13    plaintiff's ADA claim for injunctive relief may be mooted if defendant no longer owned the store

14    that failed to provide wheelchair accessible parking spaces, the plaintiff was nevertheless

15    "entitled to statutory damages for two instances where he was affected or deterred by the Store's

16    failure to provide a van parking space, totaling $8,000" under the Unruh Act); *see also Rivera v.*

17    *Crema Coffee Co. LLC*, 438 F. Supp. 3d 1068, 1073–74, 1078 (N.D. Cal. 2020) (dismissing an

18    ADA claim where the defendant coffeehouse's permanent closure rendered the plaintiff's request

19    for injunctive relief moot, but granting summary judgment in favor of plaintiff on his Unruh Act

20    claim based on a violation of Title III of the ADA and awarding $4,000 in statutory damages);

21    *Johnson v. Wayside Prop., Inc.*, 41 F. Supp. 3d 973, 980–81 (E.D. Cal. 2014) (noting that "even if

22    */////*

23

---

24  [27] "A violation of the Unruh Act may be maintained independent of an ADA claim where a
plaintiff pleads 'intentional discrimination in public accommodations in violation of the terms of

25  the Act.'" *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (quoting *Munson*,
46 Cal. 4th at 668).  In this case, the court previously granted partial summary judgment in favor

26  of defendant DMC on plaintiffs' Unruh Act claims insofar as such claims were based on a theory
of intentional discrimination because there was no evidence of willful, affirmative misconduct on

27  defendant's part.  (Doc. No. 36 at 12.)  The court noted, however, that plaintiffs' Unruh Act
claims based on alleged violations of the ADA under § 51(f) remained in this case to be tried.

28  (*Id.* at 12, n.5.)

1   a defendant has removed barriers to access and thereby mooted the plaintiff's ADA claim, those

2   remedial measures will not moot [an Unruh Act] claim for damages").

3         1.    <u>Plaintiffs' Claims that DMC Violated the Unruh Act based on an ADA Violation</u>

4         As noted above, the court has concluded that plaintiffs' ADA claims have been rendered

5   moot by the fact that the court already ordered the same injunctive relief that plaintiffs seek.  As a

6   result, in the section above addressing plaintiffs' ADA claims, the court did not evaluate the

7   merits of those claims.  The court did, however, address the substance of plaintiffs' ADA claims

8   above in its discussion of plaintiffs' Rehabilitation Act claims, to which the same standards apply

9   as those applicable to the ADA.  *See Martin v. California Dep't of Veterans Affairs*, 560 F.3d

10  1042, 1047 (9th Cir. 2009) ("Because '[t]here is no significant difference in analysis of the rights

11  and obligations created by the ADA and the Rehabilitation Act,' we have consistently applied

12  'the same analysis to claims brought under both statutes,' and again do so here.") (citing *Zukle v.*

13  *Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999)).

14        For the same reasons that the court concluded DMC did not violate the Rehabilitation Act,

15  the court concludes that plaintiffs did not establish that DMC violated the ADA.  Plaintiffs have

16  thus failed to establish an ADA violation as a predicate for their Unruh Act claims.

17        Accordingly, the court concludes that DMC did not violate California's Unruh Act by

18  discriminating against plaintiffs on the basis of their disability.  Accordingly, the court will enter

19  judgment in favor of DMC on plaintiffs' Unruh Act claims.

20                        **CONCLUSION**

21        Given the above findings of fact and conclusions of law, the court determines that DMC

22  did not discriminate against the Baxes on account of their disability and judgment will be entered

23  in favor of DMC on plaintiffs' claims under the Rehabilitation Act, the ACA, and the Unruh Act.

24  Plaintiffs' ADA claim is dismissed for lack of standing.  This order constitutes the findings and

25  conclusions required by Rule 52(a) of the Federal Rules of Civil Procedure.

26  /////

27  /////

28  /////

In accordance with Federal Rule of Civil Procedure 58(b), the Clerk of the Court is directed to enter judgment in favor of defendant DMC with respect to plaintiffs' claims brought under the Rehabilitation Act, the ACA, and the Unruh Act.  The Clerk of Court is also directed to close this case.

IT IS SO ORDERED.

Dated:   __**August 24, 2021**__                    _____

UNITED STATES DISTRICT JUDGE